Rachel G. Inabnit
LAW OFFICE OF RACHEL INABNIT, PLLC
P.O. Box 8846
Missoula, MT 59807
(406) 201-1305
rachel@inabnitlawoffice.com

*Attorney for Plaintiffs*

Jessica Christy
CHRISTY LAW, LLC
2055 S. Oneida St., Ste. 394
Denver, CO 80224
(720) 729-7841
jessica@christylaw.legal

*Admitted Pro Hac Vice for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, YELLOWSTONE TO UINTAS CONNECTION, FRIENDS OF THE BITTERROOT, and WILDEARTH GUARDIANS<br><br>*Plaintiffs,*<br><br>vs.<br><br>TOM VILSACK, in his official capacity as Secretary of the Department of Agriculture; RANDY MOORE, in his official capacity as Chief of the Forest Service; MATTHEW ANDERSON, in his official capacity as the Bitterroot National Forest Supervisor; and DAN PLILEY, in his official capacity as the West Fork District Ranger, UNITED | )<br>)<br>)<br>)<br>)<br><br><br><br><br><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 9:24-cv-00010-DLC-KLD<br><br><br><br><br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

STATES FOREST SERVICE; and UNITED           )
STATES FISH AND WILDLIFE SERVICE,           )
                                        )
                                        )
                                        )
                                        )
*Defendants.*                               )

## **INTRODUCTION**

1.    The action challenges the Mud Creek Vegetation Management Project ("Mud Creek Project" or the "Project") Decision Notice and Finding of No Significant Impact ("Decision"), signed by Bitterroot National Forest Supervisor, Matthew Anderson in January of 2023; the associated Environmental Assessment ("EA"), published by the U.S. Forest Service ("USFS" or "Forest Service") in July 2021; the Forest Service's Biological Opinion ("BiOp") and the U.S. Fish and Wildlife Service's ("FWS") concurring Section 7 Consultation for bull trout and bull trout critical habitat dated December 30, 2022; the consultation resulting in FWS's flawed Biological Assessment ("BA") for whitebark pine, dated March 29, 2022; and the current plan to begin ground disturbing work prior to reconsultation under the Endangered Species Act, initiated after the listing of whitebark pine as threatened on January 17, 2023. Plaintiffs bring this case under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332; the Administrative Procedure Act, 5 U.S.C. § 701 et seq; the Endangered Species

Act ("ESA"), 16 U.S.C. § 1531 et seq; and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq.

2.     The Project is large, encompassing 48,486 acres within the Bitterroot National Forest wherein the Forest Service intends to conduct sweeping logging, non-commercial thinning, controlled burn activities, and road construction (both temporary and standard) without engaging in a "hard look" analysis or public disclosure requirements imposed by NEPA by adopting a "wait and see" management style.

3.     The Mud Creek Project area encompasses the whole West Fork Bitterroot River-Rombo Creek watershed and portions of the Nez Perce Fork-Nelson Lake, Little West Fork, West Fork Bitterroot River-Lloyd Creek, Lower Blue Joint, and West Fork Bitterroot River-Painted Rocks Lake watersheds in the Bitterroot Mountain Range (see Figure 1).

**Figure 1. Mud Creek Project Map.**



*Figure 1. Mud Creek Project Vicinity.*

4.  Because the Project is so large, the Forest Service subdivided it into four

"Project Implementation Areas" (see Figure 2).

**Figure 2. Mud Creek Project Areas.**



*Figure 2. Mud Creek Project Implementation Areas.*

5.      Nearly every acre of the 48,486-acre Project area will be affected by some

level of disturbance during the course of the Project, which the Forest Service

expects to take 20 years. According to the EA, the Project may include 13,700

acres of intermediate and regeneration commercial logging; 26,282 acres of non-

commercial logging and burning; 4,800 acres of site preparation for prescribed

fire; 40,360 acres of prescribed fire activity; creation of 8.95 miles of specified

roads; creation and decommissioning of 33.8 miles of temporary roads; and

creation of 2.6 miles of new trails for motorized and non-motorized users.

6.     The Project also entails multiple project-specific amendments to the Bitterroot National Forest Plan. The Forest Service states these "amendments arise from a need to take a specific action to meet a forest plan goal or desired condition in such a way that it would be inconsistent with plan standards." The Forest Service is proposing amendments related to "(1) elk habitat effectiveness, (2) thermal cover, (3) old-growth, and (4) coarse woody debris."

7.     These project-specific amendments will allow the Forest Service to avoid compliance with the Bitterroot Forest Plan while it carries out the activities under the Project's implementation.

8.     USFS claims the "site-specific amendment is preferred versus a programmatic because of the deteriorating conditions, that result in increased fire intensity and potentially decreases in old growth and elk habitats." However, neither Appendix D: Forest Plan Amendment Discussion nor the Final Environmental Assessment discuss or even address the "deteriorating conditions" that would potentially lead to a "decrease[] in old growth and elk habitats."

9.     However, USFS has used these same site-specific amendments to exempt certain standards contained within the Forest Plan on at least 14 projects within the Bitterroot National Forest since 2001.

10.    Bull trout and bull trout critical habitat are present throughout the Project, including several local populations. However, bull trout core area populations in

western Montana in the Bitterroot River and West Fork Bitterroot River core areas are declining.

11.    The Forest Service concludes that although the Fish and Wildlife Service determined the Project may affect and is likely to adversely affect bull trout and bull trout critical habitat, "it may be reasonable, depending on the circumstances, to conclude there would not be a significant effect on the human environment under NEPA" because "the extent of these effects is limited." Essentially, the Forest Service is concluding that because the conditions of the waters in the Project area are already degraded, further degradation would not cause adverse impacts and that the impacts from all the smaller projects scheduled to take place can be analyzed without impacts from other projects occurring at the same time.

12.    FWS listed whitebark pine as threatened under the ESA on January 17, 2023. USFS concludes whitebark pine is "scattered throughout the project area" and proposes to suspend the prohibition on "removing, cutting, digging up, damaging, or destroying whitebark pine" in order to allow treatments, such as burning and logging, which will kill or injure whitebark pine.

13.    USFS reinitiated consultation on whitebark pine after the listing, but stated it is likely to start Mud Creek activities "before consultation is complete."

## JURISDICTION, RIGHT OF ACTION AND VENUE

14.     Jurisdiction is proper in this Court under 28 U.S.C. § 1346 because the

United States is a defendant and 28 U.S.C. § 1331 (federal question jurisdiction)

because this action arises under the laws of the United States, including the

National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*.; the National Forest

Management Act, 16 U.S.C. § 1601 *et seq*.; the Administrative Procedure Act, 5

U.S.C. § 701 *et seq*. ("APA"); the Declaratory Judgment Act, 28 U.S.C. § 2201 *et

seq*.; and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. Jurisdiction is

also proper under 28 U.S.C. § 1361 (actions to compel an officer of the United

States to perform his or her duty).

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is

a civil action in which officers or employees of the United States or an agency

thereof are acting in their official capacity or under color of legal authority, all or a

substantial part of the events or omissions giving rise to the claims herein occurred

within this judicial district, and the affected public lands and resources are located

in this judicial district.

16.     An actual, justiciable controversy now exists between Plaintiffs and

Defendants within the meaning of 28 U.S.C. § 2201 and Plaintiffs are entitled to

the relief sought herein to redress the harm Plaintiffs would otherwise suffer. The

requested relief is therefore proper under 28 U.S.C. §§ 2201-2202, 16 U.S.C. § 1540(g), and 5 U.S.C. §§ 701-06.

17.    Plaintiffs have exhausted all required administrative remedies prior to bringing this action, by submitting comments during the comment period and filing formal objections to the EA and FONSI within the required timeframe pursuant to 36 C.F.R. Part 218. Plaintiffs have participated in every step of the administrative process for the Mud Creek Project.

18.    Plaintiffs submitted comments on the Mud Creek Project on April 7, 2021.

19.    Plaintiffs filed an objection to the Mud Creek Project Draft Decision Notice, FONSI, and EA on August 21, 2021, and a second objection to the Draft Decision and Finding of No Significant Impact on August 23, 2021, both raised concerns regarding a plethora of violations under NEPA and the ESA.

20.    While a few of the smaller concerns raised were addressed, the problems objected to largely remain.

21.    On March 21, 2023, Plaintiffs Alliance for the Wild Rockies, Native Ecosystems Council, Yellowstone to Uintas Connection, and Friends of the Bitterroot sent the USFS a notice of intent to sue for the Forest Service's failure to comply with the ESA. The letter provided the requisite 60-day notice for an action to enjoin the Forest Service and FWS from violating the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A), and to compel the Agency to apply the prohibitions set

forth in *id.* §§ 1533(d), 1538(a)(1)(B) and perform a non-discretionary duty or act, *id.* § 1540(g)(1)(B) & (C).

22.    On August 17, 2023, Plaintiffs WildEarth Guardians sent the USFS a notice of intent to sue for the Forest Service's failure to comply with the ESA. The letter provided the requisite 60-day notice for an action to enjoin the Forest Service and FWS from violating the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A), and to compel the Agency to apply the prohibitions set forth in *id.* §§ 1533(d), 1538(a)(1)(B) and perform a non-discretionary duty or act, *id.* § 1540(g)(1)(B) & (C).

