Rachel G. Inabnit
LAW OFFICE OF RACHEL INABNIT, PLLC
P.O. Box 8846
Missoula, MT 59807
(406) 201-1305
rachel@inabnitlawoffice.com

Jessica Christy (Admitted *pro hac vice*)
CHRISTY LAW, LLC
2055 S. Oneida St., Ste. 394
Denver, CO 80224
(720) 729-7841
jessica@christylaw.legal

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, YELLOWSTONE TO UINTAS CONNECTION, FRIENDS OF THE BITTERROOT, and WILDEARTH GUARDIANS | ) ) ) ) ) | Case No. 9:24-cv-00010-DLC-KLD |
| *Plaintiffs,* | ) ) | |
| *vs.* | ) ) | |
| TOM VILSACK, in his official capacity as Secretary of the Department of Agriculture; RANDY MOORE, in his official capacity as Chief of the Forest Service; MATTHEW ANDERSON, in his official capacity as the Bitterroot National Forest Supervisor; and DAN PLILEY, in his official capacity as the West Fork District Ranger, UNITED STATES FOREST SERVICE; and UNITED STATES FISH AND WILDLIFE SERVICE, | ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| *Defendants.* | ) | |

**CERTIFICATION OF WORD COUNT**

Pursuant to Local Rule 7.1(d)(2), I certify that the attached *Plaintiffs' Opening Brief in Support of Their Motion for Summary Judgment* contains 6,007 words (Doc. 46 allows up to 6,500 words), excluding material Local Rule 7.1(d)(2)(E) omits from the word-count requirement. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 30th day of December 2024.

> /s/Jessica Christy (Admitted *pro hac vice)*
> Jessica Christy
> CHRISTY LAW LLC
> 2055 S. Oneida St., Ste. 394
> Denver, CO 80224
> (720) 729-7841
> jessica@christylaw.legal

# TABLE OF CONTENTS

I. Introduction ............................................................................................ 1

II. Standard of Review ............................................................................... 3

III. Standing ................................................................................................ 3

IV. Legal Authority ..................................................................................... 3

    A. National Environmental Policy Act ................................................... 3

    B. National Forest Management Act ....................................................... 5

    C. Endangered Species Act ..................................................................... 7

    D. Administrative Procedure Act ............................................................ 8

V. Legal Arguments .................................................................................... 9

    A. Failure to Prepare an EIS .................................................................... 9

    B. USFS is Unable to Demonstrate Compliance with the Bitterroot National Forest Plan, in Violation of NFMA, NEPA, and APA ........................... 13

        i.   Failure to use the Forest Plan definition of old growth, and the consequential failures to demonstrate compliance with the Forest Plan old growth standards for retention and viability, violate NFMA, NEPA, and APA .......................................................................... 14

            a.   Without site-specific surveys, USFS cannot assure the outcomes it contemplates for old growth in the EA. .................................. 14

            b.   USFS cannot demonstrate compliance with the viability standards in place at the time of the decision for indicator species ........ 15

        ii.   USFS did not adequately consider climate impacts ..................... 16

            a.   USFS relies on cookie-cutter analysis to make broad, opaque conclusions about "insignificant," "small," and "negligible effects." ...................................................................... 17

    C. ESA Violations ...................................................................................... 17

        i.   Bull Trout and Bull Trout Critical Habitat .................................... 19

   a. The no jeopardy conclusion is unsupported by the AR .......... 20

   b. The no jeopardy conclusion and incidental take permit relies on vague, unenforceable, and undisclosed BMPs and design features ....................................................................... 21

  ii. Whitebark Pine ............................................................. 22

   a. The no jeopardy conclusion is unsupported by the AR .......... 23

   b. The no jeopardy conclusion and incidental take statement rely on vague, unenforceable, and undisclosed BMPs and design features ....................................................................... 25

VII. Conclusion ................................................................. 26

## Table of Authorities

**Cases**

*Alliance for the Wild Rockies v. USFS,*
  907 F.3d 1105, 1110, 1113 (9th Cir. 2018) ...........................................5

*Alliance for the Wild Rockies v. Marten*,
  2021 WL 4551496 (D. Mont. 2021) ...................................................14

*CBD v. Bernhardt*,
  982 F.3d 723, 743 (9th Cir. 2020) ......................................................18

*CBD v. BLM*,
  698 F.3d 1101, 1121 (9th Cir. 2012) ..................................................18

*CBD v. NHTSA*,
  538 F.3d 1172, 1194 (9th Cir. 2008) ........................................... 10, 16

*CBD v. Rumsfeld*,
  198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) .....................................18

*CBD v. Salazar*,
  804 F. Supp. 2d 987, 999 (D. Ariz. 2011) .........................................19

*CBD v. U.S.F.S.*,
  687 F. Supp. 3d 1053, 1073 (D. Mont. 2023).................................9, 16

*Conner v. Burford*,
  848 F.2d 1441, 1453 (9th Cir. 1988) ..................................................17

