LISA L. RUSSELL
United States Department of Justice
Deputy Assistant Attorney General
Environment & Natural Resources Division

SHAUN M. PETTIGREW (CA Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

JOSEPH W. CRUSHAM (CA Bar No. 324764)
Trial Attorney
Wildlife & Marine Resources Section
150 M Street, N.E.
Washington, D.C. 20002
(202) 307-1145
joseph.crusham@usdoj.gov

*Counsel for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA**

ALLIANCE FOR THE WILD ROCKIES,    )
NATIVE ECOSYSTEMS COUNCIL,    )
YELLOWSTONE TO UINTAS    )
CONNECTION, FRIENDS OF THE    )
BITTERROOT, and WILDEARTH    )
GUARDIANS,    )
   )
      Plaintiffs,    )
   )
      v.    )
   )
   )
_____ )

Case No. 9:24-cv-00010-DLC-KLD

FEDERAL DEFENDANTS'
MEMORANDUM IN SUPPORT
OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT

GARY WASHINGTON,[1] in his official                    )
capacity as Acting Secretary of the                        )
Department of Agriculture, RANDY                          )
MOORE, in his official capacity as Chief                  )
of the Forest Service; MATTHEW                            )
ANDERSON, in his official capacity as the            )
Bitterroot National Forest Supervisor;                   )
DAN PLILEY, in his official capacity as               )
the West Fork District Ranger; UNITED                 )
STATES FOREST SERVICE, and                           )
UNITED STATES FISH AND WILDLIFE                 )
SERVICE,                                                           )
                                                                        )
      Federal Defendants,                              )
                                                                        )
RAVALLI COUNTY, MONTANA,                          )
                                                                        )
      Defendant-Intervenor,                           )
                                                                        )
   and                                                            )
                                                                        )
STATE OF MONTANA DEPARTMENT              )
OF NATURAL RESOURCES,                                )
                                                                        )
      Defendant-Intervenor.                          )
_____ )

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Gary Washington, Acting Secretary of the Department of Agriculture, is automatically substituted for Tom Vilsack.

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................. 1

II.    LEGAL BACKGROUND ...................................................... 3

    A.     National Forest Management Act ...................................... 3

    B.     National Environmental Policy Act .................................... 3

    C.     Endangered Species Act .................................................... 4

III.   STANDARD OF REVIEW ...................................................... 5

IV.    ARGUMENT ........................................................................ 6

    A.     Plaintiffs' NFMA Claims Fail ........................................... 6

        1.     Plaintiffs lack standing to bring their NFMA claims
            because they cannot establish redressability ............................ 6

        2.     The Forest Service properly amended the Forest Plan
            under the 2012 Planning Rule ................................. 7

        3.     The Project complies with the Forest Plan ............................. 11

    B.     Plaintiffs' NEPA Claims Fail ........................................... 14

        1.     The Forest Service reasonably determined an EIS was not
            required ................................................................. 14

        2.     The final EA took a hard look at the Project's potential
            climate impacts ....................................................... 16

    C.     Plaintiffs' ESA Claims Fail .............................................. 18

        1.     FWS Reasonably Concluded That the Project is Not
            Likely to Jeopardize Bull Trout or Adversely Modify
            Critical Habitat ...................................................... 18

            a.     FWS Properly Considered the Project's Design
                Features ....................................................... 20

|   | b. | Plaintiffs' Other Arguments Attacking the No-Jeopardy Determination Fail | 22 |

    2.    FWS Reasonably Concluded That the Project is Not Likely to Jeopardize Whitebark Pine .......................................25

        a.    FWS Properly Considered the Project's Design Features .......................................................................27

        b.    Plaintiffs' Other Arguments Regarding the WBP BO Fail .......................................................................28

V.    CONCLUSION ...........................................................................29

        b.    Plaintiffs' Other Arguments Attacking the No-Jeopardy Determination Fail ..........................................22

    2.    FWS Reasonably Concluded That the Project is Not Likely to Jeopardize Whitebark Pine.......................................25

        a.    FWS Properly Considered the Project's Design Features .......................................................................27

        b.    Plaintiffs' Other Arguments Regarding the WBP BO Fail .......................................................................28

V.    CONCLUSION ...........................................................................29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. For the Wild Rockies v. Lannom,*
  No. 21-cv-51-M-DC, 2024 WL 3199780 (D. Mont. June 27, 2024) .................. 8

*All. For the Wild Rockies v. United States Dep't of Agric.,*
  772 F.3d 592 (9th Cir. 2014) ............................................................25

*Arizona Cattle Growers' Ass'n v. FWS,*
  273 F.3d 1229 (9th Cir. 2001) ...........................................................20

*Blue Mountains Biodiversity Proj. v. United States Forest Serv.,*
  No. 23-3049, 2024 WL 4814553 (9th Cir. Nov. 18, 2024)...........................9, 16

*Blue Mountains Biodiversity Project v. Blackwood,*
  161 F.3d 1208 (9th Cir. 1998) ...........................................................14

*Cascade Forest Conserv. v. United States Forest Serv.,*
  No. 22-35087, 2022 WL 10964667 (9th Cir. Oct. 19, 2022)............................ 8

*City of Los Angeles, California v. Fed. Aviation Admin.,*
  63 F.4th 835 (9th Cir. 2023) ............................................................. 4

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
  698 F.3d 1101 (9th Cir. 2012) ...........................................................21

*Ctr. for Biological Divesity v. Bernhardt,*
  982 F.3d 723 (9th Cir. 2020) ............................................................21

*Defs. of Wildlife v. Zinke,*
  856 F.3d 1248 (9th Cir. 2017) ...........................................................20

*Earth Island Inst. v. Gibson,*
  834 F. Supp. 2d 979 (E.D. Cal. 2011)....................................................18

