Oliver Wood
Oliver Wood Law, PLLC
P.O. Box 581312
Salt Lake City, Utah 84158
(206) 351-5320
ofinnwood@gmail.com

Rachel G. Inabnit
LAW OFFICE OF RACHEL INABNIT, PLLC
P.O. Box 8846
Missoula, MT 59807
(406) 201-1305
rachel@inabnitlawoffice.com

Jessica Christy (Admitted *pro hac vice*)
CHRISTY LAW, LLC
2055 S. Oneida St., Ste. 394
Denver, CO 80224
(720) 729-7841
jessica@christylaw.legal

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, YELLOWSTONE TO UINTAS CONNECTION, FRIENDS OF THE BITTERROOT, and WILDEARTH GUARDIANS, | ) ) ) ) ) ) ) | Case No. 9:24-cv-00010-DLC-KLD<br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| *Plaintiffs,* | ) ) | |
| *v.* | ) ) | |
| GARY WASHINGTON, in his official capacity as Acting Secretary | ) ) | |

of the Department of Agriculture;
RANDY MOORE, in his official
capacity as Chief of the Forest
Service; MATTHEW ANDERSON, in
his official capacity as the Bitterroot
National Forest Supervisor; and DAN
PLILEY, in his official capacity as the
West Fork District Ranger; UNITED
STATES FOREST SERVICE; and
UNITED STATES FISH AND
WILDLIFE SERVICE,

*Federal Defendants*,

RAVALLI COUNTY, MONTANA,

Defendant-Intervenor,

and

MONTANA DEPARTMENT OF
NATURAL RESOURCES AND
CONSERVATION,

Defendant-Intervenor.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………...………………iv-v

INTRODUCTION .......................................................................……1

ARGUMENT……………………………………………………………....3

    I.      The Forest Service violated NEPA………………………………...3

          a.  Failure to take a hard look at climate…………..………………3

    II.     The Forest Service violated NFMA………………….……………6

          a.  Violation of species viability standard……………………………6

    III.    FWS violated the ESA………………………………………………12

          a.  Inadequate baseline for bull trout...……………………………...12

          b.  Unenforceable mitigation measures………………………...………18

    IV.   This Court should vacate and set aside………………….………..23

CONCLUSION…………………………………………………………...……24

CERTIFICATE OF COMPLIANCE…………………………………...………24

# TABLE OF AUTHORITIES

**CASES**

*Alliance for the Wild Rockies v. Marten*,
  2021 WL 4551496 (D. Mont. 2021)……………………………………...2

*Center for Biological Diversity v. Bernhardt*,
  982 F.3d 723, 743 (9th Cir. 2020)…………………………………...18-22

*Center for Biological Diversity v. Bureau of Land Mgmt.*,
  698 F.3d 1101, 1121 (9th Cir. 2012)………………………………...12, 18

*Center for Biological Diversity v. United States Forest Serv.*,
  687 F. Supp. 3d 1053 (D. Mont. 2023)…………………………….....3-6

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
  144 S. Ct. 2440 (2024).................................................................................23

*Earth Island Inst. v. U.S. Forest. Serv.*,
  442 F.3d 1174 (9th Cir. 2006)………………………...……………....8

*Hapner v. Tidwell*,
  621 F.3d 1239 (9th Cir. 2010)………………………………………….4

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
  305 F. 3d 957 (9th Cir. 2002)………………………………………….11

*Inland Empire Public Lands Council v. U.S. Forest Serv.*,
  88 F.3d 754 (9th Cir. 1996)………………………………………...10

*Lands Council v. McNair*,
  537 F. 3d 981 (9th Cir. 2008)…………………………………….9, 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)……………………………………………………18

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
  524 F.3d 917 (9th Cir. 2007)……………………………………………….19

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005)…………………………………………...8, 9, 12

*Neighbors of Cuddy Mountain v. Alexander*,
  303 F. 3d 1059 (9th Cir. 2002)……………………………………………7

*Pollinator Stewardship Council v. EPA*,
  806 F.3d 520 (9th Cir. 2015)…………………………………...……...24

*Se. Alaska Conservation Council v. United States Forest Serv.*,
  443 F. Supp. 3d 995 (D. Alaska 2020)…………………………………17,18

