IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, YELLOWSTONE TO UINTAS CONNECTION, FRIENDS OF THE BITTERROOT, and WILDEARTH GUARDIANS, | CV 24–10–M–DLC–KLD |
| Plaintiffs, | FINDINGS AND RECOMMENDATION |
| vs. | |
| BROOKE ROLLINS, in her official capacity as Secretary of the Department of Agriculture;[1] TOM SCHULTZ, in his official capacity as Chief of the United States Forest Service; MATTHEW ANDERSON, in his official capacity as the Bitterroot National Forest Supervisor; UNITED STATES FOREST SERVICE; and UNITED STATES FISH AND WILDLIFE SERVICE; | |
| Federal Defendants, | |
| RAVALLI COUNTY, MONTANA and STATE OF MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION, | |
| Defendant-Intervenors. | |

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current public officers are substituted for their predecessors as named Defendants.

1

Plaintiffs Alliance for the Wild Rockies, Native Ecosystems Council, Yellowstone to Uintas Connection, Friends of the Bitterroot, and Wildearth Guardians bring this action against the United States Forest Service ("USFS"), the United States Fish and Wildlife Service ("FWS"), Brooke Rollins, Tom Schultz, and Matthew Anderson (collectively "Federal Defendants"). Plaintiffs challenge the approval of the Mud Creek Project ("Project") in the Bitterroot National Forest. Plaintiffs' amended complaint alleges that Federal Defendants' approval of the Project violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332; the Administrative Procedure Act, 5 U.S.C. § 701 ("APA"); the Endangered Species Act ("ESA"), 16 U.S.C. § 1531; and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600. (Doc. 43). This matter comes before the Court on Plaintiffs' motion for summary judgment (Doc. 55), Federal Defendants' cross-motion for summary judgment (Doc. 60), and a cross-motion for summary judgment by Defendant-Intervenors State of Montana Department of Natural Resources and Conservation and Ravalli County, Montana ("Intervenor Defendants") (Doc. 65). The Court heard oral argument on the pending motions on August 20, 2025. For the reasons set forth below, the Court recommends that Plaintiffs' motion for summary judgment be denied and Federal Defendants and Defendant-Intervenors' (collectively "Defendants") cross-motions for summary judgment be granted.

2

## I.    Background

The Project area consists of 48,486 acres in the Bitterroot Mountains, in the West Fork Ranger District of the Bitterroot National Forest. (FS0011297).[2] The Project area is located southwest of Darby, Montana and east of the Frank Church River of No Return Wilderness. (FS0011298). Implementation of the Project will occur over a 20-year period. (FS0012044).

The Project authorizes vegetation treatments throughout the Project area. Authorized treatments include maximum limits of 4,800 acres of "commercial harvest —regeneration," 8,900 acres of "commercial harvest — intermediate," 26,282 acres of "non-commercial treatment," 4,800 acres of "prescribed fire — site preparation," 28,235 acres of "prescribed fire — low severity," and 12,125 acres of "prescribed fire — mixed severity." (FS0011302). These treatments are not mutually exclusive, and so in some cases may overlap on the landscape. (FS0012043).

The Project also authorizes 8.95 miles of "specified road construction" and 33.8 miles of temporary road construction. (FS0010536). The stated purpose of the Project is to "work toward restoring a healthy and resilient forest ecosystem that

---

[2] Citations to the administrative record will consist of (1) an "FS" prefix for the USFS portion of the record, an "FWS" prefix for the FWS portion, or a "Supp-FWS" prefix for the supplemental record filed by FWS, and (2) the bates page number.

meets the multiple resource objectives for the area, including fire and fuels, wildlife, aquatics, recreation, and etc." (FS0010500).

Rather than identifying precisely where vegetative treatments and activities such as roadbuilding will take place, the Project instead relies on a "condition-based planning approach." (FS0010510). "Under the condition-based approach, specific locations and types of treatments would be identified or refined during implementation based on local conditions." (FS0010510). Accordingly, "[t]he timing and location of treatments would depend on identification of specific conditions using field work during implementation of the [P]roject." (FS0010510). USFS decisions about Project activities will be made according to a pre-determined implementation process and accompanying checklists. (FS0010510; FS0010743-81).

USFS issued a scoping letter for the Project in September 2019. (FS0010504). USFS thereafter issued a draft Environmental Assessment in March 2021. (FS0010830-943). The Final Environmental Assessment ("FEA") was issued in October 2022. (FS010495). The Decision Notice and Finding of No Significant Impact was issued in January 2023. (FS011293-333).

The Bitterroot National Forest operates under the 1987 Forest Plan, which guides natural resource management activities and establishes management standards for the Forest. (FS0000005). The Project includes three project-specific

4

amendments to the Forest Plan. (FS011303). The first project-specific amendment sets aside the Forest Plan standard for "Elk Habitat Effectiveness." (FS0010818). Likewise, the second amendment sets aside the plan standard regarding thermal cover for elk habitat. (FS0010818).