23.    More than 60 days have passed since the Plaintiffs sent the 60-day notice letter and the Forest Service has failed to cease its violations of the ESA, apply the prohibitions required, or perform its non-discretionary duty or act.

24.    Plaintiffs have no adequate remedy at law.

25.    The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## **PARTIES**

26.    Plaintiff FRIENDS OF THE BITTERROOT ("FOB") is a regional, membership, nonprofit organization headquartered in Hamilton, Montana. FOB is dedicated to preserving wildlands and wildlife, and protecting the forests and watersheds of their region as they work for a sustainable relationship with the

10

environment. Members of the Friends of the Bitterroot observe, enjoy, and appreciate native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area. Their members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems. Friends of the Bitterroot brings this action on its own behalf and on behalf of its adversely affected members.

27.    Plaintiff ALLIANCE FOR THE WILD ROCKIES ("Alliance") is a tax-exempt, nonprofit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana in close proximity to the Project. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Mud Creek Project area. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to act within the law and to protect and conserve these ecosystems as set forth below. The Alliance brings this action on its own behalf and on behalf of its adversely affected members.

28.     Plaintiff NATIVE ECOSYSTEMS COUNCIL ("NEC") is a non-profit corporation. NEC is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Mud Creek Project area for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect NEC's organizational interests, as well as its members' use and enjoyment of the Project area. NEC brings this action on its own behalf and on behalf of its adversely affected members.

29.     Plaintiff YELLOWSTONE TO UINTAS CONNECTION ("Y2U") is a non-profit public interest organization dedicated to protecting the integrity of habitat for native fish and wildlife in the wildlife corridor that connects the Greater Yellowstone Ecosystem and Northern Rockies to the Uinta Wilderness and Southern Rockies. Members of Y2U work to restore fish and wildlife habitat in the Yellowstone to Uintas Corridor through the application of science, education, and advocacy. Y2U's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project. Y2U brings this action on its own behalf and on behalf of its adversely affected members.

30.     Plaintiff, WILDEARTH GUARDIANS (Guardians) is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild

places, wild rivers, and the health of the American West. Guardians is specifically committed to ensuring the survival and recovery of grizzly bears, wolverine, and other threatened species in the lower-48 States. Guardians has approximately 179,492 active members and supporters across the American West, including many who reside in Montana. Guardians maintains an office in Missoula, Montana, where the organization works to conserve threatened species such as whitebark pine and bull trout, in addition to preserving mature and old growth forests that serve as a part of a broad climate crisis solution for their ability to store vast amounts of carbon. Guardians brings this action on behalf of itself, its members, and its supporters. Members of the Plaintiff organizations reside near, visit, or otherwise use and enjoy the Mud Creek Project area. Members of the Plaintiff organizations use lands throughout the Project area for recreation, wildlife viewing, photography, education, and aesthetic and spiritual enjoyment. Plaintiffs and their members derive scientific, recreational, aesthetic, and conservation benefits and enjoyment from their use of the area.

31.     The full name of Defendant UNITED STATES FOREST SERVICE is United States Department of Agriculture, Forest Service. The Forest Service is an agency of the Department of Agriculture ("USDA") entrusted with the administration of the national forests, including the Bitterroot National Forest. The

Forest Service prepared the EA and issued the Decision that form the basis for this lawsuit.

32.    Defendant TOM VILSACK is the Secretary of the Department of Agriculture and is being sued in an official capacity.

33.    Defendant RANDY MOORE is the Chief of the Forest Service and is being sued in an official capacity.

34.    Defendant MATTHEW ANDERSON is the Supervisor for the Bitterroot National Forest and is being sued in an official capacity.

35.    Defendant DAN PLILEY is the West Fork District Ranger and is being sued in an official capacity.

36.    Defendant U.S. FISH AND WILDLIFE SERVICE ("USFWS" or "FWS") is an agency within the Department of the Interior. The FWS is charged with administering the consultation provisions of the ESA for threatened and endangered terrestrial and freshwater aquatic species, including the threated bull trout and whitebark pine.

## **STATUTORY FRAMEWORK**
### *The National Environmental Policy Act*

37.    NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

38.    NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare of" all people, and (3)

"encourage productive and enjoyable harmony" between human kind and the environment. 42 U.S.C. § 4321. NEPA recognizes that "each person should enjoy a healthful environment" and ensures that the federal government uses all practicable means to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." *Id.* § 4331(b)-(c).

39.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

40.     NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether the nature and extent of a proposed action's environmental effects requires preparing an EIS, federal agencies prepare an EA. 40 C.F.R. § 1501.3(b)-(c). If, on the basis of the EA, the agency finds that

the proposed action will produce "no significant impact" on the environment,

then an EIS need not be prepared. *Id.* § 1501.3(a). An agency's finding of "no

significant impact" and consequent decision not to prepare an EIS can be

overturned if the decision was arbitrary, capricious, or an abuse of discretion.

*See, e.g., Center for Biological v. Nhtsa,* 538 F.3d 1172 (9th Cir. 2008).

41.    In making the determination of significance, the agency must consider

various factors regarding the Project's context and intensity, including whether

the effects on the quality of the human environment are likely to be highly

controversial; are highly uncertain or involve unique or unknown risks; or may

adversely affect an endangered or threatened species or its critical habitat; and

the extent of cumulative impacts from unrelated projects in close proximity to

the Project area. A significant environmental effect may exist even if the federal

agency believes that on balance the environmental effects of a proposal will be

beneficial.

42.    Additionally, in making the significance determination, the agency must

"utilize a systemic, interdisciplinary approach . . . and utilize ecological

information in the planning and development of resource-oriented projects,"

while "recogniz[ing] the worldwide and long-range character of environmental

problems." 42 U.S.C. § 4332.

43.    Among other things, the agency's NEPA analysis must assess the cumulative impacts of the action "result[ing] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.1(g)(3). "The analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Klamath-Siskiyou v. Bureau of Land,* 387 F.3d 989, 994 (9th Cir. 2004).

44.    An agency must prepare an EIS if it is reasonable to anticipate a cumulatively significant impact on the environment. *See Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 895-96 (9th Cir. 2002).

45.    NEPA is designed to ensure that federal agencies thoroughly evaluate potential environmental impacts of and reasonable alternatives to proposed actions before making a commitment of federal resources. The NEPA review must "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 C.F.R. § 1502.2(g).

46.    In evaluating reasonably foreseeable effects, an agency must disclose incomplete, unavailable, or lacking information and either procure the information or include a statement detailing (1) that such information is incomplete or unavailable, (2) a statement of the information's relevance, (3) a

summary of existing alternative credible scientific evidence, and (4) the agency's evaluation of impacts. 42 U.S.C. § 4332.

*The Administrative Procedure Act*

47.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Final agency actions "for which there is no other adequate remedy in a court" are reviewable under the APA. *Id.* § 704.

48.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside if the action is "without observance of procedure required by law." *Id.* § 706(2)(D). Courts will also set aside agency action that contradicts an agency's prior position, "when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy" and the agency has given no reasoned justification for the change. *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

49.     An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*The Endangered Species Act*

50.    The ESA is designed to protect threatened and endangered plant and animal species and conserve their habitats. 16 U.S.C. § 1531(b). Once a land or freshwater species is listed, the FWS must develop a recovery plan that includes "site-specific management actions," "objective, measurable criteria . . . result[ing] . . . [in] the species be removed from the list." *Id.* § 1531(f)(B).

51.    Once a species is listed it becomes illegal to "take any such species within the United States" unless the taking is part of a treaty agreement or FWS issues a permit. 16 U.S.C. § 1538(a)(1)(A). To obtain a permit, the agency must submit a conservation plan detailing the impacts from the taking, steps the actor will take to minimize and mitigate impacts, and what alternatives were considered and why the alternatives were not selected. *Id.* § 1539(a)(2). FWS may approve the permit only if it finds that the taking is incidental to the project, the applicant will minimize and mitigate impacts "to the maximum extent practicable," adequate funding is provided, and that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(1)(B).

52.    When an agency contemplates actions that may impact endangered species, it must consult with the FWS to determine, using the best scientific and

commercial data available, whether any listed species are located in the project area. 16 U.S.C. § 1536(a)(2). If FWS determines that endangered species are present in the project area, the agency completing the action must complete a biological assessment detailing the potential impacts from the action to any protected species. *Id.* § 1536(c)(1). FWS then forms its own opinion regarding "how the agency action affects the species or its critical habitat," including "the impact of [] incidental taking on the species," "reasonable and prudent alternatives" to the proposed action, and "terms and conditions . . . that must be complied with by the Federal agency." Id. § 1536(b)(3).

53.     During the consultation process, the acting agency must "provide [FWS] with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat." 50 C.F.R. § 402.14(d).

54.     Once a species is listed under the ESA, FWS must "conduct, at least once every five years, a review of all species" and determine whether the listing status is still appropriate. Id. § 1533(c)(2)(A).

*National Forest Management Act*

55.     The National Forest Management Act of 1976 ("NFMA") is the primary statute governing the administration of national forests.