*Earth Island Inst. v. USFS,*
  697 F.3d 1010, 1018 (9th Cir. 2012) ....................................................6

*Gifford Pinchot Task Force v. USFWS,*
  378 F.3d 1059, 1065 (9th Cir. 2004) ....................................................6

*Hapner v. Tidwell*,
  621 F.3d 1239, 1250 (9th Cir. 2010) ....................................................5

*Lands Council v. Martin*,

    529 F.3d 1219 (9th Cir. 2008) ...................................................12

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,

    2014 WL 6977611 (D. Or. 2014) .........................................12

*Klamath-Siskiyou v. BLM*,

    387 F.3d 989 (9th Cir. 2004) ...................................................5

*Native Ecosystems Council v. USFS*,

    418 F.3d 953, 964-965 (9th Cir. 2005)...........................6, 14

*NWF v. NMFS.*,

    524 F.3d 917 (9th Cir. 2008) ....................................... 18, 19

*Ohio Forestry Ass'n v. Sierra Club*,

    523 U.S. 726 (1998)...................................................14

*Robertson v. Methow Valley Citizens Council*,

    490 U.S. 332 (1989)......................................................4

*San Luis & Delta-Mendota Water Auth. v. Jewell*,

    747 F.3d 581, 601 (9th Cir. 2014) .........................................9

*Se. Alaska Conservation Council v. U.S.F.S.*,

    443 F. Supp. 3d 995, 1005 (D. Alaska 2020) .........................4

*Sierra Forest Legacy v. Sherman*,

    646 F.3d 1161, 1200 (9th Cir. 2011) ...................................14

**Statutes**

16 U.S.C. § 1531.......................................................................7

16 U.S.C. § 1536....................................................................7, 8

16 U.S.C. § 1538.......................................................................8

16 U.S.C. § 1540.......................................................................3

16 U.S.C. § 1604.......................................................................5

42 U.S.C. § 4321 ..................................................................................4

42 U.S.C. § 4332 ................................................................. 4, 5, 9, 10

5 U.S.C. § 702 ......................................................................................9

5 U.S.C. § 706 ............................................................................... 3, 6, 9

## Regulations

36 C.F.R. § 219.11 ...............................................................................7

36 C.F.R. § 219.13 ...............................................................................6

36 C.F.R. §§ 219.8 through 219.11 ....................................................6

40 C.F.R. § 1500.1 ...............................................................................3

40 C.F.R. §§ 1502.16 ........................................................................4, 5

40 C.F.R. § 1508.1 ...............................................................................5

40 C.F.R. § 1508.8 ...............................................................................5

40 C.F.R. § 1508.27 ...........................................................................10

40 C.F.R. § 1508.25 .............................................................................4

50 C.F.R. § 402.02 .............................................................................22

50 C.F.R. § 402.14 .........................................................................7, 17

## Other Authorities

Columbia Headwaters Recovery Unit Implementation Plan for Bull Trout ,
    FWS (Sept. 2015) .................................................................. SUF ¶ 54


Inland Native Fish Strategy,
    USFS (1995) ........................................................................... SUF ¶ 57

# I.     INTRODUCTION

The action challenges the U.S. Forest Service ("USFS" or "Forest Service") and U.S. Fish and Wildlife Service ("FWS") (collectively, "Agencies") approval of the Mud Creek Vegetation Management Project (the "Project").

The Project is massive, encompassing 48,486 acres within the Bitterroot National Forest upon which nearly every acre of the Project will be affected by some level of disturbance during the 20-year pendency of the Project. SUF ¶2. Despite the massive scale, Agencies authorized the Project without determining exactly where, when, and to what extent these activities will take place. The precise location, timing, and scope of the treatments and roads will be decided at some later date – but without further analysis or opportunity for public comment as required by the National Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Administrative Procedures Act ("APA"). USFS attempts to sidestep this clear violation of NEPA by offering the public a post-NEPA opportunity to comment once USFS actually decides what actions it will take on which locations. SUF ¶6, 7.

The Project also entails multiple project-specific amendments to the Bitterroot National Forest Plan (the "Forest Plan") – one of which has been used

on 14 previous projects since 2001 – without following proper procedures for site-specific amendments. SUF ¶18. USFS is proposing amendments related to the definition of old growth and elk habitat standards. SUF ¶17. These project-specific amendments will allow USFS to avoid compliance with the Forest Plan while it implements the Project.

In addition to the failure to disclose where Project activities will take place, USFS has not adequately disclosed and analyzed the impacts to climate change, bull trout and its critical habitat, whitebark pine, old growth indicator species, and elk habitat. Further, USFS and FWS rely on unrealistic and undisclosed standards to reach blanket conclusions about Project impacts and no jeopardy findings to ESA-listed species, apparently operating under the presumption that because the habitats are already in poor condition, any additional harm will not be noticed. This does not meet the standards under ESA and APA.