*Friends of the Bitterroot v. Marten,*
  No. 20-cv-19-M-DLC, 2020 WL 5804251 (D. Mont. Sept. 29, 2020) ............... 9

*Hapner v. Tidwell,*
  621 F.3d 1239 (9th Cir. 2010) ...........................................................17

*In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior,*
  751 F.3d 1054 (9th Cir. 2014) ...........................................................14

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020) ........................................................6, 7

*Native Ecosystems Council v. United States Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ...........................................................15

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) ............................................................ 3

*Neighbors of Cuddy Mountain v. United States Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) ...........................................................16

*NRDC v. Haaland*,
    102 F.4th 1045 (9th Cir. 2024) ..........................................................24

*Nw. Ecosystem All. v. United States Fish & Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) ............................................................ 6

*Ocean Advocates v. United States Army Corps of Eng'rs.*,
    402 F.3d 846 (9th Cir. 2005) .............................................................14

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ........................................................................ 3

*Or. Nat. Desert Ass'n v. United States Forest Serv.*,
    957 F.3d 1024 (9th Cir. 2020) ............................................................ 6

*Or. Nat. Desert Ass'n v. Tidwell*,
    716 F. Supp. 2d 982 (D. Or. 2010) ....................................................18

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ........................................................................ 3

*Sierra Club, Inc. v. United States Forest Serv.*,
    897 F.3d 582 (4th Cir. 2018) ............................................................. 8

*Swomley v. Schroyer*,
    484 F. Supp. 3d 970 (D. Colo. 2020) .................................................17

*Tri-Valley CAREs v. United States Dep't of Energy*,
    671 F.3d 1113 (9th Cir. 2012) .....................................................16, 17

*Wash. Env'tl Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ............................................................ 7

*Westlands Water Dist. v. United States Dep't of Interior*,
    376 F.3d 853 (9th Cir. 2004) ............................................................. 4

*Wild Wilderness v. Allen*,
  871 F.3d 719 (9th Cir. 2017) ............................................................14

**Statutes**

16 U.S.C. § 1536(a)(2) ....................................................................... 4

16 U.S.C. § 1536(b)(4) ....................................................................... 5

16 U.S.C. § 1536(o)(2) ....................................................................... 5

16 U.S.C. § 1604(a) ............................................................................. 3

16 U.S.C. § 1604(f)(4) ....................................................................... 8

16 U.S.C. § 1604(i) ............................................................................. 3

42 U.S.C. § 4332(2)(C) ..................................................................3, 4

42 U.S.C. § 4336(b)(2) ....................................................................... 4

5 U.S.C. § 706(2)(A) ........................................................................... 5

Mont. Code Ann. 87-1-201 ...............................................................11


**Regulations**

36 C.F.R. § 219.13 ............................................................................... 8

36 C.F.R. § 219.13(a) ......................................................................... 8

36 C.F.R. § 219.13(b)(5) ...................................................................10

36 C.F.R. § 219.13(e) .........................................................................10

36 C.F.R. §§ 219.8-.11 .......................................................................10

40 C.F.R. § 1501.3 ............................................................................... 4

40 C.F.R. § 1502.2(b) .........................................................................17

40 C.F.R. § 1508.27(b) ......................................................................14

40 C.F.R. § 1508.27(b)(9) ..................................................................15

50 C.F.R. § 402.02 ............................................................................... 5

50 C.F.R. § 402.14(a) ......................................................................... 4

50 C.F.R. § 402.14(g)(8) .............................................................5, 21, 24

50 C.F.R. § 402.16(a)(3) ........................................................21

**Other Authorities**

87 Fed. Reg. 76,822 (Dec. 15, 2022)........................................26

87 Fed. Reg. 76,914 (Dec. 15, 2022)........................................26

## I. INTRODUCTION

Past fire suppression efforts and management of the Bitterroot National Forest ("Forest") have resulted in an unnatural homogenous forest that is susceptible to large scale disturbances such as wildfires, insect infestations, and disease outbreaks, and that has degraded wildlife habitat. Federal Defendants' Statement of Undisputed Facts ("SOF") ¶¶ 5-10, 18. To address these conditions, the U.S. Forest Service proposed a project to improve the landscape's resilience to wildfire, insects, and disease and update the transportation system. *Id.* ¶¶ 4, 11-15, 22-32.

Following this scoping process, the Forest Service assessed the potential effects of the proposed project in a final environmental assessment ("EA") under the National Environmental Policy Act ("NEPA"). *Id.* ¶¶ 16-17. This included assessing potential effects to fire and fuels, *id.* ¶¶ 36-44; forest composition and resilience, old growth, and carbon storage, *id.* ¶¶ 45-53; whitebark pine, *id.* ¶¶ 54-56; bull trout, *id.* ¶¶ 57-59; and elk, *id.* ¶¶ 60-65.

Based on the final EA, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("DN/FONSI") approving the Mud Creek Vegetation Project ("Project"). *Id.* ¶ 66. The Project approves a maximum amount of commercial timber harvest, non-commercial treatments, and prescribed fire across four implementation areas in the 48,486-acre Project area. *Id.* ¶¶ 23-26, 67.

In implementing these activities, the Forest Service will apply condition-based management that responds to the forest as a dynamic ecosystem by specifying which treatments will apply under which circumstances. *Id.* ¶¶ 27-31. The Project also approved Project-specific amendments to the Forest Plan related to elk habitat, thermal cover, and old growth. *Id.* ¶ 33-35, 68.

The Forest Service completed consultations with the U.S. Fish and Wildlife Service ("FWS") under the Endangered Species Act ("ESA"). After receiving a biological assessment from the Forest Service assessing impacts to bull trout and bull trout critical habitat ("Fisheries BA"), FWS rendered a biological opinion ("Bull Trout BO"), concluding that the Project was not likely to jeopardize the continued existence of bull trout or to adversely modify its critical habitat. FWS also issued an incidental take statement ("ITS") for bull trout. SOF ¶¶ 71–161. Likewise, after receiving a whitebark pine biological assessment ("WBP BA") from the Forest Service, FWS rendered a biological opinion ("WBP BO"), concluding that the Project was not likely to jeopardize the continued existence of the species. SOF ¶¶ 162-195.