*Swomley v Schroyer*,
  484 F.3d 970 (D. Colo.2020)…………………………………………..4

*350 Montana v. Haaland*,
  50 F.4th 1254 (9th Cir. 2022)…………………………………………23

**STATUTES**

 5 U.S.C. § 706(2)………………………………………...………3, 23, 24

16 U.S.C. § 1604(i)………………………………………………………2, 7

**REGULATIONS**

50 C.F.R. § 402.14(h)...............................................................12, 18, 23

**INTRODUCTION**

Plaintiffs Alliance for the Wild Rockies *et al.* challenge the Mud Creek Project, a multi-decade logging and burning project in 48,500 acres of the southern Bitterroot Mountains of Montana. The Project is in a heavily-roaded section of the Bitterroot National Forest and in one of the few strongholds for the threatened bull trout, though their numbers are declining rapidly. The Project authorizes logging on 39,982 acres of forest, burning another nearly 45,000 acres, construction of 8.95 miles of new roads and 33.8 miles of temporary roads, without knowing or disclosing the location, timing, and scope of these activities.

Because the Forest Service does not disclose the most basic details of the project, the analysis and conclusions are inadequate. For example, while the Project's total miles of roads constructed is disclosed, the much more important details like *the location* of the roads are not. This approach of punting of site-specific details of implementation to a future date renders the Project in violation of National Forest Management Act ("NFMA"), National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA"), because details like a road's location and where clearcut logging will occur deeply affect the Forest Service's analysis for species that rely on fewer roads and minimal logging.

Specifically, the Defendants' concession that the lack of site-specific detail of the Project is the basis of Plaintiffs' NFMA, NEPA and ESA claims concerning

the effects of the Mud Creek Project on the pine marten, an old growth indicator species, and bull trout, a species threatened with extinction.

For Alliance's climate argument, Defendants entirely fail to address this Court's holding in *Ctr. for Biological Diversity v. United States Forest Serv.*, 687 F. Supp. 3d 1053 (D. Mont. 2023) ("*Black Ram*"). This case is nearly indistinguishable from *Black Ram.* As for both this case and *Black Ram*, the Forest Service's meager discussion of climate related impacts is not enough to satisfy the Forest Service's duty under NEPA.

NFMA requires all actions on a Forest comply with applicable Forest Plan standards. 16 U.S.C. § 1604(i). To comply with NFMA, the Forest Service is required to provide upfront calculations in the Mud Creek Environmental Assessment ("EA") showing that the Project will comply with the Forest Plan standards for old growth indicator species, MC24, and not just assurances that the agency will comply when individual timber sales are later designed and implemented. *Alliance for the Wild Rockies v. Marten*, 2021 WL 4551496, *4 (D. Mont. Oct. 5, 2021) ("The Court cannot simply take Defendants' word" that they will comply). But the Forest Service has not shown its work, never disclosing the amount of unsuitable habitat this Project will create for old growth indicator species and concedes that no additional public comment will be available. MC11320.

Similarly, when preparing the Mud Creek Biological Opinion, the United States Fish and Wildlife Service ("FWS") did not know the timing or location of the authorized roads and how they would be used, especially the ones the Forest Service suggested – but never analyzed – would be immediately adjacent to bull trout streams and inside the buffer required by the Forest Plan to limit roadbuilding. FWS relied on vague mitigation measures without enforceable conditions or metrics, like "when road conditions degrade," to reduce impacts from road sediment on streams in threatened bull trout habitat. Because delivery of sediment from logging roads to bull trout-bearing streams depends on the location of the road, among other important factors, and the well-established caselaw prohibiting FWS from relying on vague and nonspecific mitigation measures, FWS's analysis in the Biological Opinion failed to comply with the ESA.

Defendants violated NEPA, NFMA, and the ESA in developing and authorizing the Mud Creek Project. The Project's EA, Decision Notice, and Biological Opinion for the Project should be held unlawful and set aside. 5 U.S.C. § 706(2).

## ARGUMENT

## I.     NEPA violations.

### A. The Forest Service violated NEPA by failing to take a hard look at the Mud Creek Project's climate-related impacts.

To demonstrate the inadequacies of the Forest Service's analysis of climate related impacts for the Mud Creek Project, Plaintiffs relied on this Court's recent, closely analogous "*Black Ram*" decision, along with directly relevant guidance provided by the Council on Environmental Quality ("CEQ") concerning NEPA and climate change. Doc. 56 at 16, citing *Ctr. for Biological Diversity*, 687 F. Supp. 3d 1053 ("*Black Ram*"). In response, Defendants do not even acknowledge this Court's binding precedent and instead argue that *Hapner v. Tidwell*, 621 F.3d 1239, 1242 (9th Cir. 2010) and *Swomley v Schroyer,* 484 F.3d 970(D. Colo. 2020) requires this Court to find in Defendants' favor on this issue.