The third project-specific amendment modifies Forest Plan standards for old-growth stand conditions. (FS0010823). This is achieved through two key changes. First, the project-specific amendment modifies the forest-wide standard for old growth—F.2.e.2—as well as the Forest Plan glossary definition for old growth. Without amendment, F.2.e.2 provided seven criteria for USFS to consider when identifying old growth. (FS0000025). The amendment replaces these criteria with "the quantitative and qualitative factors of Green et al. (1992, errata 2011)[,]" which represents "the best available scientific information to define old growth." (FS0010532).

Second, the project-specific old-growth amendment alters standards for old growth objectives in management areas 1, 2, and 3A of the Forest. For each management area, the relevant standard is denominated as 3(c)(2), and— prior to amendment—required that "[o]ld growth stands should be 40 acres and larger . . . ." (FS0010533). Under the amendment, these management area standards allow for the inclusion of old growth stands *less than* 40 acres in size. "Stands smaller than 40 acres, if meeting old growth criteria, will be included, because they

5

are invaluable as key characteristics of ecosystem diversity, notwithstanding their size." (FS0010533).

Following Project approval, USFS implemented programmatic (forest-wide) amendments to the Forest Plan. The standards included in the site-specific amendments (challenged by Plaintiffs) are reflected in the programmatic amendments. (Doc. 74 at ¶ 69).

Pursuant to Section 7 of the ESA, USFS engaged in consultation with FWS on the effects of the Project on bull trout. Bull trout in the coterminous United States have been listed as threatened under the ESA since 1999. Determination of Threatened Status for Bull Trout in the Coterminous United States, 64 FR 58910-01 (Nov. 1, 1999). FWS issued the bull trout Biological Opinion for the Project in December 2022. (FWS0000001-03). In the Biological Opinion, FWS determined that the Project will result in adverse effects to the species, but concluded that the Project was "not likely to jeopardize the continued existence of bull trout." (FWS0000049-50). Given the impacts to bull trout, FWS included an Incidental Take Statement with its Biological Opinion. (FWS0000052-55). The Incidental Take Statement enumerates non-discretionary Reasonable and Prudent Measures ("RPM") to reduce the amount of "take". Each RPM is subject to several non-discretionary Terms and Conditions, describing steps or actions USFS must implement to minimize impacts to bull trout. (FWS0000054-55).

Plaintiffs filed their complaint in this matter on January 11, 2024. (Doc. 1).

Subsequently, Plaintiffs filed an amended complaint on September 23, 2024. (Doc.

43). The parties thereafter filed the instant cross-motions for summary judgment.

(Docs. 55, 60, 65). The motions are fully briefed and ripe for ruling.

## II.    Legal Standards

### a.    NEPA

NEPA is a procedural statute requiring government agencies to "take a hard

look" at the "environmental consequences" of their actions. *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 350 (1989). An agency adequately conducts

a "hard look" "by providing a reasonably thorough discussion of the significant

aspects of the probable environmental consequences" of a proposed action. *Center*

*for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172,

1194 (9th Cir. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146,

1149 (9th Cir. 1998)). NEPA "does not mandate particular results," but "prescribes

the necessary process" agencies must follow to identify and evaluate "adverse

environmental effects of the proposed action." *Robertson*, 490 U.S. at 350. The

court's review is complete if upon review of the record the court is satisfied the

agency took a "hard look" at the proposed action's environmental impacts. *Idaho*

*Conservation League v. Mumma*, 965 F.2d 1508, 1519 (9th Cir. 1992). "[T]he

7

central principle of judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coalition v. Eagle Cnty., Colorado,* 145 S. Ct. 1497, 1511 (2025).

Pursuant to NEPA's implementing regulations, an agency may prepare an Environmental Assessment ("EA") to determine whether a proposed action may significantly affect the quality of the environment such that the agency must prepare a more detailed Environmental Impact Statement ("EIS"). *See* 40 C.F.R. §§ 1501.4, 1508.9 (2019). An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why the project's impacts are insignificant. *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988). "'The statement of reasons is crucial' to determining whether the agency took a 'hard look' at the potential environmental impact of the project." *Save the Yaak Committee*, 840 F.2d at 717 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

**b.    NFMA**

NFMA provides a two-tiered approach for forest planning and management. *2-Bar Ranch Limited Partnership v. United States Forest Service*, 996 F.3d 984, 986 (9th Cir. 2021). The first tier involves planning at the forest level through

USFS' development of a forest plan. *2-Bar Ranch Limited Partnership*, 996 F.3d at 986. "Forest plans are broad, programmatic documents that 'guide sustainable, integrated . . . management of the resources within the plan area in the context of the broader landscape.'" *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (quoting 36 C.F.R. § 219.1(b)). The second tier involves implementation of the forest plan to individual site-specific projects, which "must be consistent with the forest plan." *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (internal quotations omitted); 16 U.S.C. § 1604(i).