56.     NFMA requires the Forest Service to create "resource management plans for units of the National Forest System" by using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." 16 U.S.C. § 1604(a) & (b). These plans are colloquially termed "forest plans."

57.     Amendments to a forest plan may be enacted "depending on the need for change" and "should be used to keep plans current and help units adapt to new information or changing conditions." 36 C.F.R. § 219.13(a).

58.     The responsible official "shall . . . [b]ase an amendment on a preliminary identification of the need to change the plan . . . based on a new assessment; a monitoring report; or other documentation of new information, changed conditions, or changed circumstances." *Id.* § 219.13(b)(1). Further, they must also analyze the amendment under the relevant general requirements for forest plans under 36 C.F.R. §§ 219.8 through 219.11.

59.     One such requirement is that any timber sales "must ensure" the "harvest would be carried out in a manner consistent with the protection of . . . wildlife." 36 C.F.R. § 219.11(d)(3).

## STATEMENT OF FACTS
*Mud Creek Project*

60.     The Mud Creek Project is located in the Bitterroot Mountains southwest

of Darby, Montana, in the West Fork Ranger District of the Bitterroot National

Forest.

61.     The purpose of the Mud Creek Project is to "Improve landscape resilience

to disturbances (such as insects, diseases, and fire) by modifying forest structure

and composition and fuels; Reduce crown fire hazard potential within the

wildland-urban interface, adjacent community protection zone, and low severity

fire regimes; Improve habitat and forage quality and quantity for bighorn sheep,

mule deer, elk, and other regionally sensitive species; and Design and

implement a suitable transportation and trail system for long-term land

management that is responsive to public interests and reduces adverse

environmental effects."

62.     The Mud Creek Project will focus on three areas: "1) the departure from

historic disturbance regimes and subsequent existing vegetation and fuel

conditions; 2) decrease in quality and abundance of important wildlife habitats

due to vegetative changes; and 3) conditions related to the current road and trails

network."

63.     The EA states that the departure from historic disturbance regimes and

subsequent existing vegetation and fuel conditions creates a need to: "[r]educe

crown fire hazard potential within the wildland-urban interface (WUI), adjacent

community protection zone, and low severity fire regimes" and "[r]educe stand

densities, increase age class diversity, and favor shade intolerant species to

promote resilience to stressors (e.g., drought, insects, and diseases)."

64.     The EA states that the decrease in quality and abundance of important

wildlife habitats due to vegetative changes creates a need to "[i]mprove habitat

and forage quality and quantity for bighorn sheep, mule deer, elk, and other

regionally sensitive species."

65.     The EA states that the conditions related to the current road and trails

network creates the need to "Implement road improvements and best

management practices (BMPs) to address chronic sediment sources to improve

water quality and fish habitat; Decommission road segments to reduce road

densities and improve elk security where road segments are not needed for

future management; Address discrepancies (e.g., gated roads designated as

open) between on-the-ground road conditions and travel status in the Bitterroot

Travel Management Plan; and Provide for additional recreational opportunities,

by creating motorized and non-motorized trail opportunities when resource

concerns can be mitigated."

66.     The Forest Service failed to take a hard look at the Project's impacts and

failed to fully consider the impacts from the roadbuilding, the density of which

the Forest Service admits is "one of the highest road densities found in the

Bitterroot National Forest."

67.    The Forest Service proposes to add a "maximum of 9.76 miles of

specified roads" in order to "implement proposed timber harvest activities," and

proposes to construct 33.80 miles of "temporary" roads, which may or may not

be decommissioned, depending on whether funding can be found.

68.    The Decision authorizes these activities without engaging in the "hard

look" and public disclosure requirements of NEPA. Rather, the Forest Service

authorizes 48,864 acres of logging, road building, burning and other actions

without a) knowing and disclosing the location of units; b) knowing and

disclosing the timing of implementation; and c) knowing and disclosing site-

specific information on the basis of what they call a "condition-based"

management scheme, an approach that does not meet the minimum requirements

of NEPA as enacted by the United States Congress and has been soundly

rejected by the courts.

69.     Operating under these terms means the Forest Service finalized the

Project before identifying specific locations for logging, prescribed burns, and

other fuel reduction activities.[1]

70.     In preparing the Project EA, the Forest Service analyzed two alternatives:

a no action alternative, and the proposed action alternative. The proposed action

alternative "describes a suite of activities available to manage the Project area

over a period of approximately 20 years," but does not disclose which activities

will occur in what locations prior to the decision being made final.

71.     The proposed action alternative describes a maximum potential amount of

timber harvest and road construction.  However, the EA does not identify where

the harvest authorized would occur or during which season.

72.     The EA states that in order to analyze the "maximum effect" of the

Project, the Forest Service assumes that at some point in the next 20 years, all

acres of potential logging would be completed, all roads would be built, all

intentional burning will be applied, all acres proposed for clearcutting will have

intentional burning-site preparation, and all of the design features would be

perfectly implemented and followed.

---

[1] Indeed, the Forest Service agrees it is delaying taking the hard look required
under NEPA, stating it will make decisions about "location in which treatments
occur will be determined based on conditions at the time of implementation."

73.    As noted above, the EA does not provide specific locations or configurations of harvest or burns in the Project. Instead, the EA states that site-specific locations and methods for these activities will be determined during implementation over the lifespan of the Project.

74.    The Forest Service explains that "the specific locations and types of treatment would be identified or refined during implementation based on local conditions." The Forest Service identifies an "implementation process" that describes how it will "determine detailed treatment prescriptions prior to vegetation management activities by field reviewing existing conditions and identifying any resource concerns."

75.    However, these subsequent, site-specific decisions will not be subject to additional NEPA review.

76.    The Forest Service terms this approach "condition-based management," however, it should more aptly be called "circumventing basic NEPA requirements management."

77.    In other words, rather than surveying the Project area and analyzing site-specific information to determine which management activities are appropriate to which area before approving and finalizing a project, the Forest Service approved all logging and burning over large swaths of the Project area, leaving

the actual decision of what is appropriate until after the Project is finalized, when the public may no longer participate in the decision making process.

78.     The Decision and associated documents fail to sufficiently (a) identify the specific actions that will be taken by the Forest Service as part of the Project, (b) inventory the vegetation and wildlife resources that will be affected by the Project, (c) disclose the impacts on localized cognizable values that will be caused by the proposed landscape-scale logging and burning, or (d) detail and evaluate planned mitigation measures.

79.     The Forest Service conducted virtually no surveys for any sensitive or indicator species that will be affected by the Mud Creek Project. In the absence of detailed information about the proposed actions and where they will occur, the public is deprived of any meaningful opportunity to comment on the Project. As a result, USFS's NEPA analysis does not adequately describe the direct, indirect, or cumulative impacts of the Project on the human environment as required by NEPA.

80.     This is despite the Forest Service's knowledge that the Mud Creek Project area is home to whitebark pine, bull trout, and bull trout critical habitat.

*Bitterroot National Forest and Forest Plan*

81.     The Bitterroot National Forest (the "Forest") is located 40 miles south of Hamilton, Montana and straddles the Montana-Idaho border. The 1.587-million-

acre forest was founded in 1898 and contains the headwaters of the Selway and Bitterroot Rivers.

82.     The Forest is known for its steep canyons formed by heavy glaciation, situated between the Bitterroot Mountains to the west and the Sapphire Mountains to the east. The Forest's mix of alpine lakes, mid-elevation stands of Douglas fir, and lower-elevation grasslands attract a multitude of wildlife, such as mule deer, elk, bears, mountain lions, and many varieties of smaller animals and birds, and supports a diverse mixture of plant life, such as whitebark pine, subalpine larch, and Engelmann spruce. The rivers and streams also provide habitat for a range of aquatic life, including bull trout and rainbow trout.

83.     Visitors to the Forest can take advantage of the multitude of recreational opportunities, such as camping, fishing, hunting, boating, and many winter sports.

84.     In September of 1987 the Bitterroot National Forest Plan was finalized, at which time the responsible official made the decision "to manage most winter range to optimize cover/forage relationships and the capacity of the habitat to support elk." In other words, it was assumed that whatever conditions elk needed to thrive would be sufficient to allow all ungulates to thrive. To enact this management strategy, the Plan requires "at least 25 percent of the area in

28

thermal cover at all times" and "maint[enance of] 50 percent elk habitat effectiveness on lands currently developed" through road closures.

85.    Elk Habitat Effectiveness is the "index of the capability of an area to provide security for elk . . . based on hiding and thermal cover present and roads open to public motorized use."

86.    Furthermore, the elk habitat effectiveness standard has strict monitoring and evaluation requirements, meaning further evaluation is needed if there is a "deviation from Forest-wide objectives."

87.    USFS states the project may allow logging "within [elk] winter range without seasonal restrictions," which "could have negative effects to elk," but concludes any impacts would be "minimal" because, "based on discussions with Montana Fish, Wildlife, and Parks, no 'primary winter foraging areas' exist within the project area or adjacent to it."

88.    This is in direct contradiction to USFS's Coordinating Elk and Timber Management document, which states, "Timbered areas adjacent to primary winter foraging areas should be managed to maintain the integrity of cover for elk. Where timber harvest is acceptable, slash cleanup and logging should be scheduled outside the winter period."