USFS fails to sufficiently (a) identify the specific actions that will be taken as part of the Project, (b) inventory the vegetation and wildlife resources that will be affected by the Project, (c) disclose the impacts on localized cognizable values that will be caused by the proposed landscape-scale logging and burning, or (d) detail and evaluate planned mitigation measures.

## II.    **STANDARD OF REVIEW**

In this action, brought under APA and the citizen suit provision of ESA, 16 U.S.C. § 1540(g), the Court applies the APA standard of review which requires reviewing courts "shall [] hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "(D) without observance of procedure required by law." 5 U.S.C. § 706(2). A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43(1983).

## III.    **STANDING**

Plaintiffs have established standing. *See* Ex.A, Declaration Michele Dieterich; Ex.B, Declaration Jeff Lonn; SUF ¶¶..

## IV.    **LEGAL AUTHORITY**

### A. National Environmental Policy Act

NEPA is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a); which aims to (1) "prevent or eliminate damage to the

environment and biosphere," (2) "stimulate the health and welfare of" all people, and (3) "encourage productive and enjoyable harmony" between human kind and the environment. 42 U.S.C. § 4321.

To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); 42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16 (1978), 1508.25(c) (1978). The NEPA process "serves two fundamental objectives": "First, it 'ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts,'" and "second, it requires 'that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1005 (D. Alaska 2020).

NEPA analysis must assess the cumulative impacts of the action "result[ing] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. §§ 1502.16, 1508.1(g)(3), & 1508.8. "The analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Klamath-Siskiyou v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004). In evaluating reasonably foreseeable effects, an agency must disclose incomplete, unavailable, or lacking information and either procure the information or include a statement detailing (1) that such information is incomplete or unavailable, (2) a statement of the information's relevance, (3) a summary of existing alternative credible scientific evidence, and (4) the agency's evaluation of impacts. 42 U.S.C. § 4332.

## B. National Forest Management Act

NFMA is the primary statute governing the administration of national forests and requires site-specific projects on any National Forest be consistent with the governing forest plan. 16 U.S.C. § 1604(i). Under NFMA, USFS must "strictly comply with a forest plan's 'standards,' which are considered binding limitations . . . designed to prevent degradation of current resource conditions." *Alliance for the Wild Rockies v. USFS,* 907 F.3d 1105, 1110, 1113 (9th Cir. 2018); *Hapner v. Tidwell*, 621 F.3d 1239, 1250 (9th Cir. 2010). USFS must demonstrate that a project it undertakes complies with the governing forest plan.

*Alliance,* 907 F.3d at 1113. "A court will conclude that the Forest Service acts arbitrarily and capriciously . . . when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the … relevant Forest Plan." *Earth Island Inst. v. USFS*, 697 F.3d 1010, 1018 (9th Cir. 2012). Further, USFS's failure to demonstrate compliance with forest plan standards violates both NEPA and NFMA. *Native Ecosystems Council v. USFS*, 418 F.3d 953, 964-965 (9th Cir. 2005). Review of agency decisionmaking under NFMA is governed by the judicial review provisions of the APA because NFMA does not contain an express provision for judicial review. 5 U.S.C. § 706(2)(A); *Gifford Pinchot Task Force v. USFWS,* 378 F.3d 1059, 1065 (9th Cir. 2004).

Amendments to a forest plan may be enacted "depending on the need for change" and "should be used to keep plans current and help units adapt to new information or changing conditions." 36 C.F.R. § 219.13(a). The responsible official "shall . . . [b]ase an amendment on a preliminary identification of the need to change the plan . . . based on a new assessment; a monitoring report; or other documentation of new information, changed conditions, or changed circumstances." *Id.* § 219.13(b)(1). Further, they must also analyze the amendment under the relevant general requirements for forest plans under 36 C.F.R. §§ 219.8 through 219.11. One such requirement is that any timber sales

"must ensure" the "harvest would be carried out in a manner consistent with the protection of . . . wildlife." 36 C.F.R. § 219.11(d)(3).

## C. Endangered Species Act

ESA is designed to protect threatened and endangered plant and animal species and conserve their habitats. 16 U.S.C. § 1531(b). ESA and its implementing regulations require agencies to consult with FWS to ensure that their action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2). As a result of formal consultation, FWS will issue a Biological Opinion ("BiOp"), relying on the best available scientific data available, which must include, among other things, a summary of the information on which the opinion is based, a *detailed discussion* of the environmental baseline of the listed species, a *detailed discussion* of the effects of the action on listed species, and FWS's opinion whether the action is or is not likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d) & (h). FWS then forms its own opinion regarding "how the agency action affects the species or its critical habitat," including "the impact of [] incidental taking on the species," "reasonable and prudent alternatives" to the proposed action, and "terms and conditions . . . that must be complied with by the Federal agency." 16 U.S.C. § 1536(b)(3).

Once a plant species is listed, the ESA prohibits "damag[ing] or destroy[ing]" any listed plants "in knowing violation of any law . . . ." 16 U.S.C. § 1538(a)(2)(B).