Plaintiffs challenge the Project under the National Forest Management Act ("NMFA"), NEPA, and ESA. Their challenge is meritless. The Forest Service and FWS conducted thorough, reasonable analyses that comply with each statute, and Plaintiffs' arguments do not engage with their rigorous work. The Court should

deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motion, and enter judgment for Federal Defendants.

## II.  LEGAL BACKGROUND

### A.  National Forest Management Act

NFMA governs the Forest Service's administration of national forests. It is primarily a planning statute, with two basic levels of planning and management: the forest level and the individual project level. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30, 736 (1998). At the forest level, the Forest Service develops a Land and Resource Management Plan, known as a "forest plan," for each national forest. 16 U.S.C. § 1604(a). At the project level, the Forest Service implements a forest plan through specific projects and activities. *See Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). Individual projects must be consistent with the forest plan. 16 U.S.C. § 1604(i).

### B.  National Environmental Policy Act

NEPA establishes the process by which federal agencies must evaluate the environmental effects of proposed "major Federal actions." 42 U.S.C. § 4332(2)(C). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). As a result, a "court must avoid passing judgment on the substance of an agency's decision. Its focus must be on ensuring that agencies took

a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004).

NEPA requires that an agency prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.[2] An agency may prepare an EA to determine whether the impacts of an action will be significant, and if the impacts will not be significant, the agency may issue a "finding of no significant impact." 42 U.S.C. § 4336(b)(2).

### C. Endangered Species Act

Under Section 7(a)(2) of the ESA, federal agencies must ensure that any action funded, authorized, or carried out by the agency is "not likely to jeopardize the continued existence of any endangered species or threatened species" or to destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). Action agencies must consult with FWS whenever an action "may affect" a listed species. *Id.*; 50 C.F.R. § 402.14(a). If the action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in formal consultation. *Id.* § 402.14. Formal consultation culminates in the issuance of a BO by FWS. *Id.* § 402.14(h). "[M]easures included in the proposed action . . . that are intended to avoid,

---

[2] These regulations have been amended multiple time since 2020. *See City of Los Angeles v. FAA*, 63 F.4th 835, 841 n.2 (9th Cir. 2023). This brief cites the pre-2020 regulations that apply to the Project.

minimize, or offset the effects of an action are considered" by the consulting agency like "other portions of the action and do not require any additional demonstration of binding plans." 50 C.F.R. § 402.14(g)(8).

A jeopardy or adverse modification determination requires an appreciable reduction in "the survival and recovery of a listed species in the wild." 50 C.F.R. § 402.02. If FWS determines jeopardy and adverse modification are unlikely, but the action will result in "take" of a listed wildlife or fish species, FWS must issue an ITS. 16 U.S.C. § 1536(b)(4). The ITS contains reasonable and prudent measures ("RPMs") with implementing terms and conditions deemed necessary or appropriate to minimize "take" and with which the action agency must comply. 50 C.F.R. § 402.14(i)(1)(ii), (iv). Any taking in compliance with the statement is exempt from liability under ESA Section 9. 16 U.S.C. § 1536(o)(2).

## III.    STANDARD OF REVIEW

Challenges to agency action are reviewed under the Administrative Procedure Act ("APA"). A court may set aside an agency action only if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider," failed to consider important factors, offered an explanation inconsistent with the record, or the decision "is so

5

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1033 (9th Cir. 2020) (citations omitted). This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).

## IV. ARGUMENT

### A. Plaintiffs' NFMA Claims Fail

#### 1. Plaintiffs lack standing to bring their NFMA claims because they cannot establish redressability.

Plaintiffs bring NFMA claims challenging the Project-specific Forest Plan amendments to elk habitat effectiveness and elk thermal cover and asserting that the Project violated NFMA by applying an updated definition of old growth. Pls.' Opening Br. in Supp. of Mot. for Summ. J. 11-16, ECF No. 56 ("Pls.' Br."). Plaintiffs ask that the Project be vacated and remanded to the Forest Service for these alleged NFMA violations. Am. Compl. ¶ B (Prayer for Relief asking to "reverse and remand" the Project), ECF No. 43. But Plaintiffs lack standing to bring these NFMA claims because they are not redressable.

A court has Article III jurisdiction only if a plaintiff shows "(1) a concrete and particularized injury that (2) is caused by the challenged conduct and (3) is likely redressable by a favorable judicial decision." *Juliana v. United States*, 947

F.3d 1159, 1168 (9th Cir. 2020) (citations omitted). A plaintiff must establish

standing for each claim it asserts and for each form of relief sought. *Wash. Env'tl*

*Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).

In September 2023—after the Project was approved—the Forest Service

amended the Forest Plan to adopt the same forest-wide and management area

standards adopted in the Project-specific amendments Plaintiff challenges. *See*

SOF ¶ 69; Anderson Decl. ¶¶ 4-7. As a result, even if the Court found some flaw in

the Project-specific amendments, vacatur of the Project would not affect these

standards. Plaintiffs cannot show that vacatur would be "substantially likely to

redress their injuries," because the same standards would still be in effect even if

the Project-specific amendments were vacated. *Juliana*, 947 F.3d at 1170.

Plaintiffs have not established they have standing to pursue their NFMA claims.

> **2.    The Forest Service properly amended the Forest Plan under the 2012 Planning Rule.**

Plaintiffs confusingly argue in support of their NEPA failure-to-prepare-an-

EIS claim that the Forest Service improperly adopted Project-specific Forest Plan

amendments as to elk habitat effectiveness and thermal cover.[3] Pls.' Br. 9, 11-13.