However, this Court has already rejected similar arguments made in *Black Ram*. 687 F. Supp. 3d at 1075-76. In *Black Ram*, the Forest Service asserted that a logging project would "affect only a tiny percentage of the forest carbon stocks of the Kootenai National Forest, and an infinitesimal amount of the total forest carbon stocks of the United States." *Id*., *10. This Court held that "merely discussing carbon impacts and concluding that they will be minor does not equate to a 'hard look.'" *Id*., *8. "Under this logic, the USFS could always skirt the 'hard look' analysis when doing a carbon impacts review by breaking up a project into small pieces and comparing them to huge carbon stocks such as those contained within the over two million acres of land in the Kootenai National Forest." *Id.,* *10. The Forest Service must instead provide to the public "an accurate picture of what

4

impacts a project may have, no matter how 'infinitesimal' they believe they may be." *Id*.

Here, exactly like *Black Ram*, the Forest Service relies almost entirely on a cookie-cutter analysis to conclude that "any initial carbon emissions from this modified proposed action would be balanced and possibly eliminated as stand recovers and regenerates." *Compare* MC10573 and 2023 WL 5310633, *10. Just like *Black Ram,* the Forest Service failed to quantify the Project's greenhouse gas emissions, and failed to explain why it could not do so. Rather, it concluded that "this proposed action impacts a relatively small amount of forest land and carbon on the Bitterroot National Forest. Direct effects to climate change as a result of the proposed action would be insignificant because the project's emissions would constitute a negligible proportion of the global atmospheric greenhouse gas concentration." *Compare* MC10573 and 2023 WL5310633, *10. This provides no useful information and fails to comply with NEPA. As recognized by CEQ, a statement that emissions from a proposed action "represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA." MC336650-1

Defendants argue that the Forest Service provided sufficient analysis of the impacts to climate change from the Project. Doc. 61 at 17. However, the

documents cited by Defendants is a general discussion about carbon stocks and potentially influence factors on the Bitterroot National Forest and the Northern Region. *See* MC12805-833 (addressing, as it pertains to the Bitterroot National Forest as a whole, baseline carbon stores, factors influencing forest carbon, and prospective impacts from climate change to carbon stores); MC12834-876 (released in 2015, and addressing carbon stocks in forest and harvested products for the "Northern Region," which includes all of Montana and North Dakota and parts of Wyoming and South Dakota). Other than the singular paragraph contained in the EA dismissing the impact as "minor," the record is devoid of any analysis regarding the Mud Creek's Project impacts to climate change and carbon emissions. As held by *Black Ram*, "merely discussing carbon impacts and concluding that they will be minor does not equate to a 'hard look.'" *Id*. at 1076-77. Instead, the Forest Service "has the responsibility to give the public an accurate picture of what impacts a project may have, no matter how 'infinitesimal' they believe they may be." *Id*. at 1077. That was not done so here.[1]

## II.     NFMA violations.

---

[1] Contrary to the government's argument, USFS is not entitled to deference on its interpretations of NEPA. *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 738 (D.C. Cir. 2019) (finding the court owed no deference to the agency's interpretation of NEPA, as NEPA is primarily administered by CEQ); *Ass'n of Civilian Technicians v. Federal Labor Rels. Auth.*, 200 F.3d 590, 592 (9th Cir. 2000) ("courts do not owe deference to an agency's interpretation of a statute it is not charged with administering").

## A. The Forest Service failed to demonstrate compliance with Forest Plan standards for old-growth indicator species.

Defendants' insistence that the Old-Growth Amendments comply with NFMA is a red herring. Defendants fail to acknowledge and respond to Plaintiffs' claim that the Project does not demonstrate compliance with the Forest Plan Forest-wide Standard (1)(e)(1), which mandates: "[t]he amount and distribution of old growth will be used to ensure sufficient habitat for the maintenance of viable populations of existing native and desirable vertebrate species, including two indicator species, the pine marten and pileated woodpecker." MC24. *See* 16 U.S.C. § 1604(i); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F. 3d 1059, 1070 (9th Cir. 2002) (stating "NFMA's forest-wide species viability requirements is relevant to the lawfulness of any individual timber sale").