"It is well-settled that [USFS'] failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005). USFS must show that a project it undertakes complies with the governing forest plan. *Native Ecosystems Council*, 418 F.3d at 961 (citing 16 U.S.C. § 1604(i)). "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management." *Alliance for the Wild Rockies v. United States Forest Service*, 907 F.3d 1105, 1110 (9th Cir. 2018). The Court will award "substantial deference" to "[USFS'] interpretation and implementation of its own forest plan." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

c.    **ESA**

USFS actions must comply with the ESA. Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems they depend upon. 16 U.S.C. § 1531(b). The Supreme Court has deemed the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174, 180 (1978). The hallmark of the ESA is its solemn resolve that endangered species "be afforded the highest of priorities" with the goal to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority*, 437 U.S. at 174, 184.

The ESA and its implementing regulations require agencies proposing actions to engage in consultation with FWS to ensure the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2). To effectuate consultation, the ESA requires action agencies to "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." 16 U.S.C. §1536(c)(1). If formal consultation is deemed necessary, it culminates in the issuance of a biological opinion by FWS "detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is

found, [FWS] shall suggest" reasonable and prudent alternatives the action agency

can employ in implementing the proposed action. 16 U.S.C. § 1536(b)(3)(A); 50

C.F.R. § 401.14(g)-(h).

If FWS concludes that the agency action will involve "the taking of an

endangered or a threatened species *incidental* to the agency action[,]" it must

provide an Incidental Take Statement ("ITS"). 16 U.S.C. § 1536(b)(4) (emphasis

added). The ITS specifies the impact of the incidental taking on the species,

specifies reasonable and prudent measures necessary or appropriate to minimize

the impact, and sets forth the terms and conditions the federal agency must comply

with. 16 U.S.C. § 1536(b)(4)(C). "As long as any takings comply with the terms

and conditions of the [ITS], the action agency is exempt from penalties for such

takings." *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031, 1034 (9th

Cir. 2007).

Under Ninth Circuit precedent, FWS is owed deference in deciding how to

approach the jeopardy determination. *Gifford Pinchot Task Force v. U.S. Fish and

Wildlife Service,* 378 F.3d 1059, 1066-67 (9th Cir. 2004) ("the ESA does not

prescribe how the jeopardy prong is to be determined"). FWS enjoys this latitude

"so long as the effects of the agency action on a species have been considered and

addressed." *Karuk Tribe of California v. U.S. Forest Service,* 681 F.3d 1006, 1020,

(9th Cir. 2012).

11

**d.    Summary Judgment**

Courts review agency decisions under NFMA, NEPA, and the ESA by applying the standard of review set forth in the APA. *Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1058 (9th Cir. 2017); *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d at 1065. The Rule 56 summary judgment standard is therefore modified in cases requiring review of an administrative record pursuant to the APA; courts are required to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or "without observance of procedure required by law." *Center for Biological Diversity*, 868 F.3d at 1057; 5 U.S.C. § 706(2)(A); 5 U.S.C. § 706(2)(D).

The APA standard of review is deferential. A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the

12

choice made. *Motor Vehicle Mfrs.*, 463 U.S. at 43. A court may not accept an agency's post hoc rationalizations for its action. *Motor Vehicle Mfrs.*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50.

## III. Discussion

Throughout the briefing in this matter, Defendants point out that many issues and arguments raised in Plaintiffs' opening brief are not addressed in Plaintiffs' reply brief. Similarly, Defendants point out that, on reply, Plaintiffs do not address many of the arguments raised in Defendants' opening briefs. Therefore, Defendants argue, Plaintiffs have conceded these issues. Defendants further point out that several of Plaintiffs' arguments are raised for the first time on reply.

At oral argument, Plaintiffs stipulated that they are advancing a limited subset of claims. Specifically, Plaintiffs stated that they elected to move forward only (1) their ESA claims related to bull trout, (2) their NFMA species viability claim related to old growth, and (3) their NEPA hard-look claim related to climate change. Accordingly, this Court will only address these claims. Per Plaintiffs' stipulation, all other claims and arguments included in their amended complaint and summary judgment briefs are treated as waived.

a.    **NEPA**

Following their stipulation to waive other arguments, Plaintiff's sole claim under NEPA addresses the climate-related impacts of the Project. Plaintiffs argue USFS failed to take a hard look at the Project's effects on climate change, in violation of NEPA and the APA. For the reasons set forth below, the Court finds that the Project FEA violated neither NEPA nor the APA and that USFS took a sufficiently hard look at the climate-related impacts of the Project.