89.    Maps provided by USFS indicate elk winter and foraging ranges are prolific throughout the project area (maps showing elk range and other elk

habitat effectiveness characteristics), but there are no maps showing where "primary" winter foraging is situated and no discussion of why primary foraging access is a different and/or better metric than winter foraging areas more generally.

90.    Courts will set aside agency action that contradicts an agency's prior position, "when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy" and the agency has given no reasoned justification for the change. *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

*Bitterroot National Forest Plan Amendments*

91.    As part of the Project, the USFS is proposing "to suspend certain Forest Plan standards relating to elk habitat effectiveness, elk habitat, old growth, and coarse woody debris." The Decision states it is "exempting the Project from adhering to outdated prescriptive standards" as it applies to elk habitat so the Project can move forward "without unnecessary delay for a broader plan amendment process." However, the final EA states, "Amending the plan to set aside plan standards related to [elk habitat effectiveness] and thermal cover will allow proposed activities to occur that will improve habitat conditions for elks and other big game species found in the project area."

*Old Growth*

92.     Old growth in the Mud Creek Project area is composed largely of forest types dominated by ponderosa pine and Douglas fir.

93.     The Vegetation Report states that "Approximately 8,512 acres (18% of the Project area) of old growth are currently mapped within the Mud Creek Project area."

94.     The 1987 Bitterroot Forest Plan forest-wide old growth standard states, "The amount and distribution of old growth will be used to ensure sufficient habitat for the maintenance of viable populations of existing native and desirable vertebrate species, including two indicator species, the pine marten and pileated woodpecker."

95.     The 1987 Bitterroot National Forest Plan Forest-wide standard for old growth (stand conditions) that qualify as old growth will vary by habitat type and landform. Criteria to consider for identifying old growth include: Large trees, generally 15 per acre greater than 20 inches dbh for species other than lodgepole pine and 6 inches dbh for lodgepole pine; canopy closure at 75 percent of site potential; stand structure usually uneven-aged or multistoried; snags, generally 1.5 per acre greater than 6 inches dbh and 0.5 per acre greater than 20 inches; more than 25 tons of per acre of downed material greater than 6 inches diameter; heart rot and broken tops in large trees are common; and mosses and lichens are present.

96.   The 1987 Bitterroot Forest Plan defines old growth as,

A forest stand with 15 trees per acre greater than 20 inches dbh (6 inches in lodgepole pine) and canopy closure that is 75 percent of site potential. The stand is uneven-aged or multistoried. There should be 1.5 snags per acre greater than 6 inches dbh; 0.5 snags per acre greater than 20 inches; and 25 tons per acre of down material greater than 6 inches diameter. Heart rot and broken tops in large trees are common and mosses and lichens are present."

97.   Management Area 1 standard for old growth Objectives states

Old growth stands should be 40 acres and larger, distributed over the Management Area. About 3 percent of Management Area 1 suitable timberland, in each third order drainage, will be maintained in old growth. Provide 40 acre stands of old growth by coordinating management activities in this area with activities in adjacent management areas and with intermingled riparian and unsuitable management areas (USDA. 1979)

98.   Management Area 2 standard for old growth Objectives states

Old growth stands should be 40 acres and larger, distributed over the Management Area. About 8 percent of Management Area 2 suitable timberland, in each third order drainage, will be maintained in old growth. Provide 40 acre stands of old growth by coordinating management activities in this area with activities in adjacent management areas and with intermingled riparian and unsuitable management areas (USDA. 1979).

99.   Management Area 3a standard for old growth Objective states

Old growth units should be 40 acres and larger, distributed over the management area. About 8 percent of the Management Area 3a suitable timberland in each third order drainage will be maintained in old growth. Provide 40-acre stands of old growth by coordinating management activities in this area with activities in adjacent management areas especially Management Area 3b, riparian areas (USDA, 1979).

100.   Management Area 3b standard for old growth Objective states

> Nonfisheries riparian areas will be managed to provide for:
> - old growth and woody debris recruitment to prevent degradation of stream channel conditions, water quality,
> - down stream fisheries capability, and
> - wildlife habitat.
> Old growth will be available to maintain viable wildlife populations on traditional ranges. The effect of timber harvest on old growth amount, location, and kind will be documented in project environmental analysis reports.

101.   Management Area 3c standard for old growth Objective states

> Old growth stands should be 40 acres and larger, distributed over the management area. Over a percent of nonriparian suitable timberland in each separate piece of Management Area 3c will be maintained in old growth. Over 25 percent of riparian area suitable for timber production in each separate piece of Management Area 3c will be maintained in old growth. Riparian and non-riparian old growth will be coordinated to assure that old growth stands are at least 40 acres. (USDA, 1979).

102.   The locations of old growth within the Project Area are not disclosed.

103.   The Project EA states that a site-specific Forest Plan amendment is

needed for the 1987 Bitterroot National Forest Plan old growth standard. The

EA states, "The amendment for old growth instead proposes to use the stand

characteristics to define and measure old growth using the quantitative and

qualitative factors found in Old-Growth Forest Types of the Northern Region by

Green et al. 1992, errata corrected 2011. Green et al. represents the Region's

(Northern Region of the U.S. Forest Service, Region 1) best available scientific

information to define old growth."

104.   The amendment also modifies the management area standards for old growth by removing the requirement that "old growth standards should be 40 acres and larger."

105.   The Project discloses that under the modified measure of old growth, "the project will maintain 3 percent of suitable timberland as old growth per third order drainage in management area 1 and 8 percent of suitable timberland as old growth per third order drainage in management areas 2 and 3A."

106.   By removing the 40 acre requirement, the Forest Service will be able to remove large stands of old growth but still comply with the percentage requirement by piecemealing small patches of old growth trees to make up the required percentage.

107.   The Project EA states, "the interdisciplinary team has designed the Proposed Action to retain old growth status for any stands being treated that meet the Green et al. criteria. This will allow the Forest the flexibility to treat conditions related to the purpose and need of this project while retaining the old growth status of stands- as well as enhancing stands that may soon meet the old growth criteria."

108.   The Forest Service maintains that the Project will not reduce old growth as defined by Green et al.

109.   The Forest Service has not disclosed how many acres of logging in old growth will occur as a result of this Project.

110.   The Forest Service does not disclose the new old growth standard that will apply to the Project area, nor does it disclose any criteria used to calculate the old growth in the Project area.

111.   The Forest Service does not disclose whether all old growth acres counted in the Project area occur in stands of 40 acres or more.

112.   It appears that a number of stands are counted as old growth although they are less than 40 acres.

113.   Without application of the Forest Plan old growth definition and criteria and the 40-acre stand size minimum, it is unclear how many drainages actually meet the Forest Plan old growth retention standards now or post-Project, and thus it is not possible to determine whether old growth logging is proposed for drainages that currently violate the Forest Plan old growth standards.

114.   Moreover, if all areas of old growth are logged by the Project to the Project old growth criteria, none of those areas will comply with the Forest Plan definition of old growth post-Project.

*Bull Trout and Bull Trout Critical Habitat*

115.   Bull trout and bull trout critical habitat are present within the Mud Creek Project area. Three local populations are identified in the project area, with bull

trout living in eight streams within the Project area, and three streams have designated bull trout critical habitat.

116.   These populations are in decline, largely due to curtailment and degradation of their habitat, but also due to competition with other fish. Further, site extirpations are exceeding site colonization, particularly in warmer, lower elevation waters.

117.   Due to these temperature changes, it is highly unlikely that bull trout will ever be able to recover in the Nez Perce Fork.

118.   Functional ratings for streams where bull trout reside in the project area indicate that most categories for the streams are functioning at Unacceptable Risk or Functioning at Risk. Many streams in the project area are also deficient for riparian management objectives, which help support the recovery of bull trout.

119.   USFS is relying on properly implemented and effective project design features and best management practices to conclude that the Project is unlikely to reduce reproduction, numbers, or distribution of bull trout to the degree that survival or recovery is reduced.

120.   Between 100 and several hundred adult bull trout currently reside within the Mud Creek project area.

121.   Bull trout are native to waters of western North America and range throughout the Columbia River and Snake River basins, extending east to headwater streams in Montana and Idaho, into Canada, and in the Klamath River basin of south-central Oregon. Bull trout historically occurred in the Columbia River basin and were more widespread in general than they are now. The distribution of populations, however, is scattered and patchy.

122.   Bull trout have incredibly specific habitat requirements at various points in its life cycle, pertaining to water temperature, cover, channel form and stability, spawning and rearing substrate conditions, and migratory corridors. Large patches of these components are necessary to support robust populations.

123.   Bull trout exhibit a variety of migratory and nonmigratory life stages and rely on foraging, migration, and overwintering habitat to complete extensive and important parts of their life cycle. Different bull trout fish within the same local population can exhibit both resident and migratory behaviors, with some remaining in the spawning and rearing areas year-round and others adopting a more migratory pattern. Most bull trout are migratory, spawning in tributary streams where juvenile fish usually rear from 1 to 4 years before migrating to either a larger river (fluvial) or lake (adfluvial) where they spend their adult life, returning to the tributary stream to spawn.