Once an animal species is listed it becomes illegal to "take any such species within the United States" unless FWS issues a permit. 16 U.S.C. § 1538(a)(1)(A). To obtain a permit, the agency must submit a conservation plan detailing the impacts from the taking, steps the actor will take to minimize and mitigate impacts, and what alternatives were considered and why the alternatives were not selected. *Id.* § 1539(a)(2). FWS may approve the permit only if it finds that the taking is incidental to the project, the applicant will minimize and mitigate impacts "to the maximum extent practicable," adequate funding is provided, and that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(1)(B).

ESA is not just a procedural statute, as agencies also have an independent and continuing duty to avoid taking action that would "jeopardize the continued existence of a listed species," which is separate from its duty to consult. 16 U.S.C. § 1536(a)(2). This means that agencies cannot arbitrarily or capriciously rely on a BiOp to satisfy their duty under the ESA.

### D. Administrative Procedure Act

Judicial review of agency actions under NEPA, NFMA, and the ESA is governed by the Administrative Procedures Act ('APA'), 5 U.S.C. §§

706et seq.; *see San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, the 'reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A).

*CBD v. U.S.F.S,* 687 F. Supp. 3d 1053, 1066 (D. Mont. 2023). The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702.

## V. **LEGAL ARGUMENTS**

### A. Failure to Prepare an EIS

The reasons for preparing an EIS here are numerous, including the negative impacts to already dwindling ESA-listed bull trout populations; lack of ESA-listed whitebark pine surveys or analysis of the impacts to the population from Project activities; repeated, identical programmatic amendments to the Forest Plan; and lack of disclosure of where, when, and how Project activities will occur, to name a few.

NEPA requires federal agencies to prepare an EIS on any proposal for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895-96 (9th Cir. 2002). Agencies must consider multiple factors related to the intensity of the Project, including beneficial and adverse impacts, impacts to public health and safety, degree to which the possible effects

on the human environment are highly uncertain or involve unique or unknown risks, whether the action "may establish a precedent for future actions," and "the degree to which the action may adversely affect an endangered or threatened species or its habitat." 40 C.F.R. § 1508.27. The significance determination must "utilize a systemic, interdisciplinary approach . . . and utilize ecological information in the planning and development of resource-oriented projects," while "recogniz[ing] the worldwide and long-range character of environmental problems." 42 U.S.C. § 4332.

An agency's finding of "no significant impact" and consequent decision not to prepare an EIS can be overturned if the decision was arbitrary, capricious, or an abuse of discretion. *See, e.g., Center for Biological v. Nhtsa,* 538 F.3d 1172, 1178 (9th Cir. 2008).

## Endangered Species

The lack of information presented on bull trout and whitebark pine populations, paired with the depths to which Agencies go to negate Project impacts is astounding. SUF ¶¶36-75. According to the limited information presented, the Project could result in an immediate twenty percent drop in the local populations and another 20 percent drop in the next three years, SUF ¶41; but because USFS omitted any type of analysis on bull trout population cycles to justify its blanket conclusion of minimal impacts, the public does not know. USFS's claimed

inability to analyze the impacts to an ESA-listed species is the precise type of situation that calls for an EIS.

The listing of whitebark pine under the ESA created a circumstance where the impacts were highly uncertain because FWS consultation was imcomplete. As such, if USFS was not willing to wait for consultation to be complete, it was required to prepare an EIS.

## Lack of Disclosure

As addressed throughout this brief, the failure to provide sufficient site-specific information or analysis about the Project and its impacts violates NEPA and APA and warrants preparation of an EIS.

## Programmatic Amendments

USFS includes two site-specific amendments to the Forest Plan, SUF ¶16-18; without following proper procedures, and making sweeping statements about the impacts therefrom..

When implementing a programmatic amendment "[t]he responsible official's determination must be based on the purpose for the amendment and the effects (beneficial or adverse) of the amendment, and informed by the best available scientific information, scoping, effects analysis, monitoring data or other rationale." 40 C.F.R. § 219.13(b)(5)(i). USFS must articulate a "rational connection between the facts found and the choice made to enact a geographically-

limited, site-specific amendment rather than a general amendment to the Forest Plan as a whole." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 2014 WL 6977611, *27 (D. Or. 2014)(citing *Lands Council v. Martin*, 529 F.3d 1219, 1228 (9th Cir. 2008)). This requires USFS to discuss and disclose some characteristics unique to a site to support a site-specific amendment in order to satisfy its obligation to articulate a rational connection between the facts found and the choice made. *Id*. at *30 (citing *Lands Council*, 529 F.3d at 1228).

it states the project may allow logging "within [elk] winter range without seasonal restrictions," which "could have negative effects to elk," but concludes any impacts would be "minimal." USFS justified the elk-related amendments because, "based on discussions with Montana Fish, Wildlife, and Parks, no 'primary winter foraging areas' exist within the project area or adjacent to it." SUF ¶22. Not only is this in direct contradiction to recommended practices in USFS's Coordinating Elk and Timber Management document, which states, "[t]imbered areas adjacent to primary winter foraging areas should be managed to maintain the integrity of cover for elk. Where timber harvest is acceptable, slash cleanup and logging should be scheduled outside the winter period," SUF ¶ 23; it is also the only time USFS references a "primary" foraging area. This is confusing because no explanation is offered for the distinction and none of the maps make a distinction

between "primary" foraging areas and other types of foraging areas. SUF ¶ 22.
This justification, without support, is arbitrary in violation of APA.