---

[3] Plaintiffs incorrectly refer to the Project-specific amendments as "programmatic amendments." *See* Pls.' Br. 11. They are site-specific.

But any challenge to these amendments would arise under NFMA, not NEPA.[4] Federal Defendants accordingly address Plaintiffs' ill-conceived claim here.

The Forest Service promulgated regulations implementing NFMA in 2012 ("2012 Planning Rule") that govern the Project-specific Forest Plan amendments in this case. *See* 36 C.F.R. § 219.13; *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 600-01 (4th Cir. 2018). NFMA and the 2012 Planning Rule "allow for a project-specific amendment to a forest plan." *Cascade Forest Conserv. v. U.S. Forest Serv.*, No. 22-35087, 2022 WL 10964667, at *2 (9th Cir. Oct. 19, 2022). Such an amendment can be done "at any time," 36 C.F.R. § 219.13(a), and "in any manner whatsoever," 16 U.S.C. § 1604(f)(4). "Plan amendments may be broad or narrow," and the Forest Service "has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment." 36 C.F.R. § 219.13(a). This includes modifying "how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas)." *Id.*

Ignoring the Forest Service's broad authority and discretion to amend forest plans, Plaintiffs argue that the Project's elk habitat effectiveness and thermal cover

---

[4] Plaintiffs incorrectly maintain that a NFMA violation is also a NEPA violation. Pls.' Br. 6. *See All. for the Wild Rockies v. Lannom*, No. 21-cv-51-M-DC, 2024 WL 3199780, at *5 (D. Mont. June 27, 2024).

amendments violated NFMA because the Forest Service did not "discuss and disclose some characteristics unique to [the] site . . . ." Pls.' Br. 12. But NFMA and its implementing regulations do not impose such a "uniqueness" standard for site-specific amendments.

Indeed, Plaintiffs ignore that Judge Christensen previously considered and rejected this precise argument, explaining that Ninth Circuit precedent "undercut[s] Plaintiff's argument that a site-specific characteristic must be one that is unique and therefore not present anywhere else on the forest." *Friends of the Bitterroot v. Marten*, No. 20-cv-19-M-DLC, 2020 WL 5804251, at *10 (D. Mont. Sept. 29, 2020) (citations omitted). And just as in that case, the Forest Service here reasonably explained that a site-specific amendment was warranted to the elk habitat effectiveness standard because of "the small size of the third order watersheds in this project area," MC11135, and to the thermal cover standard "to adapt to changes that have occurred on the landscape," MC11135-36. *See Marten*, 2020 WL 5804251, at *10 (upholding site-specific amendments); *see also Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, No. 23-3049, 2024 WL 4814553, at *1 (9th Cir. Nov. 18, 2024) (upholding project-specific forest plan amendments).[5]

---

[5] Plaintiffs reference only the "elk-related amendments." Pls.' Br. 12. But to the extent their brief can be read as also challenging amendment of the old-growth standards, the record explains that a site-specific amendment was warranted "to

Plaintiffs' remaining argument seems to be that the Forest Service failed to apply the 2012 Planning Rule's substantive components within the scope and scale of the amendments. *See* Pls.' Br. 6-7 (citing 36 C.F.R. §§ 219.8-.11). They are wrong. The 2012 Planning Rule identifies various substantive components for forest plans developed or revised under those regulations. *See* 36 C.F.R. §§ 219.8-.11; *see also id.* § 219.7(e) (defining "plan components"). In amending a forest plan under the 2012 Planning Rule, the Forest Service must "[d]etermine which specific substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment." *Id.* § 219.13(b)(5).

The Forest Service did this by determining that the elk habitat effectiveness and thermal cover amendments would directly affect the substantive requirement as to wildlife habitat conditions at section 219.10(a)(5). MC11134. The Forest Service then assessed the amendments' potential to affect elk habitat, explaining that the habitat effectiveness amendment would "result in minimal effects to elk or elk habitat because more recent literature suggests other factors (e.g., forage quantity and quality) are more important to elk," and the removal of roads from the

---

provide consistent, measurable criteria for monitoring old growth at the project scale . . . ." MC11327.

transportation system and improvement in forage "will ultimately be beneficial to elk." SOF ¶ 64. As to thermal cover, the Forest Service explained that the most recent scientific literature shows that "thermal cover does not appreciably enhance the energetic status and productive performance of elk," and that the amendment "is not expected to have measurable effect to elk." *Id.* ¶¶ 62-63.

In response, Plaintiffs mistakenly claim the Forest Service "justified the elk-related amendments" based on information from Montana Fish, Wildlife, and Parks ("FWP") that no "primary winter foraging areas" are in the project area or next to it. Pls.' Br. 12 (citing MC10605). But the Forest Service referenced this information in the context of a larger, detailed analysis of the potential effects of the thermal cover amendment on the quality and abundance of winter range. *See* MC10604-05. And Plaintiffs fail to explain why it would be improper for the Forest Service to rely on FWP for this information. FWP, after all, is responsible for managing elk in Montana. *See* Mont. Code Ann. 87-1-201.

The Forest Service complied with NFMA and the 2012 Planning Rule in adopting site-specific amendments to elk habitat effectiveness and thermal cover.

### 3. The Project complies with the Forest Plan.

The Forest Plan provides a forest-wide standard that the "amount and distribution of old growth will be used to ensure sufficient habitat for the maintenance of viable populations of existing native and desirable vertebrate

species, including two indicator species, the pine marten and pileated woodpecker." MC24; MC11140. The Forest Plan then identifies various "[c]riteria to consider for identifying old growth." MC25. The Project-specific amendment to the Forest Plan updated those criteria to "represent[] the best available scientific information to define old growth." SOF ¶¶ 35, 48.