The Old-Growth Amendment issued with this Project, MC11327-30, does not alter or allow noncompliance with Forest Plan Management Standard (1)(e)(1). As discussed below, the Forest Service's decision to change the old growth *criteria*, or definition as set forth in Forest wide standard (1)(e)(2), does not exempt it from compliance with the requirement to ensure sufficient habitat for old growth management indicator species, namely, the pine marten. Because the Forest Service fails to establish that there is sufficient habitat – through population monitoring or habitat as a proxy – for the maintenance of viable populations of the

pine marten and lacks the requisite scientific studies and methodology for ensuring

so, the Project violates NFMA, regardless of the Old-Growth Amendments.

The mechanism created by the Forest Plan to ensure compliance with

Standard (2)(e)(1) is population trend monitoring of these two management

indicator species. MC128. Regarding pine marten, the Forest Plan mandates annual

monitoring of three transects and annual reporting of "Pine marten population in

relation to habitat changes," after a five-year average is established. *Id*. Here, the

record indicates that the Forest Service has not conducted transect monitoring for

the marten at the intervals required by the Forest Plan. *See* MC6705 (describing for

marten that "[t]he Forest rarely came close to completing the required number of

transects due to these limitations. The data was not sufficient to ascertain

population densities or trends[.]"). Nor does the record reflect that the Forest

Service did transects *in the project area* to determine population trends for marten.

MC15295 ("Forest does not have population estimates for marten within the

analysis area[.]"). Therefore, the Forest Service is unable to demonstrate

compliance with this standard in violation of NFMA and NEPA. *See Native*

*Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1250 (9th Cir. 2005).

In limited circumstances, the Ninth Circuit permits the Forest Service to

monitor indicator species' populations using habitat as a proxy. *Earth Island Inst.*

*v. U.S. Forest. Serv.,* 442 F.3d 1174, 1175 (9th Cir. 2006). Here however, the

Forest Service did not utilize a proxy, nor can it. The Forest Service must meet two conditions to invoke this exception to population trend monitoring. First, the Service must have knowledge of what quality and quantity of habitat is necessary to support the species; and second, the Forest Service has methods for measuring the existing amount of habitat that are reasonably reliable and accurate. *Native Ecosystems Council,* 428 F.3d at 1250.

First, the Forest Service has not provided a meaningful assessment of the quality and quantity of habitat needed to maintain a viable population of pine marten. Without more analysis or citation to any scientific study indicating the acres of habitat required for a viable population of pine marten, the Forest Service concludes "[m]arten habitat is abundant enough to support a viable population of marten at the Regional Scale and the project would not substantially decrease marten habitat[.]" MC0015297; *see also The Lands Council v. McNair*, 537 F. 3d 981, 998 (9th Cir. 2008) ("the Forest Service nevertheless must both describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat."). The Forest Service must support its conclusions about NFMA compliance with studies, and furthermore, "the agency must also explain the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable." *Id*. at 994.

In *Inland Empire Public Lands Council v. U.S. Forest Serv*., the Ninth

Circuit upheld a decision by the Forest Service to use habitat as a proxy where the

agency disclosed studies showing acres required for a viable population and how

many acres of suitable habitat remained after timber was harvested. 88 F.3d 754,

762 (9th Cir. 1996). Here, the Forest Service did the opposite of *Inland Empire*;

first, it never discloses any field studies explaining how many suitable acres marten

need for a viable population like the Forest Service did in *Lands Council*. Second,

while the record discloses the amount of suitable habitat for pine marten in the

project area *before treatment* (32%), MC15295, it never discloses the quantifiable

amount of unsuitable habitat created by project implementation, making it

impossible to determine how the project will impact population viability through

habitat. *See Inland Empire*, 88 F.3d at 762.

In fact, the Forest Service concedes that openings created by the Project

"would increase the *fragmented* nature of the suitable marten habitat at lower to

mid elevations." MC15297 (emphasis added). Additionally, the Forest Service

recognizes the Project would "essentially simplify the habitat for [pine marten] that

selects for more complex habitat, by removing canopy cover. . . .and *increasing*

*habitat fragmentation.*" MC0015297(emphasis added). The Forest Service states

"[t]he proposed action may convert currently identified marten habitat into

unsuitable habitat." MC15296. But the Service never details these impacts in the

context of *how much* marten habitat will be unsuitable after the Project implementation and thus fails to demonstrate how the Project would ensure sufficient habitat for the species. This does not pass muster under Ninth Circuit species viability precedent. *See Lands Council*, 537 F. 3d at 998.