The NEPA-related arguments in this matter reference implementing regulations and guidance issued by the Council on Environmental Quality ("CEQ"). (Doc. 73 at 9-10). Recent decisions in other circuits have called into question the present validity of CEQ regulations. *See Marin Audubon Socy. v. Fed. Aviation Administration*, 121 F.4th 902, 914–15 (D.C. Cir. 2024); *Iowa v. Council on Envtl. Quality*, No. 1:24-CV-00089, 2025 WL 598928, at *7 (D.N.D. Feb. 3, 2025); *but see Marin Audubon Socy. v. Fed. Aviation Administration*, No. 23-1067, 2025 WL 374897, at *1 (D.C. Cir. Jan. 31, 2025) (Srinivasan, C.J., with Millett, Pillard, Wilkins, Childs, Pan, and Garcia, JJ., concurring). Moreover, recent rulemaking addresses the removal of CEQ's implementing regulations. *See* Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025).

14

Regardless, these regulatory issues do not affect this Court's decision in the instant matter. As set forth below, this Court has not found that Defendants failed to comply with CEQ guidance or implementing regulations. Accordingly, there is no need for this Court to consider the present validity or future status of these regulations and guidance. *Cf. Citizens Action Coalition of Indiana, Inc. v. FERC*, 125 F.4th 229, 240 (D.C. Cir. 2025) ("Because [the agency] complied with CEQ guidance, we need not consider the effect of [*Marin Audubon*, 121 F.4th at 914] on [the agency's] NEPA obligations.").

The substance of Plaintiffs' climate change arguments generally rests on a recent decision in this District, *Center for Biological Diversity v. U.S. Forest Service.* 687 F. Supp. 3d 1053 (D. Mont. 2023) ("*Black Ram"*). Plaintiffs argue that, as in *Black Ram*, USFS performed only a "cookie-cutter" analysis and concluded without proper consideration that the climate impacts of the Project are insignificant. (Doc. 73 at 10-11).

The Ninth Circuit's decision in *350 Montana v. Haaland* provides much of the legal basis for the District of Montana's decision regarding NEPA and climate change in *Black Ram*. In *350 Montana*, the Ninth Circuit considered whether the Department of the Interior had, without proper consideration, dismissed as minor the emissions of a coal mine expansion project. *350 Montana*, 50 F.4th 1254 (9th Cir. 2022). The reviewing agency concluded that the mine expansion would not

15

have significant impacts on the environment because its "contribution *relative to other global sources [of greenhouse gases] would be minor* in the short-and-long-term on an annual basis." *350 Montana*, 50 F.4th at 1266. The Ninth Circuit rejected that explanation and held that, lacking a scientifically supported basis for its conclusion, the agency had not fulfilled the requirements of NEPA. 50 F.4th at 1266, 1272.

In *Black Ram*, the court considered the Kootenai National Forest Black Ram Project in northwest Montana. The court found that the Black Ram Project's EA was insufficient because, "although the USFS took steps to explain how the Project could impact carbon emissions, it did so only in general terms, which does not meet NEPA's 'hard look' standard." *Black Ram*, 687 F. Supp. 3d at 1075. The court explained that USFS' climate impacts analysis did not satisfy NEPA because (1) it relied primarily on "the cookie-cutter and boilerplate Project Climate Report" and therefore "did not utilize high quality and accurate information which NEPA requires" and (2) it also relied, without scientific explanation, on the assertion that "the short-term loss of carbon from logging would be outweighed by the net increase in carbon sequestration resulting from a healthier forest . . . ." 687 F. Supp. 3d at 1075. The agency concluded that the project's impact would make up "only a tiny percentage of forest carbon stocks of the Kootenai National Forest,

16

and an infinitesimal amount of total forest carbon stocks of the United States." 687 F. Supp. 3d at 1075.

Here, Plaintiffs' opening brief alleges generally that "USFS's cookie-cutter conclusions on impacts to climate change is precisely the type of 'analysis' that has been repeatedly rejected." (Doc. 56 at 24). Plaintiffs add more detail to this argument in their reply brief. Namely, Plaintiffs point to alleged failures to quantify climate-related impacts at the scale of the Project and to explain why quantification was not possible. (Doc. 73 at 10).

Ultimately, Plaintiffs' comparison to *Black Ram* falls short. In *Black Ram*, the fatally inadequate, "cookie-cutter" analysis depended on a verbatim reproduction of analysis from another forest. 687 F. Supp. 3d at 1074 n.7. Plaintiffs have not shown that significant analysis supporting USFS' conclusions was borrowed from elsewhere. Nor have Plaintiffs rebutted the quantitative estimates that were included in the forest-specific carbon assessment and which underly the decision to prepare a qualitative analysis for the Project. USFS' decision to include a qualitative analysis is reasonably explained in the FEA. (FS010563). Therefore, the matter at hand is distinguished from *Black Ram* and the Court finds that the Project climate analysis did not violate NEPA.

**b.    NFMA**

As with their NEPA claims, Plaintiffs stipulated to waive all but one of their claims brought pursuant to NFMA. The surviving claim addresses indicator species viability standards for pine marten. However, the argument Plaintiffs present on reply is a significant departure from the opening brief and any reference to the claim in the amended complaint. Accordingly, the Court finds that Plaintiffs' arguments regarding pine marten were improperly raised. Further, even if the claim had been properly raised, the Court finds no violation of the Forest Plan or NFMA.