124.   Because of both the resident and migratory behaviors and the lake and stream habitats of the bull trout, its habitat needs are quite complex. To illustrate, at all life stages, bull trout require complex forms of cover, including large woody debris, undercut banks, boulders, and pools. Spawning, rearing, and migration areas require deep pools and cover, while juveniles are often found in riffles and runs and are strongly associated with instream cover, such as woody debris and riparian vegetation. The undercut banks and coarse substrates provide cover and overwinter habitat for juvenile bull trout. Resident bull trout in headwater streams require deep pools and instream cover. Many of these habitat features are dependent on watershed conditions as a whole.

125.   In May of 2013, the Forest Service and the Montana Field Office of FWS completed a report titled Conservation Strategy for Bull Trout of USFS Lands in Western Montana ("Conservation Report").

126.   The Conservation Report found that bull trout species (see Figure 3) and critical habitat (see Figure 4) are located in multiple tributaries of the Bitterroot River, throughout the Mud Creek Project Area.

127.   The Conservation Report asserted that the bull trout population in this region is "declining"; that "monitoring indices for this core area are considered largely inadequate"; that in 2000, 2003, and 2007 "a series of major fires burned large

portions of the bull trout habitat in the Bitterroot River drainage"; and that "the Bitterroot is near the top in terms of climate change risk."

**Figure 3. Map of Bull Trout Populations in the Bitterroot River Core Area.**



**Figure 4. Designated Critical Habitat (pink lines) for Bull Trout.**



128.   Timber harvest and road building in or close to riparian areas can immediately reduce stream shading and cover, channel stability, and large woody debris recruitment and increase sedimentation and peak stream flows. These activities can, in turn, lead to increased stream temperatures, bank erosion, and decreased long-term stream productivity. The effects of road construction and associated maintenance account for a majority of sediment loads to streams in forested areas; in addition, stream crossings also can impede fish passage.

129.   The Forest Service used the WEPP road model to generally estimate the change in sediment delivery to bull trout bearing streams and critical habitat by anticipating pounds of sediment delivered per year for a 200-foot segment of road and projected that "hauling and the continued use of [] near-stream roads may still result in short-term sediment delivery to a degraded baseline in the Nez Perce For and Rombo Creek," and that "the current action will result in short-term sediment increases during project activities, moderate-term sediment decreases from the existing baseline, and then likely the baseline will return to its pre-project level following the breakdown of BMPs." But Project specific impacts to particular populations and/or reaches of critical habitat are not disclosed because the timing and site-specific location of Project activities are not yet known.

130.   The USFS and USFWS failed to rely on the best available information.

131.   There is no assessment for whether a site-specific action would, or would not, potentially contribute to outright extirpation of key populations of bull trout, or significant and permanent modification of critical habitat.

132.   For example, the Lower Blue Joint Creek Population of bull trout includes between 50-250 resident spawning adults and as many as 50 migratory spawning adults. This is an important population residing within an important migratory corridor that connects spawning and rearing habitat in the HUC with the Painted Rocks Reservoir. The Lower Blue Joint Creek population is of moderate significance to the local population, and habitat conditions are of high significance in limiting the population.

133.   The sediment indicator is already at a current baseline condition of functioning at unacceptable risk. Even if the fisheries biologist may have seen improvement to the habitat condition in the area, this cannot supplant the need for site specific consideration of conditions that may or may not exist when an activity is implemented in the future.

134.   The Conservation Strategy calls for reducing roads and stream crossings, yet project activities as proposed could exacerbate already dire conditions for this local population in this location, and there is no analysis as to whether a short-term flush of sediment associated with project activities may impact this population, and its habitat, beyond a threshold for localized extirpation.

135.   But USFS and USFWS failed to consider the impact by assuming that long-term sediment benefits it assumes will occur as a general principle, will outweigh harms that occur during the project.

136.   This site-specific analysis is missing as it relates to nearly all of the local

bull trout populations and designated critical habitat. For example, in the

Incidental Take Statement, the FWS acknowledges it anticipates incidental take

of bull trout in the Blue Joint Creek population, but indicates that it is difficult to

quantify for a number of enumerated reasons including "[t]he amount of

sediment produced or delivered is determined by a number of factors that are not

only influenced by local site parameters such as topography and soil type, but

are influenced by weather, time of implementation and effectiveness of

mitigation measures."

137.   The BiOp fails to disclose the adequate determining principles by which

the USFS may act in its role to minimize environmental harms. For example,

term and condition B states "the Forest will determine if road conditions are in

danger of being degraded to the point where there is a high risk of sediment

depositions in streams." There is no discussion of what metrics the Forest

Service will use to determine whether a road has deteriorated to this point, nor

what creates a high risk of sediment deposition in streams.

138.   Term and condition C states "The Forest will devise and implement a long-term solution to minimize the perpetual sediment delivery of the miles of FR 468 within the Nez Perce Fork RHCA prior to the initiation of the third implementation unit (Blue Joint)." There is no discussion of specifics regarding the "long-term solution" the USFS imagines.

139.   Because of this lack of information, the public is deprived of the opportunity to comment on the full Project facets.

140.   These terms and conditions provide no effective means of minimizing the take of protected species and adverse modification of habitat.

141.   Further, there is no requirement that the USFS rely on scientifically rigorous best-available information to make decisions about harm reduction strategies.

142.   Additionally, the BiOp failed to assess the direct, indirect, and cumulative effects; and failed to validate assumptions regarding the efficacy of the reasonable measures including design features and Terms and Conditions prescribed.

143.   The BiOp also does not incorporate the environmental baseline conditions of bull trout and habitat.

144.   For instance, the USFS did not even mention the impacts from 450 truckloads driven through the Project area as part of the Piquette Creek HUC, which concluded in the summer of 2022.

145.   Throughout the Project's consultation documents, the agencies' analyses rely on Project design features and other mitigation that the Forest Service identified. However, USFWS failed to consider that many of these project design features and BMPs are vague, nonbinding, and highly uncertain to occur under the "condition-based" management approach the Forest Service employed for the Project. The BiOp relies upon false assumptions regarding the efficacy of mitigation measures.

146.   The BA notes "since 2000, nearly 300 harvest units that contained RHCAs on the Bitterroot NF have been checked for sediment intrusion in the year following completion of the harvest, and in some cases, two years following harvest. In no instances was sediment observed leaving the harvest units or landings, filtering its way through the RHCA buffers, and entering streams (USFS 2021)."

147.   However, monitoring of the Westside Timber Sale in the Darby Ranger District (2018-19) illustrated the failure of BMPs to reduce or eliminate sediment delivery to Moose Creek; The School Point Prescribed Burns occurring in the West Fork Ranger District (2018-19) resulted in unanticipated burns causing bank erosion and overstory tree mortality, etc. Multiple monitoring reports for the Bitterroot amply illustrate that the assumption that project design, BMPs and mitigation measures will be effective is far from a reasonable assumption. This is particularly important where, as here, the site-specific characteristics timing of implementation of the proposed Project are not being disclosed.

148.   Further, USFWS fails to address bull trout recovery in the Biological Opinion. Under ESA regulations, FWS's jeopardy analysis must consider not just survival, but "survival and recovery" of the species. 50 C.F.R. § 402.02. In the Biological Opinion, USFWS fails to consider what effect the Project will have on bull trout recovery. And for the reasons already discussed above, there is no reasonable basis for finding the Project will not impede bull trout recovery, given the harms USFWS admitted the Project will cause bull trout in this vulnerable, downward-spiraling core area.

149.   In addition, despite the best available information warranting a determination that actions associated with the Project are likely to result in an adverse modification of critical habitat, the BiOp fails to include reasonable and prudent alternatives, § 7(b)(3)(A), including an alternative requiring the Forest Service disclose site specific details of its proposed project activities, the timing that project activities will occur, and/or adequate determining principles informed by the best available science and information for bull trout and critical habitat.

150.   Sedimentation affects streams by reducing pool depth, altering substrate composition, reducing interstitial space, and causing braiding of channels, which reduce carrying capacity for aquatic species such as bull trout. Sedimentation negatively affects bull trout embryo survival and juvenile bull trout rearing densities.

151.   An assessment of the interior Columbia Basin ecosystem revealed that increasing road densities were associated with declines in four nonanadromous salmonid species (bull trout, Yellowstone cutthroat trout (Oncorhyncus clarkii bouvieri), westslope cutthroat trout (O. c. lewisi), and redband trout (O. mykiss spp.)) within the Columbia River basin, likely through a variety of factors associated with roads. Bull trout were less likely to use highly roaded basins for spawning and rearing and, if present in such areas, were likely to be at lower population levels. These activities can directly and immediately threaten the integrity of the essential physical or biological features needed for bull trout recovery.

*Whitebark Pine*

152.   USFS submitted a Biological Assessment concluding no jeopardy for whitebark pine on June 15, 2021, FWS concurred with this determination on December 20, 2022, and FWS listed whitebark pine as threatened under the ESA on January 17, 2023.

153.   USFS stated it would reinitiate consultation on whitebark pine after the listing, but is likely to start Mud Creek activities "before consultation is complete."