USFS's repeated and successive use of the site-specific amendments
effectively voids these standards, in violation of NFMA, and the Agency's decision
to move forward with this project prior to completing amendments to the Forest
Plan required it to prepare an EIS.

Here, there are plethora of reasons for USFS to create an EIS and its failure
to do so violates NEPA and APA.

### B. USFS is Unable to Demonstrate Compliance with the Bitterroot National Forest Plan, in Violation of NFMA, NEPA, and APA.

"[T]he question in any NFMA challenge is whether the Court 'can
reasonably discern from the record that the Forest Service complied with' the
Forest Plan's standards, 'and thereby complied with NFMA.'" *Alliance for the
Wild Rockies v. Marten*, 2021 WL 4551496 *2 (D. Mont. 2021) (citing *Native
Ecosystems*, 481 F.3d at 961). It is well settled that USFS "must demonstrate that
the [site-specific] project would be consistent with the land resource management
plan of the entire forest" in order to comply with the NFMA and NEPA. *Neighbors
of Cuddy Mountain v. USFS*, 137 F.3d 1372, 1377 (9th Cir. 1998); 36 C.F.R. §
219.10(e); 16 U.S.C. § 1604(a); *Native Ecosystems*, 418 F.3d at 963. Further,
"[t]he duty to demonstrate Forest Plan consistency applies at the time of the
decision, not at a speculative future date." *Ohio Forestry Ass'n v. Sierra Club*, 523

U.S. 726, 729-30 (1998). "NFMA requires sufficient disclosure for a court to be able to 'ascertain from the record that the Forest Service is in compliance' with the statute and regulations." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1200 (9th Cir. 2011) citing *Native Ecosystems*, 418 F.3d at 963. This Court has found that "[t]he Court cannot simply take Defendants' word" that a project complies with a standard. *Alliance*, 2021 WL 4551496 *4.

<blockquote>
i.      **Failure to use the Forest Plan definition of old growth, and consequential failures to demonstrate compliance with the Forest Plan old growth standard for retention and viability, violate NFMA, NEPA, and the APA**
</blockquote>

Instead of striving to meet old growth standards required in the Forest Plan, SUF ¶¶; USFS decided to eliminate it entirely through the use of a programmatic amendment. USFS presents this amendment as only a positive, but it entirely overlooks that now old growth stands that do meet this 40-acre requirement can be fragmented and broken up, frustrating the purpose of the 40-acre standard in the first place, which would result in a significant decrease in the health, regeneration, and long-term viability of old growth stands.

<blockquote>
a.   **Without site-specific surveys, USFS cannot assure the outcomes it contemplates for old growth in the EA.**
</blockquote>

Without a complete site survey, USFS cannot know the impacts of the management activities on the Project area, particularly with the staggered nature of the surveys and implementation plan. SUF ¶¶ . USFS cannot possibly conduct

the Forest Plan's mandated coordination to create the old growth stands of more than 40 acres and removal of this standard means USFS does not even have to try. This method literally misses the forest for the trees by the apparent decision to neglect the interconnectedness of multiple stands.

**b. USFS cannot demonstrate compliance with the viability standards in place at the time of the decision for indicator species.**

The Forest Plan requires old growth standards in place, in part, to support the health of pine marten and piliated woodpeckers, two important indicator species. SUF ¶¶. By removing the 40-acre requirement, USFS will be able to remove large stands of old growth but still comply with the percentage requirement by piecemealing small patches of old growth trees to make up the required percentage. This will have some amount of impact to both of these species, but there is no attempt to characterize these impacts in any meaningful way other than blanket conclusions from "impacts." SUF ¶¶.

USFS's failure to use the Forest Plan definition of old growth renders it impossible to determine (a) whether the Project area complies with Forest Plan old growth retention standards, (b) whether old growth forest that will be logged by the Project will comply with the Forest Plan old growth definition after logging operations, and (c) whether old growth logging is proposed in areas that will violate the Forest Plan old growth retention standards after Project logging. In

other words, the entire old growth analysis for the Project area is invalid until

USFS applies the Forest Plan old growth definition in place at the time the Project

was approved. The failure to use this standard, and consequent failures to

demonstrate compliance with Forest Plan old growth standards for retention and

viability, violates NFMA and the APA. USFS's presentation of elimination of this

standard as only a positive, ignoring the problems created by habitat fragmentation,

is misleading.