The amendment also removed the provision in various management area standards that required stands to be managed as old growth only if they were at least 40 acres. *Id.* ¶ 35. Under the amendment, "[s]tands smaller than 40 acres, if meeting old growth criteria, will be included, because they are valuable as a key characteristic of ecosystem diversity, notwithstanding their size." *Id.* Combined, these amendments result in identification of more stands and a greater variety of stands as old growth. *Id.* ¶¶ 35, 48; *see also* MC13800-02.

Plaintiffs argue the Project violates the Forest Plan because the Forest Service did not "use the Forest Plan definition of old growth," and thus "the entire old growth analysis for the Project area is invalid until [the Forest Service] applies the Forest Plan old growth definition in place at the time the Project was approved." Pls.' Br. 14, 16. But, unlike the elk habitat effectiveness and thermal cover amendments discussed above, Plaintiffs' brief does not challenge the old

growth amendments, and the Project-amended standards apply to assess the Forest Service's compliance with the Forest Plan.[6]

But even if the original standards applied, Plaintiffs fail to explain how the Project would violate those standards because no Project activities "will remove any stand from old growth status." SOF ¶ 48. Therefore, under either the inclusive amended definition or the rigid original definition, all old growth in the Project area will be retained. Plaintiffs' speculation that "now old growth stands that do meet this 40-acre requirement can be fragmented and broken up" finds no support in the record. Pls.' Br. 14; *see also id.* 15-16 (same argument as to indicator species).

Plaintiffs also suggest that a site-specific survey is required for the Forest Service to "know the impacts of the management activities on the Project area." *Id.* 14. But Plaintiffs ignore that the Forest Service identified and mapped the old growth stands in the Project area through extensive field verification (i.e., walk through stand exams) and aerial photo interpretation. MC13800-01. This information allows the Forest Service to understand and analyze the Project's potential effect on old growth stands throughout the Project area.

---

[6] As noted above, even if Plaintiffs challenged the old growth amendment, the Forest Service adequately explained the need for it.

The Project-specific old growth amendment applied the best available science to identify additional stands and acres in the Project area that qualify as old growth. The Forest Service detailed the location of those stands and explained that Project activities would not affect their old growth status. None of this violated the Forest Plan.

## B. Plaintiffs' NEPA Claims Fail

### 1. The Forest Service reasonably determined an EIS was not required.

Under NEPA, "an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). "Whether an action 'significantly' affects the environment requires analyzing both 'context' and 'intensity.'" *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing 40 C.F.R. § 1508.27). "Context refers to the setting in which the proposed action takes place." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27(a)). "Intensity means 'the severity of the impact.'" *Id.* (citing 40 C.F.R. § 1508.27(b)). "[T]he regulations identify ten factors that agencies should consider in evaluating intensity." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (citing 40 C.F.R. § 1508.27(b)(1)-(10)).

The forest supervisor considered the context and intensity for the Project as assessed in the final EA and supporting documents and concluded that an EIS was not needed. MC11306-09. The FONSI and supporting documents explain the basis for this conclusion, providing the "convincing statement of reasons" as to why a project's impacts are insignificant that NEPA requires. *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citation omitted).

In claiming otherwise, Plaintiffs argue the Project's potential effects to bull trout and whitebark pine required preparation of an EIS. Pls.' Br. 10-11. But Plaintiffs misunderstand this intensity factor. *See* 40 C.F.R. § 1508.27(b)(9). The relevant inquiry is the degree of any potential effect on the species, not individuals of the species. And as detailed in the final EA, aquatics report, and fisheries biological assessment, there will be limited to no effects on either species. SOF ¶¶ 54-59. This factor does not support an EIS. *See Native Ecosys. Council*, 428 F.3d at 1240 (declining to require EIS any time a federal agency discloses adverse impacts on wildlife species or habitat).

Without identifying a specific intensity factor, Plaintiffs argue in a single sentence that "the failure to provide sufficient site-specific information or analysis about the Project and its impacts . . . warrants preparation of an EIS." Pls.' Br. 11. But Plaintiffs ignore the detailed information in the final EA documenting the Project area, implementation areas, current vegetative conditions, specific

conditions that would warrant particular treatments, maximum treatments in each implementation area, and the potential effects of those treatments. SOF ¶¶ 24-31. Plaintiffs have not raised substantial questions about the Project's potential effects that would support preparation of an EIS. *See Blue Mountains Biodiversity Proj.*, 2024 WL 4814553, at *2-3 (rejecting arguments that site-specific amendment, time for trees to regrow, cumulative impacts, and effects to ESA-listed species required EIS).

### 2. The final EA took a hard look at the Project's potential climate impacts.

An EA satisfies NEPA's hard-look mandate if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). "The purpose of an EA under NEPA is not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (citation omitted).

Plaintiffs mischaracterize the Forest Service's assessment of the Project's potential climate impacts as "cookie-cutter." Pls.' Br. 17. The final EA, vegetation report, and Forest-specific carbon assessment provided a thorough analysis of

carbon storage on the Forest and the Project's potential effects on that storage. *See*

SOF ¶¶ 49-53. That analysis explained the role of forests in the global carbon

cycle, the amount of stored carbon on the Forest, how that stored carbon is affected

by disturbances, management, and environmental factors, the role that improving

forest resiliency will have on those carbon stocks, and the potential carbon

emissions resulting from implementation activities. *Id.* Based on all this, the Final

EA reasonably explained that emissions from Project-implementation activities

"would be small relative to the carbon sequestered in the forest products," and

"would be balanced and possibly eliminated as the stand recovers and

regenerates." *Id.* ¶ 53. This analysis provided a more than reasonably thorough

analysis of the issue.

Indeed, the Ninth Circuit previously upheld an EA for a project that

authorized timber harvest "to reduce likely fire intensity" that included *no*

discussion of climate change. *Hapner v. Tidwell*, 621 F.3d 1239, 1242, 1245 (9th

Cir. 2010). In doing so, the court correctly noted that potential "[i]mpacts shall be

discussed in proportion to their significance." *Id.* at 1245 (quoting 40 C.F.R.