Second, the Forest Service also does not have reasonably reliable and accurate methods for measuring the existing amount of that habitat for the marten. In *Idaho Sporting Congress, Inc. v. Rittenhouse*, the Ninth Circuit rejected the Forest Service's methodology for monitoring old growth indicator species where the Service found that none of the acres designated for old growth in models qualified during a field inspection. 305 F. 3d 957, 972 (9th Cir. 2002). The Forest Service does the same thing here, leaning on its very limited site-specific survey of the old growth stands in an attempt to predict the impacts of the management activities on the human environment, and thus the habitat indicator species.

Despite the Defendants' assertion that the Forest Service conducted extensive walk-through stand exams and aerial imagery, Doc. 61 at 13, the record does not support this assertion of thoroughness. The Service only conducted walk-through exams on 4,200 acres of the 48,500-acre project area. MC14020. Additionally, the Service itself determined that aerial imagery was inaccurate for assessing forest stand composition, and old growth in particular: "[u]pon field review, many of these photo interpreted stands did not meet the minimum old

growth criteria for Green et al nor the Forest Plan." MC13801. Thus, the Forest Service does not have an accurate portrait of exactly how much unsuitable habitat will be created for pine marten through project implementation, and therefore, the Service cannot use habitat as a proxy to comply with the Forest Plan.

In sum, the Forest Service is unable to demonstrate compliance with Forest Plan Standard (1)(e)(1) because it is unable to ensure the amount and distribution of old growth will provide sufficient habitat for the maintenance of a viable population of pine marten. Therefore, the Forest Service violates NFMA and NEPA. *Native Ecosystems Council,* 428 F.3d at 1250.

## III. ESA violations.

### A. Defendants fail to provide a detailed discussion of the environmental baseline and impacts to bull trout from temporary roads in Riparian Habitat Conservation Areas in violation of the ESA and APA.

A biological opinion must include a "detailed discussion of the environmental baseline of the listed species," a "detailed discussion of the effects of the action on listed species," and FWS's opinion on whether the proposed action is likely to jeopardize the continued existence of the species. 50 C.F.R. § 402.14(h). The failure to address effects and consider important factors renders the biological opinion arbitrary and capricious. *Center for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir. 2012).

Logging roads and their chronic delivery of sediment to streams present one of the greatest risks to bull trout in Montana. FWS2377. In 1995, the Forest Service amended various standards into its Forest Plan to address impacts to bull trout, including creating Riparian Habitat Conservation Area ("RHCA") buffers that limits logging and roadbuilding within a certain distance of the waterway. MC60580; Doc. 53-6. Therefore, the impact of logging roads on sediment delivery to streams within the Project area and more specifically in RHCAs is an important factor that the FWS is required to consider. However, FWS fails to adequately address the effects of opening roads within RHCAs on bull trout in violation of the ESA and the APA.

In their response, Defendants rely on the false condition that logging and roadbuilding will occur outside RHCAs. *See* Doc. 61 at 23 (stating: "Temporary roads will not deliver sediment because they will be built outside RHCAs."); *see also* FWS144 ("The conclusion of this BA/BE is that because of the avoidance of RHCAs, the construction of . . temporary roads . . . would deliver insignificant quantities of sediment to streams, and is likely to have no effect, and at worst an insignificant effect, on bull trout and bull trout habitat"). However, the record reflects that the Forest Service plans to build an undisclosed number of temporary roads *within* the RHCA. FWS concedes that, "where road prisms exist within RHCAs, and there are culverts at the stream crossings, those prisms could be used

as temporary roads as long as dirt is not side cast within the RHCA." FWS35. Moreover, "[w]hile specific locations of temporary roads may be adjusted based on further ground-truthing, the miles of temporary road constructed for the project will not exceed the maximum identified." MC10539. The failure to adequately disclose and consider this action's effect on bull trout and bull trout critical habitat violates the ESA and the APA.

Specifically, the FWS and Forest Service do not disclose which RHCAs meet these criteria. (i.e. which RHCAs have road prisms and have culverts at stream crossings.) Despite acknowledging in the Biological Opinion that the precise location of temporary roads in RHCAs is necessary to determine the amount of sediment entering bull trout streams and thus determine the impacts to bull trout, FWS26-30, the Agencies cannot, and do not, disclose the location of potential temporary roads within the RHCAs. Moreover, FWS recognized in its Biological Opinion for the Bitterroot National Forest Travel Plan that the factors influencing "the delivery of sediment to streams from forest roads include the proximity of the road to the stream, gradient, and section length of the road, degree of road use, road condition (maintenance), number of stream crossings and soil type." FWS2377. Additionally, the agency also makes clear that certain streams in the Project area are more at risk from sedimentation because of the proximity to roads and the gradient of the roads. *See* FWS137-140.