In their opening brief, Plaintiffs argue "USFS cannot demonstrate compliance with the viability standards in place at the time of the decision for indicator species." (Doc. 56 at 22). Plaintiffs further argue that by amending the Forest Plan, the Project will impact pine marten and pileated woodpeckers, "two important indicator species." (Doc. 56 at 22). The opening brief insists that USFS' analysis of Project impacts on indicator species should rely on the prior definition of old growth, which requires a stand of at least 40 acres. Following their stipulation at oral argument, Plaintiffs abandoned any claims related to pileated woodpecker.

Plaintiffs' reply brief changes the focus of their arguments regarding pine marten. There, Plaintiffs argue the Project "does not demonstrate compliance with

the Forest Plan Forest-wide Management Standard (1)(e)(1)." (Doc. 73 at 12). That

standard—F.1.e.1—requires that

> [t]he amount and distribution of old growth will be used to ensure
> sufficient habitat for the maintenance of viable populations of existing
> native and desirable vertebrate species, including two indicator
> species, the pine marten and pileated woodpecker.

(FS0000024). As Plaintiffs point out, this standard was not modified by the old-

growth amendment to the Forest Plan, which instead affects Forest-wide

Management Standard F.1.e.2.

Plaintiffs therefore argue USFS has failed to establish the presence of

sufficient habitat across the Project area for "the maintenance of viable populations

of the pine marten" and further "lacks the requisite scientific studies and

methodology for ensuring so . . . ." (Doc. 73 at 13). Plaintiffs further challenge

USFS' methods for assessing quality and quantity of habit for pine marten, and

allege that the Project would have overall detrimental effects on pine marten

habitat. In essence, Plaintiffs argue F.1.e.1 requires USFS to ensure sufficient

habitat for pine marten and that, because USFS has failed to establish the existence

of sufficient habitat, the project therefore violates NFMA.

As Defendants point out, the focus on pine marten and F.1.e.1 is a

significant departure from Plaintiffs' NFMA arguments in their first amended

complaint and throughout their opening brief. Defendants therefore argue that it is

improper for Plaintiffs to raise these arguments for the first time on reply.

Accordingly, the Court finds that the arguments regarding F.1.e.1 are improperly raised.

Even if Plaintiffs' arguments had been properly raised, it is apparent that their claims on this issue fail. The text of F.1.e.1 creates the obligation that USFS must "ensure sufficient habitat for the maintenance of viable populations" of pine marten. (FS0000024). However, the obligation created by that standard operates through USFS actions affecting the "amount and distribution of old growth." In other words, the standard does not mandate that USFS take actions unrelated to the amount and distribution of old growth. It follows that, to demonstrate compliance with F.1.e.1, USFS need only show that Project activities affecting *the amount and distribution of old growth* will not detrimentally affect the maintenance of viable populations of pine marten.

As Defendants point out, the record indicates that vegetative treatments will not remove any stand from old growth status. (FS0010531; FS0015050). A such, it is unclear how the Project could violate F.1.e.1. Further, even if Plaintiffs are correct that USFS has been deficient in assessing and calculating habitat and population numbers for pine marten, such a conclusion would not affect the Project's impacts on the *amount and distribution* of old growth. Accordingly, Plaintiffs' arguments on this issue are unpersuasive.

c.    **ESA**

Regarding bull trout, Plaintiffs challenge FWS's preparation of the species' Biological Opinion and accompanying ITS. As with Plaintiff's NFMA claims, there is significant inconsistency between the arguments raised in Plaintiffs' opening brief and their reply brief. In addition, it appears that several of Plaintiffs' arguments regarding their bull trout claims have been waived. However, the Court will nevertheless address each of the arguments made by Plaintiff under this claim. As set forth below, the Court finds no violation of the ESA.

Plaintiffs first argue that the Biological Opinion relies on deficient or inaccurate analysis regarding roads in the Project area. The presence of roads on the landscape is significant for bull trout because roads have the potential to contribute increased sediment to streams, with negative impacts to the species. The arguments on this issue change dramatically from Plaintiffs' opening brief to their reply brief. Ultimately, the arguments in the opening brief are unpersuasive and the new arguments brought in the reply brief are improperly raised.

Plaintiffs' opening brief alleges that temporary roads will not be decommissioned following the completion of Project activities, contrary to the agencies' conclusions. Plaintiffs insist that "decommissioning is not currently funded or scheduled to occur." (Doc. 56 at 27). Therefore, Plaintiffs argue, the Biological Opinion is premised on a false assumption regarding the future of these

roads and their long-term impacts on bull trout. In support of this theory, Plaintiffs

cite to a seemingly unrelated paragraph in their Statement of Undisputed Facts.[3]

(Doc. 56 at 27).