154.   USFS conducted surveys for whitebark pine on a "very small portion of the project area," and concluded that it "is scattered throughout the project area," including in "the northern portion," "the southeastern portion," "the central part," and "in the west central" part of the project. USFS stated "Surveys are still needed throughout the project area." Based on the Project documents, it is unclear when these surveys will occur and who will identify the whitebark pine – whether it will be a biologist/botanist or whether it will be the logging company.

155.   USFS also states "Non-commercial whitebark pine thinning may occur within the inventoried roadless area in locations that have the best potential for whitebark pine."

156.   The EA characterizes USFS's recent listing decision for whitebark pine as including a provision stating "no forest management, restoration, or research-related activities are known to pose any threat to the whitebark pine in any form."

157.   The listing decision actually states "no forest-management, restoration, or research-related activities pose any *species-level threat* to the whitebark pine in any form," and anticipates these activities may "affect individual trees or populations," so agencies must still complete a Section 7 consultation prior to starting activities that may affect whitebark pine (emphasis supplied).

158.   Despite the lack of surveys for whitebark pine, but the apparent presence throughout the Project area, the Mud Creek BA for whitebark pine concludes no threat to the species in any form. Because USFS has conducted limited surveys for whitebark pine presence in the project area, it does not have adequate information upon which to base this jeopardy conclusion and upon which to allow removal of this species.

159.   USFS claims both that whitebark pine is scattered throughout the Mud Creek Project area and that "[b]ecause of the low abundance of whitebark pine and poor habitat suitability within these units, treatments are not anticipated to have a measurable effect on habitat suitability and population stability."

160.   Additionally, the whitebark pine BA attempts to support a jeopardy determination with the promise that project design features will prevent adverse effects. Among the design features relied upon, the Forest Service promises to avoid whitebark pine trees 3" dbh or greater unless excepted by a Forest Service Botanist ad hoc.

161.   This design feature is arbitrary and capricious and fails to rely upon the best information available. It allows for the elimination of 99% of the whitebark pine individuals surveyed, with no ascertainable strategy or consideration for the best available information indicating that cutting and burning results in the loss of whitebark pine establishment.

51

162.   It cannot be assumed that whitepark pine will establish following project activities, as the agencies do throughout the analysis, trees must be planted following project activities. The Forest Service and USFWS failed to consider the best available information regarding what is necessary to realize the measure and degree of recruitment that is assumed in the BA.

*Climate Impacts*

163.   USFS's climate impacts reports address carbon storage in forests generally and charts the reduction in storage from various disturbances, including, for the Bitterroot National Forest, from harvest, insects, and fire.

164.   USFS states that most logging and burning would "affect the aboveground carbon pool in live woody vegetation," a source of nearly one-third of the carbon stocks in the Forest.

165.   USFS concludes that "carbon losses associated with harvests have been small compared to the total amount of carbon stored in the Forest, resulting in a loss of about 0.1 percent of non-soil carbon from 1990 to 2011."

166.   There is no discussion of this projects potential impacts as compared to the amount of disturbances occurring between 1990 and 2011 "small." And there is no discussion of the cumulative impacts from repeated logging projects in the Bitterroot.

167.   There is only a short qualitative conclusion of the climate impacts from the use of fossil fuel engines to build roads, cut trees, and remove and transport cut logs to mills – that it "would be small relative to the carbon sequestered in the forest products."

168.   USFS concludes more broadly, "Direct effects to climate change as a result of the proposed action would be insignificant because the project's emissions would constitute a negligible proportion of the global atmospheric greenhouse gas concentration."

*Whitebark pine reinitiated consultation*

169.   As it pertains to whitebark pine, the USFS reinitiated consultation with FWS after the species was listed as threatened on January 17, 2023, but also stated it anticipated implementation of the Project activities "likely before consultation is complete."

170.   USFS completed its reinitiated consultation with FWS on March 21, 2024, from which a Biological Opinion ("BiOp") was issued. In response to deficiencies in the BiOp, Plaintiffs issued a second sixty-day notice to sue letter, which was received by all relevant Defendants on July 1, 2024.

171.   On August 30, 2024, Defendants' USFS and FWS issued a response to the second sixty-day notice to sue letter intended to "provide the following information

to demonstrate compliance with the requirements under the ESA related to whitebark pine on the Mud Creek Project."

172.   FWS also issued a revised BiOp on August 29, 2024, which "includes clarifying language regarding the analysis of effects of the Project on whitebark pine.

173.   Sixty days from July 1, 2024, is August 30, 2024.

174.   In concluding there was no jeopardy to whitebark pine from the project, the BiOp relies on five mitigation measures:

1. **Measure 1:** To the extent possible, whitebark pine trees of all size classes will be protected from damage.

2. **Measure 2:** No treatments will occur in the vicinity of 'plus' trees.

3. **Measure 3:** Avoid ground disturbance from heavy equipment within whitebark pine stands and within 10 meters (33 feet) of known whitebark pine trees.

4. **Measure 4:** During prescribed burning operations, other trees will be felled away from whitebark pine trees, and fuel loads will be reduced near whitebark pine by pulling slash or piling slash away from whtebark pine trees, designing ignition patterns to limit fire intensity, and creating file line as needed to protect whitebark pine individuals.

5. **Measure 5:** During road and trail construction, whitebark pine trees 3" in diameter at breast height and larger will be avoided and protected to the extent possible. Where feasible, proposed roads will be moved so that individuals are not damaged. If individuals are removed during road construction, rust-resistant whitebark pine will be planted in suitable habitat adjacent to road construction.

175.   USFS is directed to reinitiate consultation if "the amount or extent of taking specified in the incidental take statement is exceeded."

## **FIRST CLAIM FOR RELIEF**

*USFS's failure to disclose and consider all environmental impacts of the Project, as well as its failure to provide support for a change in position, is arbitrary, capricious, and contrary to law, in violation of NEPA and the APA*

176.   All previous paragraphs are incorporated by reference.

177.   NEPA regulations require federal agencies to discuss the direct, indirect, and cumulative effects of their actions in an EA. 40 C.F.R. §§ 1502.16, 1508.8. The EA should provide a clear basis for choice among alternatives. 40 C.F.R. § 1502.14.

178.   The NEPA process "serves two fundamental objectives": "First, it 'ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts,'" and "second, it requires 'that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1005 (D. Alaska 2020).

179.   NEPA further requires that agencies take a "hard look" at the environmental consequences of its proposed actions *before* the agency chooses a particular course of action, without favoring a pre-determined outcome.

55

180.   The Mud Creek EA violates the hard-look and public disclosure requirement of NEPA and fails to provide sufficient site-specific information or analysis about the Project and its impacts. The EA does not disclose specific locations where logging or prescribed burns will occur within the four project areas.

181.   For example, the Forest Service states that "The location in which treatments occur will be determined based on conditions at the time of implementation."

182.   In another instance, USFS relies on statements regarding a lack of "primary winter foraging" in the Project area to conclude that impacts to elk will be "minimal," rather than relying on the evidence presented in the record – indicating that elk forage exists throughout the Project area.

183.   The Forest Service does not adequately address the direct, indirect, and cumulative effects of the Project on the human environment, does not provide a clear basis for choice among alternatives, and does not contain sufficient information to foster informed decision-making or informed public participation. The Project EA's omission of the actual location of proposed timber harvest and prescribed burning within the Project Area falls short of NEPA's mandate. For these reasons, the Mud Creek EA violates NEPA, 42 U.S.C. § 4332(2)(C), and is therefore "not in accordance with law" under 5 U.S.C. § 706(2)(A) and "without observance of procedure required by law" under 5 U.S.C. § 706(2)(D).

## SECOND CLAIM FOR RELIEF

*USFS's failure to prepare an environmental impact statement violates NEPA, NFMA, and the APA.*

184. All previous paragraphs are incorporated by reference.

185. NEPA requires federal agencies to prepare an EIS on any proposal for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

186. Under NEPA, an agency must prepare an EIS before it makes an "irreversible and irretrievable commitment of resources" to an action that will significantly affect the environment. 42 U.S.C. § 4332(C); *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983).

187. To determine whether to prepare and EIS or an EA, the Agency must consider multiple factors related to the intensity of the Project, including beneficial and adverse impacts, impacts to public health and safety, degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, whether the action "may establish a precedent for future actions," and "the degree to which the action may adversely affect an endangered or threatened species or its habitat." 40 C.F.R. § 1508.27.

188. Here, because the USFS does not know the impacts of the Project due to a postponement of the decisions regarding which management activities will occur

where, the impacts on the human environment are highly uncertain. The context and intensity of the Project warrants preparation of an EIS.

189.   Further, when the impacts are highly uncertain, an EIS is required. The listing of whitebark pine under the ESA created a circumstance where the impacts were highly uncertain because consultation is not complete. As such, if USFS is not willing to wait for consultation to be complete, it must prepare an EIS.

190.   Additionally, USFS includes two site-specific amendments to the Forest Plan: Elk habitat standards related to road densities and thermal cover and old growth standards and concludes that the site-specific Forest Plan amendments are "not considered a significant change to the plan for the purposes of the NFMA," as the "amendment applies to only this project."

191.   USFS has been using this same site-specific amendment to skirt the same Forest Plan requirements for over two decades on at least 14 different projects within the Bitterroot National Forest.