### ii.    USFS did not adequately consider climate impacts

To satisfy NEPA, an analysis of the climate impacts of a project must

include "a reasonably thorough discussion of the significant aspects of the probable

environmental consequences." *CBD v. NHTSA.*, 538 F.3d 1172, 1194 (9th Cir.

2008) (internal quotation marks omitted). However, even if the impacts will be

small, the discussion must be sufficiently robust to allow the public to understand

the reasoning behind that conclusion. Omission of this critical information does not

satisfy NEPA. *CBD v. U.S.F.S.*, 687 F. Supp. 3d 1053, 1073 (D. Mont.

2023) (finding "merely discussing carbon impacts and concluding that they will be

minor does not equate to a 'hard look'").

### a. USFS relies on cookie-cutter analysis to make broad, opaque conclusions about "insignificant," "small," and "negligible effects."

USFS's cookie-cutter conclusions on impacts to climate change is precisely the type of "analysis" that has been repeatedly rejected. Courts have repeatedly rejected these types of analysis-free blanket statements.

The AR appears to contain some information which would allow USFS to conduct at least some amount of analysis and to make more specific conclusions, SUF ¶¶86-92; and the Court should require USFS to utilize the information in its possession to truly assess the climate impacts from the Project.

USFS fails to adequately disclose the climate change impacts of the Project, including the Project's impacts on carbon storage, sequestration, and impacts to global climate change, both for this project and when considered cumulatively with other logging projects in the Bitterroot. This action violates NEPA and APA.

### C. ESA violations

ESA regulations mandate that biological opinions "shall include . . . [a] detailed discussion of the effects of the action on listed species." 50 C.F.R. §402.14(h). In undertaking this analysis, "the ESA requires the biological opinion to analyze the effect of the entire agency action." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988). The failure to address effects and consider important

factors renders the biological opinion arbitrary and capricious. *CBD v. BLM*, 698

F.3d 1101, 1121 (9th Cir. 2012).

FWS may rely on mitigation measures to support a no jeopardy conclusion

only when such measures "constitute a 'clear, definite commitment of resources,'

and be 'under agency control or otherwise reasonably certain to occur.'" *CBD v.*

*Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (quoting *NWF v. NMFS.*, 524 F.3d

917, 936 & n.17 (9th Cir. 2008)). Furthermore, "[t]he measures 'must be subject to

deadlines or otherwise-enforceable obligations; and most important, they must

address the threats to the species in a way that satisfies the jeopardy and adverse

modification standards.'" *Id.* (quoting *CBD v. Rumsfeld*, 198 F. Supp. 2d 1139,

1152 (D. Ariz. 2002)). "Binding mitigation measures cannot refer only to

generalized contingencies or gesture at hopeful plans; they must describe, in detail,

the action agency's plan to offset the environmental damage caused by the

project." *Id.*

Undetermined or unidentified future mitigation measures may not be used to

support a no jeopardy decision. *Id.* "Indefinite mitigations measures" or "measures

that are too vague, or do not commit resources, or are otherwise insufficiently

integrated into the proposed action are generally unenforceable under the ESA, and

thus cannot be properly relied upon." *Id.* A "sincere general commitment to future

improvements" is not enough to offset the negative effects of an action "absent

specific and binding plans." *NWF*, 524 F.3d at 936.

Lastly, "[r]ecovery must be considered explicitly and separately from survival." *CBD v. Salazar*, 804 F. Supp. 2d 987, 999 (D. Ariz. 2011). "[A]n agency must "know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from 'significant' impairments to habitat that is already severely degraded." *Id.* at 1000.

In this instance, FWS could not engage in a detailed discussion of the Project's impacts on bull trout, critical habitat, and whitebark pine without knowing critical information about the Project – namely where, when, and how the Project activities will be carried out and where those activities occur in relation to the locations of the listed species and habitat. Thus, Agencies violate ESA, NEPA, and APA in three primary ways: (1) failure to adequately support its no jeopardy conclusion with concrete information; (2) reliance on vague, unenforceable, and undisclosed Best Management Practices ("BMPs") and Design Features; and (3) failure to provide appropriate guardrails in the incidental take statement.

### i. Bull Trout and Bull Trout Critical Habitat

While the BiOp does acknowledge some impacts to bull trout from some activities, it makes no attempt to quantify these harms. The lack of analysis and disclosure of what management activities will occur where, the impacts to bull

trout and bull trout critical habitat cannot be properly considered and analyzed, in violation of the ESA and NEPA.

### a. The no jeopardy conclusion is unsupported by the administrative record.

Agencies acknowledge the small population of bull trout in the area, the degraded status of the habitat, and the impacts from the Project, but then concludes "no jeopardy" without any analysis of what the impacts mean to the continued survival of bull trout. SUF ¶¶36-60. Further, USFS's conclusion that the undisclosed, improved road conditions will be maintained in perpetuity is arbitrary, as FWS recognizes. SUF ¶47. USFS's conclusion is further undermined because the modeling presumes all temporary roads will be decommissioned once Project activities are complete, which USFS explicitly admits will not be the case. SUF ¶46. Because decommissioning is not currently funded or scheduled to occur, the assumption underpinning the BiOp's conclusions about sedimentation is fatally flawed and USFS's reliance thereupon is arbitrary and unlawful. Starkly put, if the impacts from this Project cause the local bull trout population to collapse, it will not matter that the long-term improvements would create a more suitable habitat because there will not be any bull trout left to live there.