§ 1502.2(b)); *see also Swomley v. Schroyer*, 484 F. Supp. 3d 970, 975-77 (D. Colo.

2020) (upholding EA's discussion of climate impacts of forest resilience project).

The Forest Service's well-reasoned explanation of the Project's negligible potential

climate impacts is consistent with this proportionality standard and is subject to

deference. *See Earth Island Inst. v. Gibson*, 834 F. Supp. 2d 979, 990 (E.D. Cal. 2011) (deference to agency's assessment of climate impacts of fuel reduction project).

## C. Plaintiffs' ESA Claims Fail[7]

### 1. FWS Reasonably Concluded That the Project is Not Likely to Jeopardize Bull Trout or Adversely Modify Critical Habitat

The Bull Trout BO thoroughly analyzes the potential effects of the Project to bull trout and its critical habitat, ultimately concluding that the primary threat is sediment delivery to streams. SOF ¶¶ 121-148.

FWS outlined each Project activity, considering the design features for each to be "part of the proposed action." SOF ¶¶ 77-94, 104. For instance, FWS considered that Riparian Habitat Conservation Area ("RHCA") buffers will apply "to all water bodies." SOF ¶¶ 78, 104. RHCA buffers are designed to prevent activities from delivering sediment to streams. *Id.*; SOF ¶¶ 125-128, 96-97. Because essentially no timber harvest will occur within RHCAs, FWS found that timber harvesting is unlikely to deliver sediment to streams and affect bull trout. SOF ¶ 126-127. Moreover, log truck loads cannot exceed 13,500, and more

---

[7] Because FWS issued BOs, the Forest Service's Fisheries BA and WBP BA are not final agency actions. *See, e.g.*, *Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 995 (D. Or. 2010). Despite Plaintiffs' repeated reference to the adequacy of Forest Service analyses, the question is only whether FWS's BOs comply with the ESA and APA.

specific limits are included for roads near streams containing bull trout or bull trout habitat. SOF ¶¶ 81, 128. All new roads and roads used for log hauling must be upgraded to current Best Management Practices ("BMPs") to reduce sediment delivery. SOF ¶¶ 81-82, 85, 104.

The Bull Trout BO is exhaustive. Employing its detailed bull trout framework and recovery plan, FWS considered effects to individual bull trout, local populations, core areas, and recovery units. SOF ¶¶ 108-111, 115-140.

Ultimately, FWS found that hauling and a specific road-crossing removal would likely adversely affect bull trout through sediment delivery, but such effects would be limited to short-term "pulse events." SOF ¶¶ 141-147, 151. FWS also determined the Project could reduce sediment in the "moderate" term (through BMP application) and "long" term (by reducing road crossings and densities). *Id.*

FWS concluded that the Project is "not anticipated to reduce the reproduction, numbers, or distribution" of bull trout at each demographic unit level "to the degree that survival or recovery is reduced." SOF ¶ 152–53. Thus, FWS determined that the Project would not jeopardize bull trout "at the range-wide scale" by appreciably reducing survival and recovery. *Id.*

Regarding critical habitat, FWS determined that short-term sedimentation would likely adversely affect five of the nine primary constituent elements. SOF ¶¶ 154-155. Because these effects would be "unlikely to change the functional

capacity of the entire action area," FWS determined they would not "appreciably reduce the conservation value" of any core area or "reduce the function of critical habitat to support" recovery. *Id.* Thus, FWS found the Project is not likely to destroy or adversely modify critical habitat.[8]

FWS included an ITS. SOF ¶¶ 156-161. Finding it impracticable to numerically quantify the "amount of take" due to the diffuse nature of sedimentation, FWS identified surrogate measures for take, including effectively implementing design features, and whether log truck loads exceed a maximum number for specified roads. SOF ¶¶ 156-158.[9] FWS included three RPMS and nine terms and conditions. SOF ¶¶ 159-161.

### a. FWS Properly Considered the Project's Design Features.

Plaintiffs argue that it was improper for FWS to consider the Project's design features in the Bull Trout BO because they are "not enforceable." Pls.' Br. 18-19, 21. Plaintiffs misunderstand the Project and law.

---

[8] Plaintiffs do not expressly challenge FWS's critical habitat determination and appear to incorrectly conflate it with the no-jeopardy conclusion. *See, e.g.*, *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1259-62 (9th Cir. 2017) (explaining difference between adverse modification and jeopardy analyses).

[9] Plaintiffs fault FWS for not "quantifying" harm, Pls.' Br. 19, but FWS need not provide a numerical limit where, as here, FWS has explained that such limit could not be "practically obtained" and the surrogate measures are "linked" to take. *Arizona Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1249-50 (9th Cir. 2001).

FWS determined that the design features were "part of the proposed action," SOF ¶ 104, and thus it was proper for FWS to consider their effects. 50 C.F.R. 402.14(g)(8). Plaintiffs' reliance on *CBD v. Bernhardt*—where measures at issue were merely "possible strategies" for mitigation—is misplaced. 982 F.3d 723, 746-47 (9th Cir. 2020). Here, because the features are part of the Project's design, failure to implement them would be a change in the action possibly triggering reinitiation. *See CBD v. BLM*, 698 F.3d 1101, 1115 (9th Cir. 2012); 50 C.F.R. § 402.16(a)(3). Moreover, implementation, maintenance, and monitoring of the design features are surrogates for take in the ITS and required by each RPM. SOF ¶¶ 158-161. Thus, the design features are binding in multiple independent ways.