The Forest Service inaccurately claims that the impacts of opening these roads within RHCAs will be limited by the Project's design features' prohibition of side casting of dirt.[2] MC10540. But the side casting of dirt is not the only impact from roads in RHCAs that will result from this Project. For example, FWS recognizes that in addition to side casting, snow removal and road grading also can significantly impact sedimentation in the stream. FWS2377 ("Channelized stream sections resulting from riprapping of roads adjacent to stream channels are directly affected by sediment from side casting, snow removal, and road grading; such activities can trigger fill slope erosion and failures.") The Project authorizes snow removal, FWS10, which as FWS concedes, "can result in increased erosion of the road surface and fill slope. As plowed roads begin to thaw in spring, water can flow down vehicle ruts in the ice covered road surface for long distances[.]" MC9957. The Project also authorizes road grading in RHCAs. FWS103.

Perhaps even more importantly, the day-to-day operations on roads within the RHCAs will contribute to sedimentation: "Log trucks produce sediment by disturbing and loosening soil at road/stream crossings and other sites within sediment-contributing distance of streams." MC12165. When vehicles travel on logging roads, this compacts the roadbed, "[t]he compacted surface of the road

---

[2] Montana Department of Natural Resources and Conservation defines side casting as "the act of moving excess earthen material over the side of a road during road maintenance operations."

sheds water at greater rates than undisturbed ground, and with this surface flow some of the fine sediment that makes up the road tread or travelway. Due to the extremely low infiltration rates of compacted road surfaces, even minor hydrologic or precipitation events cause surface flow and fine sediment erosion." MC12198. Thus, the record indicates that the use of these roads will result in sedimentation to streams despite the design features' side casting prohibition.

Defendants' argument that sediment traps will mitigate impacts to streams is not supported by the record. FWS10. Even with sediment traps installed below the roads within RHCAs, which are proposed, MC11098, the record indicates that "[o]n the Bitterroot National Forest we have found that using straw bales as sediment traps is only marginally effective." MC12207.

The Forest Service also recognizes that roads with the highest risk of sediment delivery are those roads within 100 feet of streams. FWS145. Temporary roads built in RHCAs would provide chronic sedimentation to streams in the action area. FWS135l; FWS2380. For example, the Nez Perce Fork Road, which is within an RHCA, causes consistent sediment delivery to the Nez Perce Fork. FWS27 (stating that assuming the "current prism location and [road] remains unpaved in the sections that are within the RHCA, and especially the 2.1 miles within 100 feet of the stream, the Nez Perce Fork habitat will be continually degraded by persistent sediment delivery.") Like the Nez Perce Fork Road, the opening of any roads in

RHCAs would likely also provide persistent sediment delivery, but Defendants never disclose – much less analyze – the location or impacts from those roads within RHCAs.

The Biological Opinion does not disclose or analyze how close the roads in RHCAs will be to streams; which streams are closest to the roads in RHCAs; whether those streams contain bull trout; and how much sedimentation already occurs in that stream and would be expected to enter the stream from the road, as Defendants did for other roads in RHCAs like the Nez Perce Fork Road. It is arbitrary for FWS to conclude that sediment will negatively impact the Nez Perce Fork bull trout populations because of proximity of the road to the stream, FWS27, then fail to analyze the proximity of other roads in RHCAs to bull trout-bearing streams and their effects because of sedimentation.

FWS's consideration of the "maximum mileage" of roads that may be constructed in the Project is not enough and does not address the lack of admittedly important information regarding the location and timing of these roads, especially within the undisclosed road prisms in the RHCAs. *Supra* 11. The Forest Service was unsuccessful in making this same argument under NEPA in *Se. Alaska Conservation Council v. United States Forest Serv.*, 443 F. Supp. 3d 995 (D. Alaska 2020). It should similarly be rejected here under the ESA, as there remains

a lack of site-specific information necessary to inform a meaningful analysis. *Id*. at 1013-14.