As Defendants point out, the assertion that temporary roads will not be

decommissioned is contradicted in the FEA. "Temporary roads constructed would

be obliterated within three years of completing activities in the treatment area."

(FS0010606). The decommissioning of temporary roads is part of the Project, and

therefore FWS did not arbitrarily rely on USFS' future compliance with its own

Project.[4] To this same point, Federal Defendants also argue that "[t]emporary roads

will not deliver sediment because they will be built outside [Riparian Habitat

Conservation Areas]." (Doc. 61 at 31). This second line of argument is represented

---

[3] Plaintiffs cite to ¶46 in their Statement of Undisputed Facts (Doc. 56-1). The cited passage in turn quotes from the Biological Opinion: "[T]he current action will result in short-term sediment increases during project activities, moderate-term sediment decreases from the existing baseline, and then likely the baseline will return to its pre-project level following the breakdown of the BMPs."

[4] Plaintiffs also claim "USFS's conclusion that the undisclosed, improved road conditions will be maintained in perpetuity is arbitrary . . . ." (Doc. 56 at 27). In support, Plaintiffs cite, without explanation to ¶ 47 in their Statement of Undisputed Facts. There, Plaintiffs reproduce either a mis-labelled or mis-cited table, apparently from the Project FEA. Plaintiffs do not explain how this table supports their argument. The table does include a column that relates levels of sediment delivery from roads and stream crossings "Post Haul, BMPs Applied and Maintained." Presumably, the argument relates to the amounts of sediment included in that column. Lacking further explanation or context, the Court cannot identify an actionable claim or argument.

in a single sentence and merits attention primarily for reasons explained below. It does not impact the Court's determination on the issue of road decommissioning.

The Project Biological Opinion explains that, with limited exceptions, new roads will not be constructed within Riparian Habitat Conservation Areas ("RHCA") in the Project area. (FS0012083). RHCAs demarcate a buffer surrounding streams and other features of a watershed. (FS0012054). The Project does allow for the construction of four new stream crossings in "non-fish bearing, intermittent, and small perineal streams in non-bull trout drainages." (FS0012083). These new stream crossings therefore will not impact bull trout.

With significant sideboards, the Project also authorizes the potential use of road prisms within RHCAs. However, those prisms must already exist and there must also be culverts at stream crossings. Further, road prisms within RHCAs may only be used as temporary roads "as long as dirt is not side cast within the RHCA." (FS0012083).

In their reply brief, Plaintiffs significantly change the scope and focus of their argument as it concerns temporary roads. While Plaintiffs' first amended complaint and opening brief focus on the *decommissioning* of roads, the argument in their reply brief swings to the *use or construction* of temporary roads within RHCAs. On that point, Defendants argue "FWS fails to adequately address the

effects of opening roads within RHCAs on bull trout in violation of the ESA and the APA." (Doc. 73 at 18).

These arguments regarding temporary roads within RHCAs are plainly raised for the first time on reply. Such arguments need not be considered by the Court. *Native Ecosystems Council v. Weldon*, No. CV 10-57-M-DWM, 2011 WL 13193257, at *15 (D. Mont. June 7, 2011), *aff'd*, 697 F.3d 1043 (9th Cir. 2012) ("The issue was not addressed in the Plaintiffs' opening brief on summary judgment, thus it is not considered here.").

Perhaps in anticipation of Defendants' challenge to these new arguments raised on reply, Plaintiffs' point out that Defendants themselves argued[5] that no new roads would be built in RHCAs. "In their response, Defendants rely on the false condition that logging and roadbuilding will occur outside RHCAs." (Doc. 73 at 18). Yet, contrary to Plaintiffs' implication, Defendants did not open the door to Plaintiffs' new line of argument regarding temporary roads in RHCAs.

The context in which Defendants raised the issue of road construction is distinct from the arguments now raised by Plaintiffs. Plaintiffs use the issue of temporary roads in RHCAs to support their claims that FWS produced a deficient

---

[5] "Plaintiffs also argue that road decommissioning may not occur and thus FWS should not have analyzed its effects. Temporary roads will not delivery sediment because they will be built outside of RHCAs. Either way, the Project provides that temporary roads will be decommissioned following timber harvests." (Doc. 61 at 31) (internal citations omitted).

jeopardy decision because those roads will have undisclosed and negative impacts on bull trout. In contrast, Defendants mention temporary roads in response to Plaintiffs' original claim (as addressed above) that road decommissioning was not certain to occur. (Doc. 61 at 31).

The statement in question is reflected in a single sentence and forms only one part of a Defendants' case against Plaintiffs' assertions regarding decommissioning. Further, even if Defendants had opened the door to a new line or argument, Defendants reference to roads within RHCAs clearly dwells only on whether roads will be *built* within RHCAs. As Defendants and the administrative record make clear, no new roads will be built within the RHCAs. Rather, existing road prisms will be *used* for Project purposes. (FS0012083). Because the issue of temporary roads within RHCAs was improperly raised, the Court need not consider it. Plaintiffs have not shown a violation of the ESA regarding the effects of roads on bull trout.