192.   "The responsible official's determination must be based on the purpose for the amendment and the effects (beneficial or adverse) of the amendment, and informed by the best available scientific information, scoping, effects analysis, monitoring data or other rationale." *Id.* § 219.13(b)(5)(i).

193.   USFS must articulate a "rational connection between the facts found and the choice made to enact a geographically-limited, site-specific amendment rather than

a general amendment to the Forest Plan as a whole." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 2014 WL 6977611, *27 (D. Or. 2014)(citing *Lands Council v. Martin*, 529 F.3d 1219, 1228 (9th Cir. 2008)). This requires USFS to discuss and disclose some characteristics unique to a site to support a site-specific amendment in order to satisfy its obligation to articulate a rational connection between the facts found and the choice made. *Id*. at *30 (citing *Lands Council*, 529 F.3d at 1228).

194.   USFS's repeated and successive use of the site-specific amendments effectively voids these standards, in violation of NFMA, and the Agency's decision to move forward with this project prior to completing amendments to the Forest Plan required it to prepare an EIS.

195.   The Forest Service's failure to prepare an EIS evaluating the environmental impacts of the Proposed Actions violated NEPA. 42 U.S.C. § 4332(2)(C). The Forest Service's Decision Notices are therefore arbitrary, capricious, not in accordance with law, and not in accordance with the procedures required by law. 5 U.S.C. § 706(2)(A), (D).

## THIRD CLAIM FOR RELIEF
*The Forest Service's failure to use the Forest Plan definition of old growth, and consequential failures to demonstrate compliance with the Forest Plan old growth standard for retention and viability, violate NFMA, NEPA, and the APA.*

196.   All previous paragraphs are incorporated by reference.

197.   As discussed above, the Forest Plan sets forth a specific definition/criteria for old growth forests.

198.   As discussed above, the Forest Service does not dispute that it did not apply the Forest Plan definition/criteria for old growth forest to the Project area.

199.   Instead of using the Forest Plan definition/criteria for old growth forest, the Forest Service used less protective criteria.

200.   The Forest Service does not disclose which management activities will be in old growth nor does the Forest Service disclose where old growth occurs within the Forest.

201.   The Forest Service's failure to use the Forest Plan definition of old growth renders it impossible to determine (a) whether the Project area complies with Forest Plan old growth retention standards, (b) whether old growth forest that will be logged by the Project will comply with the Forest Plan old growth definition after logging operations, (c) whether old growth logging is proposed in areas that will violate the Forest Plan old growth retention standards after Project logging. In other words, the entire old growth analysis for the Project area is invalid until the Forest Service applies the Forest Plan old growth definition.

202.   The Forest Service's failure to use the Forest Plan definition of old growth, and consequent failures to demonstrate compliance with Forest Plan old growth standards for retention and viability, violates NFMA and the APA.

203.   The Forest Service's failure to take a hard look at this issue in the

Environmental Assessment and failure to fully and fairly disclose to the public that

it was applying an old growth definition significantly less protective than the

Forest Plan old growth definition violates NEPA.

## FOURTH CLAIM FOR RELIEF
*USFS violated NEPA when it failed to take a hard look at climate impacts.*

204.   All previous paragraphs are incorporated by reference.

205.   NEPA requires federal agencies, including the Forest Service, to take

a "hard look" at the direct, indirect, and cumulative impacts of proposed major

federal actions. 42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16 (1978),

1508.25(c) (1978). Among the impacts NEPA requires agencies to disclose are

climate impacts.

206.   The Forest Service fails to adequately disclose the climate change

impacts of the Mud Creek Project. Specifically, the Forest Service fails to disclose

the Project's impacts on carbon storage, sequestration, and impacts to global

climate change, both for this project and when considered cumulatively with other

logging projects in the Bitterroot.

207.   Further, the Forest Service fails to disclose the climate pollution

impacts of project implementation – the use of fossil fuel engines to build roads,

cut trees, and remove and transport cut logs to mills – compared to the no action

alternative. The Forest Service thus failed to take a "hard look" at the Project's climate pollution impacts, in violation of NEPA.

208.    The failure of the Forest Service to take the required "hard look" at the climate pollution impacts of the Mud Creek Project violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

### FIFTH CLAIM FOR RELIEF

*USFS's failure to disclose and take a hard look at impacts to bull trout, including from climate change and additional sedimentation from off-road vehicles, as well as FWS's reliance on the same failures in creating its incidental take statement, are arbitrary, capricious, and contrary to law, which violates the ESA.*

209.   All previous paragraphs are incorporated by reference.

210.   This Claim for Relief challenges the Forest Service's finding of no significant impact as it pertains to bull trout and bull trout critical habitat within the Project area and seeks judicial review of final agency actions taken pursuant to the ESA and is brought pursuant to the judicial review provisions of the ESA. 16 U.S.C. § 1540(g).

211.   Section 7 of the ESA requires that a federal agency seeking to conduct an action that it authorizes, funds, or carries out must ensure that the action does not "jeopardize" ESA-listed species or their critical habitat; and that federal action agencies must fulfill thus duty by conducting consultation with FWS, pursuant to ESA Section 7(a)(2) and implementing regulations. 16 U.S.C. § 1536(a)(2).

212.   ESA Section 7 requires that such consultation must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

213.   Because there is no disclosure of what management activities will occur where, the impacts to bull trout and bull trout critical habitat cannot be properly considered and analyzed, in violation of the ESA.

214.   USFS also sidesteps any meaningful analysis of impacts from climate change on bull trout and its critical habitat, despite FWS's conclusion that bull trout range in the Bitterroot River is likely to decrease from 880.7km in 2010 to just 280.3 km by 2040.

215.   FWS and USFS did not provide a detailed discussion of several factors that are critical to bull trout recovery. For instance, the BiOp discusses how project activities such as culvert removal will negatively impact bull trout, including by increasing sedimentation and turbidity, which will increase the "likelihood of mortality," but there is no attempt to quantify this risk and no discussion of how mortality will impact the species, given the declining population of bull trout in the Project area. Additionally, bull trout critical habitat is largely categorized as "functioning at risk" or "functioning at unacceptable risk" throughout the Project Area and this fact is glossed over by the repeated assertion that impacts to the water will be "minimal" or too small to measure.

216.   Furthermore, USFS entirely omits discussion of FWS's prediction that sedimentation from "near stream roads and crossings will likely begin to deteriorate again . . . return[ing] to its pre-project level following the breakdown of BMPs." Nor is there any discussion regarding how the "[c]ritical habitat in the action area is not currently providing its intended recovery function and is in need of active restoration."

217.   USFS also notes that it may not decommission roads if there is no funding, which it neither considered in its sedimentation analysis nor addressed in its analysis, further rendering inadequate its incidental take statement.

218.   Additionally, FWS and USFS do not address any steps or strategies included in the Project that will aid in species recovery.

219.   Lastly, because there is an incomplete or lack of discussion of important impacts to bull trout survival and recovery, and the measures outlined in the incidental take permit are vague ("ensure . . . BMPs are maintained to ensure their effectiveness throughout the duration of the project"), difficult to enforce ("if road conditions are in danger of being degraded to the point where there is a high risk of sediment deposition to streams"), or seemingly arbitrary (prohibiting more than a certain number of log truck trips without discussion of how FWS arrived at these numbers), the incidental take permit is unlawful.

220.   Defendants' violations of the ESA allow a citizen suite to proceed under 16 U.S.C. § 1540(g). Further, Defendants' violations are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly the ESA approvals, incidental take statement, BiOps, EAs, and DN/FONSIs must be held unlawful and set aside under 5 U.S.C.§ 706(2).

## SIXTH CLAIM FOR RELIEF
*USFS's failure to complete consultation prior to commencing action on the Project and consider all impacts to white bark pine, including from climate change, violate the ESA.*

221.   All previous paragraphs are incorporated by reference.

222.   This claim for relief challenges the results of the ESA consultations between the Forest Service and the U.S. Fish and Wildlife Service regarding the Project's effects on whitebark pine. This claim seeks judicial review of final agency actions taken pursuant to the ESA and is brought pursuant to the judicial review provisions of the ESA. 16 U.S.C. § 1540(g).

223.   Section 7 of the ESA requires that a federal agency seeking to conduct an action that it authorizes, funds, or carries out must ensure that the action does not "jeopardize" ESA-listed species or their critical habitat; and that federal action agencies must fulfill this duty by conducting consultation with the US Fish and

Wildlife Service and/or NOAA Fisheries, pursuant to ESA Section 7(a)(2) and implementing regulations. 16 U.S.C. § 1536(a)(2).

224.   ESA Section 7 requires that such consultation must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

225.   Further, once consultation is initiated, ESA Section 7(d) prohibits any irreversible and irretrievable commitment of resources.

226.   As it pertains to whitebark pine, the USFS claims it has reinitiated consultation with FWS after the species was listed as threatened on January 17, 2023. The USFS also states it reinitiated consultation on January 19, 2023, but anticipates implementation of the Project activities "likely before consultation is complete."

227.   USFS's design features regarding prospective identification of whitebark pine are arbitrary and capricious.

228.   Further, the Forest Service is uncertain whether and to what degree mitigation efforts aiming to promote recruitment and recolonization of impacted populations of whitebark pine will be successful.