Lastly, USFS also sidesteps any meaningful analysis of impacts from climate change on bull trout and its critical habitat, despite the predicted severe

loss of suitable habitat. SUF ¶75. The projected habitat decrease is significant and it is entirely overlooked, in violation of ESA and APA.

**b. The no jeopardy conclusion and incidental take permit relies on vague, unenforceable, and undisclosed BMPs and design features.**

USFS and FWS are relying on perfect, complete, and permanent BMPs implementation to support the no jeopardy conclusion, but the BMPs themselves do not appear in the BiOp and thus, are not enforceable. Without disclosure of these BMPs, the reliance on their perfect execution to conclude no jeopardy is arbitrary and unlawful.

Many of the design features are vague or difficult to enforce. For instance, USFS must take action "if road conditions are in danger of being degraded to the point where there is a high risk of sediment deposition to streams," FWS54; without discussion of what metrics USFS will use to determine whether a road has deteriorated to this point, or what a high risk of sediment deposition in streams means. USFS also claims that follow up surveys found "no instances [of] sediment observed leaving the harvest units or landings, filtering its way through the RHCA buffers, and entering streams," a claim which is just not true. SUF ¶¶. The assumption that project design features, BMPs, and mitigation measures will be permanently, 100% effective is not reasonable.

In another example, term and condition C states "The Forest will devise and implement a long-term solution to minimize the perpetual sediment delivery of the miles of FR 468 within the Nez Perce Fork RHCA prior to the initiation of the third implementation unit (Blue Joint)." SUF ¶52. If, as USFS's modeling purports to demonstrate, the BMPs would eliminate all or nearly all background sedimentation, it is unclear why there a need to develop a new solution.

Further, USFWS fails to address bull trout recovery in the Biological Opinion. Under ESA regulations, FWS's jeopardy analysis must consider not just survival, but "survival and recovery" of the species. 50 C.F.R. § 402.02. There is no reasonable basis for finding the Project will not impede bull trout recovery, given the harms USFWS admitted the Project will cause. All of these actions violate ESA and APA.

### ii. Whitebark Pine

The deficiencies in the whitebark pine BiOp violate of ESA and APA, including vague, unenforceable, and inconsistent language in the Conservation Measures; a failure to fully disclose and consider the impacts to whitebark pine, including damage from the planned activities and impacts from climate change; and an utter failure to separately consider species recovery.

The current status of whitebark pine is dire, SUF ¶¶; and Agencies attempts to support its no jeopardy conclusion with the promise that project design features

will prevent adverse effects is not supported by the AR. Instead, the mitigation measures (or Conservation Measures) are limited in impact due in vague language such as preventing harm "to the extent possible" no treatments in the "vicinity" of plus trees, and preventing impacts to "known" trees.

### a. The no jeopardy conclusion is unsupported by the administrative record.

USFS failed to address how the significant killing and damaging of whitebark pine trees of all ages from fire on 84% of its suitable habitat and from logging activities in the areas with the best habitat for whitebark pine will impact the survival of the species.

Further, there is no disclosure and consideration of the sharp decline of the species overall, the predation from Clark's nutcracker when there are insufficient seeds produced, and the potential spread of white pine bluster rusk from heavy vehicle operations.

USFS also fails to consider the impacts from failing to conduct testing for plus trees in the project area, a decision it supports by noting all the plus trees are at least five miles from any planned activities. SUF ¶78. The disregard for how whitebark pine is propagated means the long-term benefits of the plus tree program (and, thus, the ultimate goal of having these hardier-gened trees spread throughout whitebark pine range) could evaporate due to destruction of plus trees whose seeds

were hidden and forgotten about by Clark's nutcracker outside of the identified areas. SUF ¶73.

This cursory acknowledgement of general risks to whitebark pine is not the detailed discussion of the current status contemplated under ESA or APA. USFS has failed to consider the impacts to the species from damaging and destroying several generations of cone-producing trees, particularly given how many young trees are anticipated to be killed or damaged and the extremely slow growth rate of the species. SUF ¶72. Because of the slow growth rate of whitebark pine, it may take 40 to 60 years for a single tree to produce cones, and a sharp decline in the number of whitebark pine trees of cone-bearing age would delay the subsequent generations of cone-bearing trees for the next 60 to 80 years within the Project area (depending on the implementation schedule). Indeed, the results of this causes significant cascading impacts as the decline in seed production results in fewer Clark's nutcrackers present who will then hide fewer seeds (and possess a greater recollection of the location of stashed seeds), resulting in fewer forgotten seeds growing into whitebark pine trees, starting the doom spiral cycle all over again.