Plaintiffs also incorrectly argue that FWS relied on "perfect, complete, and permanent" implementation of design features. Pls.' Br. 21. FWS determined BMPs would provide only moderate-term benefits because they would degrade within 10 years, and that—even with the "highest efficacy of design feature implementation and BMP management"—adverse sediment affects were likely. SOF ¶¶ 129-132.[10] Plaintiffs also ignore that certain Project components—such as

_____

[10] Thus, Plaintiffs' argument that FWS assumed "improved road conditions" would last forever, and their questioning why FWS would require the Forest Service to devise a *long-term* solution for sediment delivery on certain roads, are misplaced. Pls.' Br. 20-22.

permanent removal of a road crossing at Rombo Creek—will result in long-term benefits to bull trout. SOF ¶ 153.

Plaintiffs incorrectly refer to Term and Condition B of the ITS as a "design feature," and complain that it is vague. Pls.' Br. 21. Whether roads are degrading and at high risk of delivering sediment is neither vague nor difficult to enforce. SOF ¶ 159. And Plaintiffs provide no support for the proposition that FWS must specify the "metrics" by which the Forest Service makes these determinations.

Finally, Plaintiffs complain that the BMPs "do not appear in the" Bull Trout BO. Pls.' Br. 21. Examples of BMP upgrades are specified in the Bull Trout BO, FWS9-10, but the ESA does not require that every facet of the proposed action be repeated by FWS—the full suite of BMPs are in the Forest Service's record. SOF ¶ 82.

### b. Plaintiffs' Other Arguments Attacking the No-Jeopardy Determination Fail.

Plaintiffs otherwise make unsupported, conclusory assertions that FWS failed to consider certain issues, without explaining how such issues undermine FWS's expertise and no-jeopardy determination.

For instance, Plaintiffs argue that the condition-based nature of the Project caused FWS to issue the Bull Trout BO "without knowing critical information." Pls.' Br. 19. Plaintiffs identify nothing that FWS failed to consider, and they ignore that FWS analyzed the full extent of possible activities on a site-specific level. For

example, FWS considered the maximum number of log hauls authorized by the Project—13,500—including specific limits for specific roads near bull trout. SOF ¶¶ 128, 160. FWS likely analyzed *more* impacts than will ultimately occur, because 13,500 is "likely an overestimate" that was used to ensure the maximum possible extent of effects were analyzed. SOF ¶ 81. Moreover, FWS's consideration of specific RHCA barriers buffering impacts from activities—like specified road construction and treatments—is site-specific, *see* SOF ¶ 78, 85-86, and FWS considered impacts to specific streams containing bull trout or critical habitat in the action area, *see* SOF ¶ 117, 129, 131, 136, 144, 151, 154.

Plaintiffs baldly assert that FWS failed to consider "the continued survival of bull trout," and speculate that the Project could "cause the local bull trout population to collapse." Pls.' Br. 20. But FWS carefully considered the status of and potential effects to bull trout at each demographic unit level and determined that the Project would not jeopardize the species' survival and recovery. SOF ¶¶ 108-10, 141-147, 152-53.

Plaintiffs also argue that road decommissioning may not occur and thus FWS should not have analyzed its effects. Pls.' Br. 20. Temporary roads will not deliver sediment because they will be built outside RHCAs. SOF ¶ 127. Either way, the Project provides that temporary roads will be decommissioned following timber harvests. SOF ¶ 32, 86, 104. Likewise, decommissioning existing roads is

part of the proposed action. SOF ¶ 90-92, 135-137. Thus, FWS properly analyzed the Project "as presented." *NRDC v. Haaland*, 102 F.4th 1045, 1072-73 (9th Cir. 2024); *see* 50 C.F.R. 402.14(g)(8).[11]

Next, Plaintiffs argue that FWS did not consider climate change, Pls.' Br. 20-21, but FWS considered its effects throughout the Bull Trout BO. SOF ¶¶ 106-107, 150.

Finally, Plaintiffs claim that FWS failed to address recovery. Pls.' Br. 22. Recovery is addressed at every stage of FWS's analysis. SOF ¶¶ 72-73, 108-10, 147, 163. Moreover, removing road crossings and decommissioning roads will aid recovery by reducing long-term sedimentation and opening habitat, SOF ¶ 137, 140, 151-53, as will Terms and Conditions C and D, which mandate the Forest Service remove another road crossing and address long-term sediment delivery on a specific road of concern for bull trout, SOF ¶ 159.

---

[11] *See also* Federal Defendants' Statement of Disputed Facts ¶¶ 1, 50 (explaining that Plaintiffs' assertions regarding funding for decommissioning are misleading and incorrect).

### 2. FWS Reasonably Concluded That the Project is Not Likely to Jeopardize Whitebark Pine.[12]

FWS thoroughly analyzed the potential effects of the Project to whitebark pine and reasonably concluded that the Project would not jeopardize the continued existence of the species.

The WBP BA contains "specific measures to reduce the degree of impact from the proposed action" to whitebark pine, and FWS considered these measures "part of the proposed action." SOF ¶¶ 165, 173.

FWS assessed the maximum extent of effects from the Project—including where activities could occur in relation to potential whitebark pine habitat—noting that because it is condition based, the actual effects on whitebark pine could be "far less." SOF ¶ 183.[13] FWS found that the Project could damage or kill individual trees. SOF ¶¶ 182-188. But FWS noted the design features intended to reduce such impacts. *Id.* FWS also considered the effects of "restoration activities" designed to reduce blister rust, mountain pine beetle infestations, and prevent daylight competition. SOF ¶ 169-70, 187.

---

[12] With consultation on whitebark pine complete, Plaintiffs' challenge to the Forest Service's alleged "failure to complete consultation" is moot. Am. Compl. at 65-67; *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014).

[13] Thus, as with the Bull Trout BO, Plaintiffs' claim that FWS issued the WBP BO without "critical information" about where activities will be carried out is simply mistaken. Pls.' Br. 19.