Without knowing the actual locations, timing, and scope of where the roads will be built, specifically within the RHCAs, FWS could not analyze or describe the localized impacts that can potentially occur to bull trout-bearing streams, and thus bull trout. FS9300. FWS acknowledges that for some roads within 100 feet of streams, design features will not be enough to limit impacts from sedimentation. FWS36. Without consideration of these fundamental, relevant factors, FWS has failed to provide the required detailed discussion of the effects of the Mud Creek Project, and the Biological Opinion is arbitrary, capricious, and in violation of the ESA. *Ctr. for Biological Diversity*, 698 F.3d at 1121; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43(1983) (decision is arbitrary and capricious where it entirely fails to consider an important aspect of the problem); 50 C.F.R. § 402.14(h).

## B. FWS's reliance on vague and unenforceable mitigation measures violates the ESA and APA.

FWS may rely on mitigation measures to support a no jeopardy conclusion only when such measures "constitute a 'clear, definite commitment of resources,' and be 'under agency control or otherwise reasonably certain to occur.'" *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir.

2020) (quoting *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 n. 17 (9th Cir. 2007)). Furthermore, "[t]he measures 'must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.'" *Id*. (quoting *Center. For Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)). "Binding mitigation measures cannot refer only to generalized contingencies or gesture at hopeful plans; they must describe, in detail, the action agency's plan to offset the environmental damage caused by the project." *Id*. Undetermined or unidentified future mitigation measures may not be used to support a no jeopardy decision. *Id*. "Indefinite mitigations measures" or "measures that are too vague, or do not commit resources, or are otherwise insufficiently integrated into the proposed action are generally unenforceable under the ESA, and thus cannot be properly relied upon." *Id*. A "sincere general commitment to future improvements" is not enough to offset the negative effects of an action "absent specific and binding plans." *Nat'l Wildlife*, 524 F.3d at 936.

Here, there are at least three mitigation measures that FWS relies on to mitigate the Project's effects on bull trout. FWS 54-55. These mitigation measures contain insufficient specificity to limit impacts from the Project on bull trout, especially when it comes to depositing sediment in bull trout-bearing streams.

19

First, one of the Project Biological Opinion's terms and condition for Reasonable and Prudent Measure ("RPM") # 1 states that over the course of the 20-year project, "the Forest will determine if road conditions are in danger of being degraded to the point where there is a high risk of sediment deposition to streams. The Forest will temporarily suspend haul or other use until corrective actions can be implemented or until natural conditions are again conducive to use without creating sediment inputs to project area streams." FWS54.[3] This, however, fails to "describe, in detail, the action agency's plan to offset the environmental damage caused by the project." Specifically, FWS never determines the method for how the Forest will determine when road conditions are in danger of depositing sediment into the stream.

In *Bernhardt*, the court assessed the agency's terms and conditions that contained language that "in the event [a polar bear] encounter occurs," finding that "[i]t is unclear what will constitute a polar bear encounter[.]" 982 F.3d at 747. Similarly here, it is unclear what will constitute "road conditions [that] are in danger of being degraded to the point where there is a high risk of sediment deposition[.]" FWS54. Without more criteria or a description of conditional triggers, these are the types of "generalized contingencies" that make for

---

[3] "RPM" # 1 states: "Identify and implement means to reduce the potential for incidental take of bull trout resulting from the magnitude of sediment delivery to streams during project implementation and following project implementation." FWS54.

unenforceable mitigation measures in the Ninth Circuit. *Bernhardt*, 982 F.3d at 743. FWS makes the kind of "gesture at hopeful plans" that was determined unlawful when it fails to define what a corrective action – i.e. contingencies – will stop the harm of degraded road conditions. *Id.*

Second, another term and condition for RPM # 1 is that the Forest Service "will devise and implement a long-term solution to minimize the perpetual sediment delivery of the miles of FR 468 within the Nez Perce Fork RHCA prior to the initiation of the third implementation unit (Blue Joint)." FWS55. Here, again, this is a vague, plan-to-make-a-plan; the same kind of term and condition shot down by the Ninth Circuit in *Bernhardt*. 982 F.3d at 747(stating, "The generality of the mitigation measures makes it difficult to determine the point at which the action agency may renege on its promise to implement these measures."). The Agencies' promise to come up with a "long-term solution" in the future is a "noncommittal assurance[] that cannot shoulder the government's burden to identify a 'clear, definite commitment of resources." *Id*. at 746.

The record indicates that there are sufficiently binding-and-certain-to-occur mitigation measures that the Agencies *could* utilize. For example, the Biological Opinion discloses that the FWS has recognized a long-term solution to minimize the perpetual sediment delivery into the Nez Perce Fork RHCA: pave the two miles of road. *See* FWS27. Thus, the record here indicates the FWS is unable to provide

a definite commitment of resources. To comply with binding Ninth Circuit case law, FWS must do more than what it does in this case: aspire to "devise and implement a long-term solution to minimize" and never says what that is. *Bernhardt*, 982 F.3d at 746.