Next, Plaintiffs argue "USFS also sidesteps any meaningful analysis of impacts from climate change on bull trout and its critical habitat, despite the predicted severe loss of suitable habitat."[6] (Doc. 56 at 27-28). Plaintiffs' short argument on this matter is contradicted by the text of the Biological Opinion.

---

[6] The Court presumes Plaintiffs intend this argument to refer to FWS—the agency responsible for preparing the Biological Opinion—rather than USFS.

Specifically, the cumulative effects section addresses climate change, as does the "New or Emerging Threats" section of Appendix A. (FS0012096-97; FS0012112-13). Accordingly, Plaintiffs' argument on this issue is unsuccessful. And even if it was successful, the issue is not included in Plaintiffs' reply brief, nor was it addressed at oral argument. Therefore, the Court concludes that Plaintiffs intended to waive this argument.

Plaintiffs' next argument regarding bull trout focuses on FWS' alleged reliance on "vague, unenforceable, and undisclosed" Best Management Practices (BMPs) and design features. (Doc. 56 at 28). Regarding enforceability, Plaintiffs argue that because the BMPS "do not appear" in the Biological Opinion they are unenforceable. However, as Defendants point out, the BMPs are part of the Project and are binding on the agency. Specifically, the BMPs are discussed as part of the Project's aquatic design features, which are incorporated by reference into the Biological Opinion. (FS0011902, FS0012051-58). Accordingly, their enforceability is not undermined by Plaintiffs' assertions.

Regarding implementation, Plaintiffs argue FWS unreasonably presumed 100% effectiveness across all "project design features, BMPS, and mitigation measures." (Doc. 56 at 28). However, the Biological Opinion contradicts this assertion. "[E]ven with the highest efficacy of design feature implementation and BMP management, the potential for sediment to be delivered is still high on the

Nez Perce Fork and Rombo Creek." (FS0012084). The Biological Opinion further

concludes that the BMPs will eventually degrade following the completion of the

Project. "The BMP upgrading prior to haul and the implementation of the design

features will minimize the sediment delivery resulting from log haul during the

project, and those minimizations will endure following project activities for likely

up to 10 years." (FS0012084). Accordingly, Plaintiffs' assertion regarding the

presumed effectiveness of BMPS and project design features is incorrect and does

not support Plaintiffs' claim that FWS violated the ESA.

Plaintiffs further argue that many of the BMPS and design features are

"vague or difficult to enforce." (Doc. 56 at 28). In their opening brief, Plaintiffs'

primary example in support of this claim refers to Term and Condition B from

RPM # 1 in the Project ITS. RPM #1 instructs USFS as follows:

> Identify and implement means to reduce the potential for incidental
> take of bull trout resulting from the magnitude of sediment delivery
> to streams during project implementation and following project
> implementation.

(FS0012102). To implement RPM #1, the ITS provides non-discretionary Terms

and Conditions. The passage cited by Plaintiffs is taken from Term and Condition

B, which reads

> [t]hroughout the life of the timber sale, the Forest will determine if
> road conditions are in danger of being degraded to the point where
> there is a high risk of sediment deposition to streams. The Forest will
> temporarily suspend haul or other use until corrective actions can be

> implemented or until natural conditions are again conducive to use
> without creating sediment inputs to project area streams.

(FS0012102). Plaintiffs' critique of this binding obligation is that it lacks a

discussion of "what metrics USFS will use to determine whether a road has

deteriorated to this point, or what a high risk of sediment deposition in

streams means." (Doc. 56 at 28).

Plaintiffs' primary support for this line of argument and the purported

inadequacy of Term and Condition B comes via analogy to *Center for Biological

Diversity v. Bernhardt*. 982 F.3d 723 (9th Cir. 2020). In that case, the Ninth Circuit

rejected mitigation measures addressed in a FWS Biological Opinion because they

did not constitute a "clear, definite commitment of resources." *Bernhardt,* 982 F.3d

at 748. The court specified that "[m]itigation measures relied upon in a biological

opinion must constitute a 'clear, definite commitment of resources,' and 'be under

agency control or otherwise reasonably certain to occur.'" *Bernhardt,* 982 F.3d at

743 (citing *Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.,* 524 F.3d

917, 936 & n.17 (9th Cir. 2008)).

The facts at hand are plainly distinguishable from those in *Bernhardt*. There,

the court considered mitigation measures contained in the body of a Biological

Opinion. Here, Plaintiffs challenge the Terms and Conditions of an RPM written

into the Project ITS. In *Bernhardt*, the mitigation measures were inadequate under

the ESA in large part because they were unenforceable. *Bernhardt,* 982 F.3d at

747. That court also held that mitigation measures "can be made enforceable in a variety of ways, including by incorporation into the terms and conditions of an [ITS]." *Bernhardt*, 982 at 744. Here, the Term and Condition in question *is* part of an ITS. Therefore, the analogy to *Bernhardt* is inapt. Having cited no further authority to support their conclusions regarding Term and Condition B to RPM # 1, Plaintiffs' argument on this point fails.