229.   Defendants' violations of the ESA allow a citizen suite to proceed under 16 U.S.C. § 1540(g). Defendants' violations of the ESA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or

limitations within the meaning of the judicial review provisions of the APA; and

accordingly, the ESA approvals, BAs, EAs, and DN/FONSIs must be held

unlawful and set aside under 5 U.S.C.§ 706(2).

## SEVENTH CLAIM FOR RELIEF

*USFS's inadequate consultation with FWS, and the BiOp produced therefrom, with its failure to disclose and consider all impacts to white bark pine, including from climate change, violate the ESA.*

230.   All previous paragraphs are incorporated by reference.

231.   This claim for relief challenges the results of the reinitiated ESA

consultations between the Forest Service and the U.S. Fish and Wildlife Service

regarding the Project's effects on whitebark pine. This claim seeks judicial review

of final agency actions taken pursuant to the ESA and is brought pursuant to the

judicial review provisions of the ESA. 16 U.S.C. § 1540(g).

232.   Section 7 of the ESA requires that a federal agency seeking to conduct an

action that it authorizes, funds, or carries out must ensure that the action does not

"jeopardize" ESA-listed species or their critical habitat; and that federal action

agencies must fulfill this duty by conducting consultation with the US Fish and

Wildlife Service and/or NOAA Fisheries, pursuant to ESA Section 7(a)(2) and

implementing regulations. 16 U.S.C. § 1536(a)(2).

233.   ESA Section 7 requires that such consultation must be based on the "best

scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

234.   The BiOp must provide "a *detailed discussion* of the environmental baseline of the listed species" and "a *detailed discussion* of the effects of the action on listed species." 50 C.F.R. § 402.14(h)(ii) & (iii) (emphasis supplied).

235.   The ESA is not just a procedural statute, as agencies also have an independent and continuing duty to avoid taking action that would "jeopardize the continued existence of a listed species," which is separate from its duty to consult. 16 U.S.C. § 1536(a)(2). This means that agencies cannot arbitrarily or capriciously rely on a BiOp to satisfy their duty under the ESA.

236.   The ESA prohibits "damag[ing] or destroy[ing]" any listed plants "in knowing violation of any law . . . ." 16 U.S.C. § 1538(a)(2)(B).

237.   The deficiencies in the BiOp are wide-ranging and in violation of the ESA, including vague, unenforceable, and inconsistent language in the Conservation Measures; a failure to fully disclose and consider the impacts to whitebark pine, including damage from the planned activities and impacts from climate change; and an utter failure to separately consider species recovery.

238.   In forming its *no jeopardy* conclusion, an agency may rely on mitigation measures, providing the measures are "specific and binding plans" with "a clear, definite commitment of resources for future improvements." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 935-36 (9th Cir. 2008).

239.   Instead, the mitigation measures (or Conservation Measures) are limited in impact due in vague language such as preventing harm "to the extent possible" (Measures 1 and 5) no treatments in the "vicinity" of plus trees (Measure 2), and preventing impacts to "known" trees (Measure 3).

240.   Because the Agencies are relying on modeled locations, rather than a ground survey, it does not currently know the location of any whitebark pine trees, and furthermore, does not indicated it will conduct further ground surveys to flag the locations of whitebark pine trees.

241.   This means that every whitebark pine in the project area could be deemed "not known" and thus, not subject to the Conservation Measures.

242.   Because none of these measures are specific or certain to occur, they do not address threats to the species in a way that justifies the no jeopardy conclusion.

243.   In addressing current risks to the status of whitebark pine, USFS notes "white pine bluster rust conditions are between 20 and 80 percent average infection rate"[2]; two "one-acre occurrences of mountain pine beetle in whitebark pine in the action area"; and that "[c]limate change is likely affecting whitebark pine across its range."

244.   This cursory acknowledgement of risks more generally to whitebark pine is not the detailed discussion of the current status contemplated in the regulations.

---

[2] This statement applies to a much wider range of area than to just the project area.

245.   USFS has failed to consider the impacts to the species from damaging and destroying several generations of cone-producing trees. Because of the slow growth rate of whitebark pine, it may take 40 to 60 years for a tree to grow to 3 inches at breast height, meaning every USFS's action could result in a sharp decline in the number of whitebark pine trees of cone-bearing age, which could delay the subsequent generations of cone-bearing trees for the next 60 to 80 years within the project area (depending on the implementation schedule). USFS failed to consider and disclose this.

246.   Without consideration of the slow growth of whitebark pine, significant cascading impacts will result in a further decline in seed production, resulting in fewer Clark's nutcrackers present, hiding fewer seeds (and a greater recollection of those seeds were stashed), resulting in fewer seeds growing into trees to start the decline cycle again.

247.   Additionally, prescribed fire "is expected to kill whitebark pine trees of all age classes with seedlings and saplings being more susceptible than mature trees." Because prescribed fire is approved for 84% (7,162 acres out of 8,446 acres of total habitat) of the whitebark pine habitat in the project area, this cursory reference to killing whitebark pine trees in prescribed fire areas does not sufficiently disclose and consider the risks to the species from the project actions.

70

248.   Further, there is no disclosure and consideration of the sharp decline of the species overall, the predation from Clark's nutcracker when there are insufficient seeds produced, and the potential spread of white pine bluster rusk from heavy vehicle operations.

249.   USFS also fails to consider the impacts from failing to conduct testing for plus tress in the project area. Although USFS states "no effects to 'plus' trees are expected" because all the plus trees are at least five miles from any planned activities. This disregards the life cycle of whitebark pine, whose nuts can be carried up to twenty miles by Clark's Nutcracker, meaning the long term benefits of the plus tree program could evaporate due to destruction of plus trees whose seeds were planted outside of the identified areas.

250.   Lastly, USFS is in possession of information that discusses impact to whitebark pine from climate change, including that, by sometime between 2030 and 2040, 70 percent of the range for whitebark pine will no longer be suitable for the species and by 2100, only 3 percent of the current habitat will remain.

251.   Although USFS tacitly acknowledges climate change will "likely exacerbating the primary threats to whitebark pine and its decline," there is no discussion of what this means for the jeopardy of the species nor its recovery.

252.   "Recovery must be considered explicitly and separately from survival." *CBD v. Salazar*, 804 F. Supp. 2d 987, 999 (D. Ariz. 2011). "[A]n agency must

"know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from 'significant' impairments to habitat that is already severely degraded." *Id.* at 1000.

253.   USFS created a restoration strategy for whitebark pine in 2012, in anticipation of the listing of the species under the ESA. In particular, this document places particular emphasis on young trees, which it acknowledges are in fewer supply. USFS cannot claim no jeopardy by ignoring a problem it has been aware of for over a decade.

254.   USFS's revised BiOp still includes no analysis of the impacts of its actions on the survival of whitebark pine.

255.   In sum, the BiOp fails to provide a detailed discussion of the effects from the project, fails to consider important aspects of the problem, and fails to consider relevant factors in violation of the ESA and the APA.

256.   Defendants' violations of the ESA allow a citizen suite to proceed under 16 U.S.C. § 1540(g). Defendants' violations of the ESA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly, the ESA approvals, BAs, BiOps, EAs, and DN/FONSIs must be held unlawful and set aside under 5 U.S.C.§ 706(2).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief:

A.      Declare that the Defendants' Decision Notice violates NEPA and APA and their respective implementing regulations;

B.      Order, adjudge, and declare that the Mud Creek Project's EA, FONSI, BA, BiOp, and Decision Notice are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under NEPA, NFMA, ESA, and the APA, and reverse and remand the EA, FONSI, BA, BiOp, and Decision back to the agencies;

C.      Order the Defendants to comply with the requirements of NEPA, ESA, and APA and their respective implementing regulations by preparing an Environmental Impact Statement that fully discloses and analyzes the full interrelated environmental, cultural, economic, and socioeconomic impacts (direct, indirect, and cumulative), effects and consequences associated with the Projects as described above;

D.      Order the Defendants to comply with the requirements of NEPA and APA and their respective implementing regulations by identifying with specificity locations for logging and prescribed burns approved by the Decision and then

analyzing the environmental impacts of such activities on wildlife habitat, threatened and endangered species, and native vegetation in the Project area using the best available scientific information and data;

E.   Order the Defendants to comply with the requirements of ESA and their respective implementing regulations by completing comprehensive wildlife surveys and candidly assessing the evidence regarding the status of the various bull trout populations within the Project area in order to make an informed jeopardy decision based on the best available scientific information and data, including from climate change;

F.   Vacate the Forest Service's decision and the US Fish and Wildlife Service's Biological Opinion for both whitebark pine and bull trout and bull trout critical habitat;

G.   Enter appropriate preliminary and permanent injunctive relief prohibiting the Forest Service from permitting or allowing any implementation of the Projects in order to ensure that the Forest Service and the FWS comply with federal law and avoid irreparable harm to the environment until such time as the Forest Service and the FWS are in full compliance with the law;

H.   Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and disbursements associated with this action under the Equal Access to Justice Act, 28

U.S.C. § 2412 et seq., the ESA, 16 U.S.C. § 1540(g)(4), and any and all other

provisions of law; and

I.      Award such other relief as this Court deems just and proper.