Lastly, although USFS tacitly acknowledges climate change will "likely exacerbating the primary threats to whitebark pine and its decline," there is no discussion of what this means for the jeopardy of the species nor its recovery.

Despite the lack of surveys for whitebark pine, but the apparent presence throughout the Project area, the BiOp for whitebark pine concludes no threat to the species in any form. Because USFS has conducted limited surveys for whitebark pine presence in the project area, it does not have adequate information upon which to base this jeopardy conclusion and upon which to allow removal of this species, in violation of ESA and APA.

**b. The no jeopardy conclusion and incidental take statement relies on vague, unenforceable, and undisclosed BMPs and design features.**

In concluding there was no jeopardy to whitebark pine from the project, the BiOp relies on five "Conservation Measures" USFS proposes. SUF ¶¶79-84. USFS is directed to reinitiate consultation if "the amount or extent of taking specified in the incidental take statement is exceeded." SUF ¶85. Because these measures are not specific or certain to occur, they do not mitigate threats to the species in a way that justifies the no jeopardy conclusion. Each of these mitigation measures and the standard for reinitiating consultation is problematic.

The problem with the word "known" in Measure 3 is that it allows wide loopholes due to USFS's reliance on modeling for tree habitat locations, rather than a ground survey. It is unclear if any trees located within the modeled habitat locations are "known" as used in the BiOp. Certainly, if the modeling was incorrect at identifying a location of possible whitebark pine trees, those trees are

not "known" because they do not exist. It is less clear whether a whitebark pine tree in a modeled location, but that is inadvertently overlooked during a ground survey is a "known" tree. Less clear still is whether a whitebark pine tree located in a modeled location that was not subject to a ground survey before Project activities take place is a "known" tree. This type of uncertainty creates confusion and will result in far more death and destruction to whitebark pine than the BiOp contemplates.

Measures 1 and 5 essentially allow for the elimination of 99% of the whitebark pine individuals surveyed, because there is no standard for what is "possible" in terms of protecting trees from fire and logging. Finally, it cannot be assumed that whitepark pine will establish following project activities, as the Agencies do throughout the analysis, trees must be planted following project activities. USFS and USFWS failed to consider the best available information regarding what is necessary to realize the measure and degree of recruitment that is assumed in the BiOp.

## VI.   CONCLUSION

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief:

Declare that the Project (and its affiliated EA, FONSI, BAs, and BiOps) is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with

law under NEPA, NFMA, ESA, and the APA, and reverse and remand the EA, FONSI, BA, BiOp, and Decision back to the agencies to address the deficiencies addressed herein.

Enter appropriate preliminary and permanent injunctive relief prohibiting USFS from permitting or allowing any implementation of the Projects in order to ensure that USFS and the FWS comply with federal law and avoid irreparable harm to the environment until such time as the USFS and the FWS are in full compliance with the law;

Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and disbursements associated with this action under the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., the ESA, 16 U.S.C. § 1540(g)(4), and any and all other provisions of law; and

Award such other relief as this Court deems just and proper.

Respectfully submitted December 30, 2024.

/s/ *Jessica Christy*
Jessica Christy
CHRISTY LAW LLC
2055 South Oneida Street, Suite 394
Denver, CO 80224
(720) 729-7841
jessica@christylaw.legal

/s/ Rachel G. Inabnit
Rachel G. Inabnit
LAW OFFICE OF RACHEL INABNIT,
PLLC
P.O. Box 8846
Missoula, MT 59807
(406) 201-1305
rachel@inabnitlawoffice.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2024, I served a true and correct copy of the foregoing document, via CM/ECF on:

SHAUN M. PETTIGREW
Senior Trial Attorney
CA State Bar No. 254564
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
Telephone: (202) 532-5973
shaun.pettigrew@usdoj.gov

JOSEPH W. CRUSHAM
Trial Attorney
CA Bar No. 324764
Wildlife & Marine Resources Section
150 M Street, N.E.
Washington, D.C. 20002
(202) 307-1145
joseph.crusham@usdoj.gov

*Attorneys for Federal Defendants*

Julie A. Weis (admitted *pro hac vice*)
Christopher T. Griffith (admitted *pro hac vice*)
Haglund Kelley LLP
2177 SW Broadway
Portland, Oregon 97201
(503) 225-0777
jweis@hk-law.com
cgriffith@hk-law.com

Bill Fulbright, Ravalli County Attorney
205 Bedford St, Suite C
Hamilton, MT 59804
(406) 375-6750
bfullbright@rc.mt.gov

*Attorney for Defendant-Intervenor Ravalli County, Montana*

MARK C. PHARES
EMILY OBERMILLER
Montana Department of Natural Resources and Conservation
2705 Spurgin Rd.
Missoula, MT 59804
(406) 542-4341
mphares@mt.gov
cnd404@mt.gov

*Attorneys for Montana Department of Natural Resources and Conservation*