Ultimately, FWS found that anticipated mortality from the Project "would not appreciably reduce the overall abundance, reproduction, and distribution of whitebark pine throughout its range." SOF ¶ 191. FWS found that the Project is "consistent with the recovery outline" for the species, by avoiding impacts to potentially blister-rust resistant "plus" trees and maintaining large stands of adult trees "to support Clark's nutcrackers," whitebark pine's primary seed-dispersal mechanism. SOF ¶ 192.[14] FWS determined that the Project would not "exacerbate" the species' primary stressors: blister rust, mountain pine beetle, altered fire regimes, and climate change. SOF ¶ 193; *see* 87 Fed. Reg. 76,882, 76,914–15 (December 15, 2022) (Section 4(d) rule finding "no threats at the species level" to whitebark pine "from forest-management activities"). Moreover, the Project would affect a "very small proportion" of the species' range, and the design features would likely "further reduce" effects. SOF ¶ 193.

Because ESA sections 7(b)(4) and 7(o)(2) "do not apply to listed plant species," FWS did not issue an ITS. SOF ¶ 194. But the agencies agreed that the Forest Service will submit yearly "post-implementation report[s]" to FWS regarding effects to whitebark pine and design features effectiveness. SOF ¶ 195.

---

[14] Contrary to Plaintiffs' arguments, FWS considered seed predation. Pls.' Br. 23; SOF ¶ 175, 178.

### a.     FWS Properly Considered the Project's Design Features.

Plaintiffs' primary argument is that it was improper for FWS to consider the WBP BA's design features. Pls.' Br. 22, 25-26. But again, FWS considered the design features to be "part of the proposed action," SOF ¶ 173, and consideration of their effects was appropriate. *See* Section IV.C.1.a.

Plaintiffs complain that some features refer to avoiding impacts to "known" trees during timber harvests. Pls.' Br. 25-26. The Forest Service relied on extensive surveys—covering "[m]ost of the project area"—and modeling—96% accurate and the "best available science"—to determine potential whitebark pine habitat. SOF ¶¶ 166, 179. The design features make clear that the Forest Service will avoid impacts to trees "known" through surveys, conduct "[p]re-implementation surveys," and—where such surveys are "infeasible"—rely on modeled habitat to protect whitebark pine from damage during harvesting. SOF ¶ 165. FWS's conclusion that such features will "reduce" (but not eliminate) effects is reasonable. SOF ¶ 193.

Likewise, FWS reasonably concluded that the Forest Service's plan to avoid intentionally affecting whitebark pine would reduce effects. *Id*; SOF ¶ 165. Plaintiffs' claim that "99%" of surveyed whitebark pine could be eliminated is unfounded, Pls.' Br. 26, and ignores that the Forest Service will submit yearly

reports to FWS about the extent of effects and success of design features. SOF ¶ 195.

### b. Plaintiffs' Other Arguments Regarding the WBP BO Fail.

Aside from unsupported claims about design features, Plaintiffs falsely claim that FWS failed to consider certain issues, without explaining how such issues undermine FWS's expert conclusion that the Project will not jeopardize whitebark pine.

Plaintiffs incorrectly assert that FWS did not consider how the Project would impact survival of whitebark pine or the species' "sharp decline." Pls.' Br. 23. FWS found that adverse effects from the Project would not jeopardize the species' survival because the Project can affect only a minuscule portion of its range, it will not worsen the threats responsible for its listing and decline, and design features will further reduce effects. SOF ¶¶ 175, 192-93.

Additionally, Plaintiffs argue that FWS did not consider the "potential spread" of blister rust from "heavy vehicle operations." Pls.' Br. 31. But this is not how blister rust spreads, SOF ¶ 176, and it is already widespread in the action area, SOF ¶ 180.

Plaintiffs also argue that protections for "plus" trees are inadequate. Pls.' Br. 23-24. FWS reasonably concluded that the Project will not affect "plus" trees because the four known trees are "at least 5 miles away from any Project

activities," and if a new "plus" tree is discovered during implementation, "it will be buffered 100 feet from any treatment." SOF ¶ 182.

Plaintiffs characterize the WBP BO's analysis of the threats to the species as "cursory," but then list issues FWS considered. Pls.' Br. 24. For example, FWS considered the slow growth rate of whitebark pine and that the Project will likely result in damage and mortality to seedlings and saplings. SOF ¶¶ 174, 185-186. Plaintiffs also overlook facets of the Project designed to benefit WBP of all ages, SOF ¶¶ 169-70, 187, and the larger context of FWS's no-jeopardy conclusion: the Project can affect only a very small proportion of the species' habitat and will not exacerbate any of its primary threats. SOF ¶ 193.

Finally, Plaintiffs falsely assert that FWS failed to adequately consider climate change. Pls.' Br. 24. FWS considered the effects of climate change on whitebark pine and found that the Project would not exacerbate this threat. SOF ¶ 175, 177, 181, 193.

## V.  CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for summary judgment, grant Federal Defendants' motion, and enter judgment for Federal Defendants.


Respectfully submitted on this 10th day of February, 2025.

29

LISA L. RUSSELL
Deputy Assistant Attorney General
Environment & Natural Resources Division


*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
Senior Trial Attorney, CA Bar No. 254564
Natural Resources Section
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

JOSEPH W. CRUSHAM
Trial Attorney, CA Bar No. 324764
Wildlife & Marine Resources Section
150 M Street, N.E.
Washington, D.C. 20002
(202) 307-1145
joseph.crusham@usdoj.gov

*Counsel for Federal Defendants*

## CERTIFICATE OF COMPLIANCE

Under Local Rule 7.1(d)(2)(e), I hereby certify that the foregoing brief contains 6,495 words, excluding caption, certification of compliance, table of contents and authorities, and certificate of service.

*/s/Shaun M. Pettigrew*
Shaun M. Pettigrew
*Counsel for Federal Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which will provide service to counsel for the parties.

*/s/Shaun M. Pettigrew*
Shaun M. Pettigrew
*Counsel for Federal Defendants*