Third, neither the Biological Opinion's terms and conditions or the design features of the proposed action address the undisclosed temporary roads built on existing road prisms in RHCAs. FWS fails to include mitigation measures that will address the ongoing, chronic impacts from the roads in the RHCAs that could be reopened immediately adjacent to bull trout-bearing streams. The design features do not address these issues. The Forest Service places minimal restrictions on these temporary roads in RHCAs (e.g. no side cast dirt), and because Defendants have not disclosed the location of roads and their length, it's possible that all of the 11.3 miles of these roads could be within RHCAs, depositing sediment into streams. MC10538. As the Defendants have not disclosed the location of roads and their proximity to streams, these temporary roads could have similar effects to other roads in RHCAs, like the Nez Perce Fork. But there are no mitigation measures in place to stop the chronic deposition of sediment into waterways within the RHCAs.

Finally, in RPM#1, the terms and conditions state the "Forest shall remove the Flat Creek culvert barrier on FR 468 prior to the beginning of the third implementation unit (Blue Joint)." FWS55. But the Biological Opinion never

analyzes the removal of the Flat Creek culvert barrier, nor does the Forest Service's Biological Assessment. While the Biological Opinion discusses the removal of the barrier culvert in Rombo Creek, FWS34 ("removal of the culvert on FR 13462 will create a relatively large sediment pulse event"), FWS omits any mention of the impacts from removal of the Flat Creek culvert nor how it will impact bull trout in the stream. The Flat Creek culvert removal would occur on a stream that feeds into the Nez Perce Fork, which is already a sediment impaired stream because of the logging road within 100 feet of it. FWS27. FWS's omission from considering a relevant factor in the proposed action that will occur because of RMP#1 is arbitrary and capricious in violation of the ESA and APA. *See* 50 C.F.R. § 402.14(h).

In sum, FWS provides vague and unenforceable mitigation measures to support its no jeopardy determination for bull trout in violation of the ESA and APA.

## IV. The Court should vacate and set aside the Forest Service's EA and Decision Notice, and FWS's Biological Opinion.

The Forest Service violated NFMA and NEPA in preparing the Mud Creek EA and approving the Decision Notice, and FWS violated the ESA in issuing the Mud Creek Biological Opinion. The Court should therefore hold unlawful and set aside these agency decisions. 5 U.S.C. § 706(2).

Under the Administrative Procedure Act ("APA"), vacating the unlawful agency action is the presumptive remedy. *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022); *see also Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.,* 144 S. Ct. 2440, 2467 (2024) (Kavanaugh, J., concurring) ("the ordinary meaning of 'set aside' in §706(2) has long been understood to refer to the remedy of vacatur"). Courts order remand without vacatur only in "limited circumstances." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). Here, Defendants cannot meet their burden to demonstrate rare circumstances that would warrant allowing the EA, Decision Notice, and Biological Opinion to remain in place despite the violations of NFMA, NEPA, and the ESA. *Id*. Defendants' violations are substantial, and there would be only minor disruptive consequences of delaying this 20-year project while Defendants determine whether or not the Mud Creek Project can comply with NFMA, NEPA, and the ESA.

## CONCLUSION

Plaintiffs respectfully request that the Court grant the Plaintiffs' motion for summary judgment, deny Defendants' and the Intervenor's cross-motions, and set aside the Forest Service's EA and Decision Notice, and FWS's Biological Opinion.

Respectfully submitted on March 24, 2025.

*/s/ Oliver Wood*
Oliver Wood
Oliver Wood Law, PLLC
P.O. Box 581312

Salt Lake City, Utah 84158
ofinnwood@gmail.com

/s/ Rachel G. Inabnit
Rachel G. Inabnit
LAW OFFICE OF RACHEL INABNIT, PLLC
P.O. Box 8846
Missoula, MT 59807
(406) 201-1305
rachel@inabnitlawoffice.com

*Attorneys for Plaintiffs*

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.1(d)(2), I certify that *Plaintiffs' Reply Brief in Support of Their Motion for Summary Judgment* contains less than 6500 words (Doc. 45 allows up to 6,500 words), excluding material Local Rule 7.1(d)(2)(E) omits from the word-count requirement. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this March 24, 2025.

/s/Oliver Wood