As in other portions of their briefing, the scope of Plaintiffs' claims regarding Project RPMs and other alleged "mitigation measures" is significantly expanded in their reply brief. On reply, Plaintiffs develop their arguments on mitigation measures to include additional Terms and Conditions, the potential for additional measures that *could* be implemented, and temporary roads within RHCAs.

The first of these arguments on reply concerns Term and Condition C to RPM # 1. As with Term and Condition B, Plaintiffs support their arguments with reference to *Bernhardt*. As above, the analogy to *Bernhardt* is inapt, and Plaintiffs' argument is unpersuasive.

Plaintiffs next argue that "[t]he record indicates that there are sufficiently binding-and-certain-to-occur mitigation measures that the Agencies *could* utilize." (Doc. 73 at 26). Plaintiffs further insist that FWS failed "to include mitigation measures that will address the ongoing, chronic impacts" from temporary roads on

29

existing prisms within RHCAs in the Project Area. (Doc. 73 at 27). However, Plaintiffs have cited to no authority that supports to proposition that the ESA is violated where additional mitigation measures might have been but were not implemented. Accordingly, this argument is also unpersuasive.

Plaintiffs' reply also raises a new and distinct argument regarding Term and Condition D to RPM # 1. That Term and Condition requires that USFS "shall remove the Flat Creek culvert barrier on FR 468 prior to the beginning of the third implementation unit (Blue Joint)." (FS0012103). Plaintiffs argue that the Biological Opinion does not address the impacts stemming from removing the culvert in question. Therefore, Plaintiffs insist, RPM # 1 is in violation of the ESA.

In their reply, Federal Defendants point out the culvert in question was discussed in the Biological Opinion (FS0012077) and that the removal of the culvert was separately authorized (FS0011808). (Doc. 76 at 20). Accordingly, Plaintiffs have failed to show that the Biological Opinion was deficient in its analysis of the Flat Creek culvert. In sum, Plaintiffs have failed to demonstrate any inadequacy relating to mitigation measures, BMPS, RPMs, or project design features.

In their final ESA arguments regarding bull trout, Plaintiffs allege FWS "fails to address bull trout recovery in the Biological Opinion." (Doc. 56 at 29). In support, Plaintiffs cite to 50 C.F.R. § 402.02, which states in relevant part

30

> Jeopardize the continued existence of means to engage in an action
> that reasonably would be expected, directly or indirectly, to reduce
> appreciably the likelihood of both the survival and recovery of a listed
> species in the wild by reducing the reproduction, numbers or
> distribution of that species.

Applying this regulatory language, Plaintiffs explain that because FWS "admitted" the Project will cause harms to bull trout, the agency must therefore conclude that the Project will impede recovery of the species. (Doc. 56 at 29).

However, Plaintiffs have cited no authority that would support the basic premise of their argument—that because the Project involves some impacts to bull trout that it therefore will have overall negative impacts on recovery of the species. Further, Plaintiffs' argument rests on a factually incorrect assertion—that FWS did not address recovery of the species. To the contrary, recovery is address throughout the Biological Opinion, culminating with the following finding:

> Therefore, [FWS] concludes that this project will not appreciably
> reduce both the survival and recovery and would not jeopardize bull
> trout at the range-wide scale of the listed entity, the coterminous
> population of the United States.

(FS0012099). Accordingly, Plaintiffs have not shown that FWS failed to adequately address recovery of bull trout. Further, this line of argument was not presented in Plaintiffs' reply brief or addressed at oral argument. As elsewhere, the Court therefore presumes that Plaintiffs intended to waive this argument.

For these reasons, Plaintiffs have shown no legally significant deficiency in the Biological Opinion or associated ITS regarding bull trout. Plaintiffs' arguments

to that effect fall short. Accordingly, the Court finds that FWS, as the agency charged with preparing the Biological Opinion and ITS, has not violated the ESA.[7]

## IV.    Conclusion

For the reasons discussed above,

IT IS RECOMMENDED that Plaintiffs' motion for summary judgment (Doc. 55) be DENIED and Defendants' cross-motions for summary judgment (Doc. 60; Doc. 65) be GRANTED.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 30th day of September 2025.

_Kathleen L. DeSoto_
Kathleen L. DeSoto
United States Magistrate Judge

---

[7] As addressed above, Plaintiffs' briefing sometimes refers to USFS in arguments regarding the preparation of the Biological Opinion and ITS. In general, it appears that these references to USFS are either mistakes of fact or simply drafting errors. In either event, to the extent that Plaintiff may have intended to allege ESA violations on the part of USFS, the Court finds none.