Oliver Wood
Oliver Wood Law, PLLC
P.O. Box 581312
Salt Lake City, Utah 84158
(206) 351-5320
ofinnwood@gmail.com

Alizabeth A. Bronsdon
Bronsdon Law Firm, PLLC
P.O. Box 7262
Missoula, MT 59807
(267) 664-3422
bronsdonlaw@gmail.com

Rachel G. Inabnit
LAW OFFICE OF RACHEL INABNIT, PLLC
P.O. Box 8846
Missoula, MT 59807
(406) 201-1305
rachel@inabnitlawoffice.com

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, YELLOWSTONE TO UINTAS CONNECTION, FRIENDS OF THE BITTERROOT, and WILDEARTH GUARDIANS, <br><br> *Plaintiffs,* <br><br>       *v.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 9:24-cv-00010-DLC-KLD <br><br> **PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATIONS [DOC. 85]** |

GARY WASHINGTON, in his                          )
official capacity as Acting Secretary            )
of the Department of Agriculture;                )
RANDY MOORE, in his official                     )
capacity as Chief of the Forest                  )
Service; MATTHEW ANDERSON, in                    )
his official capacity as the Bitterroot          )
National Forest Supervisor; and DAN              )
PLILEY, in his official capacity as the          )
West Fork District Ranger; UNITED                )
STATES FOREST SERVICE; and                       )
UNITED STATES FISH AND                           )
WILDLIFE SERVICE,                                )
                                                 )
*Federal Defendants*,                            )
                                                 )
RAVALLI COUNTY, MONTANA,                          )
                                                 )
Defendant-Intervenor,                            )
                                                 )
        and                                      )
                                                 )
MONTANA DEPARTMENT OF                            )
NATURAL RESOURCES AND                            )
CONSERVATION,                                    )
                                                 )
Defendant-Intervenor.                            )
                                                 )
_____

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………..3

TABLE OF AUTHORITIES…………………………………………………………….4

BACKGROUND…………………………………………………...…………………6

STANDARD OF REVIEW...…………………………………………………………7

OBJECTIONS…………………………………………………………………..…...7

I.      NEPA OBJECTION……………………………………………………………7

    A.  Objection 1: The Findings and Recommendations erroneously distinguish the *Black Ram* decision in finding the Forest Service's climate analysis adequate………………………………………….....7

II.     NFMA OBJECTIONS…………………………….…………………………….11

    A. Objection 2: Plaintiffs' NFMA claim was properly raised……………..11

    B. Objection 3: Plaintiffs should prevail on their NFMA species viability claim……………………………………………………...…………..14

III.    ESA OBJECTION…………………………...………………………………..20

    A. Objection 4: The Findings and Recommendations erroneously distinguish *Center for Biological Diversity v. Bernhardt*……………………..…..20

CONCLUSION………………………………………………………………………..26

CERTIFICATE OF COMPLIANCE…………………………………………………..26

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. U. S. Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018)…………………………………………...11

*Ctr. for Biological Diversity v. Bernhardt,*
  982 F.3d 723 (9th Cir. 2020)……………...…………………………21-25

*Ctr. for Biological Diversity v. Rumsfeld,*
  198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)………………………………22

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  687 F. Supp. 3d 1053(D. Mont. 2023)…………………….……………..7-10

*Eberle v. City of Anaheim,*
  901 F.2d 814 (9th Cir.1990)…………………………………..……………13

*Env't Def. Ctr. v. BOEM.*,
  36 F.4th 850 (9th Cir. 2022)…………………………………………………..10

*Inland Empire Public Lands Council v. U.S. Forest Serv.,*
  88 F.3d 754 (9th Cir. 1996)…………………………………………………...15

*Myers v. Fulbright,*
  367 F. Supp. 3d 1171 (D. Mont. 2019)……………………….....................7

*Native Ecosystems Council v. Marten,*
  612 F. Supp. 3d 1146 (D. Mont. 2020)………………………………………13

*Native Ecosystems Council v. Weldon,*
  697 F.3d 1043 (9th Cir. 2012)………………………………………...………11

*Neighbors of Cuddy Mountain v. Alexander,*
  303 F. 3d 1059 (9th Cir. 2002)…………………………………..……….18-19

*North Cascades Conservation Council v. U.S. Forest Serv.,*
  136 F. 4th 816 (9th Cir. 2025)………………………………………….………6

*Selkirk Conservation All. v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003)…………………………………………….20

*United States v. Syrax*,
    235 F.3d 422 (9th Cir. 2000)…………………………………………...7

## STATUTES AND REGULATIONS

16 U.S.C § 1536(b)(4)…………………………………………………………20

36 C.F.R. § 219.15(b)…………………………………………..……………..…11

50 C.F.R. § 402.16(c))…………………………………………………………..24

Plaintiffs respectfully submit the following objections to Magistrate DeSoto's Findings and Recommendations (Doc. 85) in this matter.

## BACKGROUND

This case challenges the Forest Service's approval of the Mud Creek logging project on the southern end of the Bitterroot Mountains. MC0011321. Set on the Bitterroot National Forest among the towering ponderosa pines and clear streams beneath Trapper Peak and along the West Fork of the Bitterroot River, the Mud Creek Project authorizes commercial logging on 13,700 acres, including commercial clear-cuts on 4,800 acres, and non-commercial activities, like thinning, on another 26,282 acres. MC0010513. The Project would take 20 years to complete, MC0011302, and it would construct 8.95 miles of permanent roads and 33.8 miles of temporary roads. MC0010539.

Crucially, the Forest Service did not study the site-specific impacts of the action but rather used the "condition-based management" approach, where "timing and location of treatments would depend on identification of specific conditions using field work during implementation of the project." MC0010510. The Ninth Circuit recently criticized the Forest Service's "excessive reliance on condition-based management detracts from a decisionmaker's or public participant's ability to assess a proposed action's environmental consequences." *North Cascades*

6

*Conservation Council v. U.S. Forest Service*, 136 F. 4th 816, 829-30 (9th Cir. 2025).

In early 2023, the Forest Service issued its Decision Notice and Final EA for the Project. MC0011321. The Forest Service also obtained a biological opinion. FWS0000001. Plaintiffs challenged the project alleging violations of NFMA, NEPA, and the ESA. Following briefing and a hearing, Judge DeSoto issued findings in favor of the United States Forest Service ("Forest Service") and United States Fish and Wildlife Service ("FWS") on all claims. Doc. 85.

## STANDARD OF REVIEW

Objections are reviewed de novo. *Myers v. Fulbright*, 367 F. Supp. 3d 1171, 1173 (D. Mont. 2019). The Court reviews for clear error findings to which no party timely objects. *Myers*, 367 F. Supp 3d at 1173. Clear error exists if the Court is left with a "definite and firm conviction that a mistake has been committed." *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000).

## OBJECTIONS

## I.    NEPA objection.

### A. Objection 1: The Findings and Recommendations erroneously distinguish the *Black Ram* decision in finding the Forest Service's climate analysis adequate.

The Findings and Recommendations conclude *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053 (D. Mont. 2023) ("*Black Ram*") is

distinguishable from the Mud Creek Project, and "the Project climate analysis did not violate NEPA." Doc. 85 at 17. Distinguishing *Black Ram*, the Findings and Recommendations find that Plaintiffs have "not shown that significant analysis supporting USFS' conclusions was borrowed from elsewhere" nor "have Plaintiffs rebutted the quantitative estimates that were included in the forest-specific carbon assessment and which underly the decision to prepare a qualitative analysis for the Project." Doc. 85 at 17. The Court's conclusions regarding *Black Ram* are incorrect.

While the Magistrate's findings focus on one of *Black Ram*'s facts—that there was "a verbatim reproduction of analysis from another forest[,]" Doc. 85 at 17—the Mud Creek climate analysis and *Black Ram* suffer from the same big-picture flaws. As this Court explicitly stated in *Black Ram*, "[m]erely discussing carbon impacts and concluding that they will be minor does not constitute a 'hard look.'" *Black Ram*, 687 F. Supp. 3d at 1077. This is precisely the deficiency present in the Forest Service's analysis of the Mud Creek Project and Plaintiffs' summary judgment briefing thoroughly explains why the Forest Service's analysis in this case is similarly flawed, but only this one allegedly distinguishing fact was discussed in the Magistrate's order. Doc. 56 at 24; MC10573 ("Direct effects to climate change as a result of the proposed action would be insignificant because

the project's emissions would constitute a negligible proportion of the global atmospheric greenhouse gas concentration.").

The Findings and Recommendations distinguish *Black Ram*'s climate analysis because Plaintiffs in this case have not shown that there was "the fatally inadequate, 'cookie-cutter' analysis [that] depended on a verbatim reproduction of analysis from another forest." Doc. 85 at 17. However, Plaintiffs explained why this fact is not dispositive or materially distinguishable. The Court in *Black Ram* faulted the "verbatim reproduction of analysis from another forest" in the purported project-specific carbon report because it was not based on "high quality and accurate information." *Black Ram*, 687 F. Supp. 3d at 1075. In Mud Creek, the Forest Service never even completed a project-specific carbon analysis and instead relied on the "Forest Carbon Assessment for the Bitterroot National Forest." MC10563. Thus, whether a borrowed, boilerplate analysis in *Black Ram*, or a non-existent site-specific analysis in Mud Creek, the results are the same: "the USFS has the responsibility to give the public an accurate picture of *what impacts a project may have*, no matter how "infinitesimal" they believe they may be." *Black Ram*, 687 F. Supp. 3d at 1077 (emphasis added).

The Findings and Recommendations also erroneously conclude that "Plaintiffs [have not] rebutted the quantitative estimates that were included in the forest-specific carbon assessment and which underly the decision to prepare a

qualitative analysis for the Project." Doc. 85 at 17. But the Forest Service's reliance on the tiered, forest-wide carbon assessment does not excuse its failure to analyze the project-specific impacts of the Mud Creek Project. In *Black Ram*, the Forest Service also used a forest-wide carbon assessment to conclude impacts to climate change would be minor, but the Court determined that "merely discussing carbon impacts and concluding that they will be minor does not equate to a 'hard look.'" *Black Ram*, 687 F. Supp. 3d at 1077. While the Findings and Recommendations in Mud Creek fall back on the forest-wide carbon assessment, that assessment is insufficient as it only generally discusses impacts of logging on carbon stores. MC0012817-18. Furthermore, "agencies cannot tier their environmental review under NEPA to assessments . . . that do not actually discuss the impacts of the *project at issue." Env't Def. Ctr. v. BOEM*, 36 F.4th 850, 874 (9th Cir. 2022) (quotations omitted) (emphasis added).

In sum, the Findings and Recommendations errs when it distinguishes this case from *Black Ram* based on the absence of verbatim copying of other analyses because this entirely overlooks the fundamental flaws in the Forest Service's climate change analyses. Both cases involve the agency's reliance on inadequate comparisons to larger carbon stocks and unsubstantiated, unsupported assertions regarding long-term carbon sequestration, failing to provide the requisite "hard look" mandated by NEPA. *Black Ram*, 687 F. Supp. 3d at 1077.

For these reasons, the Court should reject the conclusion that *Black Ram* is distinguishable and find the Forest Service's analysis in this case similarly deficient under NEPA.

## II.    NFMA objections.

Under NFMA, forest management occurs at two levels: the forest level and the project level. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). At the forest level, the Service develops a forest plan that includes binding standards. *Id*. The Service then approves site-specific projects that must "strictly" comply with these standards. 36 C.F.R. § 219.15(b), (d); *All. for the Wild Rockies v. U. S. Forest Serv.*, 907 F.3d 1105, 1109–10 (9th Cir. 2018).

### A. Objection 2: Plaintiffs' NFMA claim was properly raised.

The Magistrate's findings conclude that Plaintiffs' "arguments regarding F.1.e.1 [the Forest Plan] are improperly raised[,]" Doc. 85 at 20, because they are a "significant departure from Plaintiffs' NFMA arguments in their first amended complaint and throughout their opening brief." *Id*. at 19. This conclusion is in error.

A close review of Plaintiffs' amended complaint, opening brief, and reply brief reflects that Plaintiffs' contention that the Forest Service violated its forest plan species viability standard ("Species Viability Standard") is clear and consistently raised. For example, Plaintiffs' amended complaint argues: "[t]he

Forest Service's failure to use the Forest Plan definition of old growth, and consequent failures to demonstrate compliance with Forest Plan old growth standards for retention and viability, violates NFMA and the APA." Doc. 43 at ¶ 202. Next, in their opening brief, Plaintiffs argue "USFS cannot demonstrate compliance with the viability standards in place at the time of the decision for indicator species." Doc. 56 at 22. The Court then distinguishes the opening brief, stating that Plaintiffs "insist[] that USFS' analysis of Project impacts on indicator species should rely on the prior definition of old growth, which requires a stand of at least 40 acres." Doc. 85 at 18. This reading of Plaintiffs' opening brief is in error, as the brief argued that:

> By removing the 40-acre requirement, USFS will be able to remove large stands of old growth but still comply with the percentage requirement by piecemealing small patches of old growth trees to make up the required percentage. This will have some amount of impact to both of these [indicator] species, but there is no attempt to characterize these impacts in any meaningful way other than blanket conclusions from "impacts."

Doc. 56 at 22. Removing the 40-acre definition of old growth required a plan amendment for the old growth standards ("Old Growth Amendment"), but the Forest Service did not amend the plan for the Species Viability Standard at issue in this claim. In other words, despite issuing the Old Growth Amendment, the Forest Plan still requires the Forest Service to comply with the Species Viability Standard. Doc. 73 at 12.

12

Plaintiffs made the exact same argument in the reply brief as they did in the amended complaint and opening brief, arguing "that the Forest Service is unable to demonstrate compliance with Forest Plan Standard (2)(e)(1)[1] because it is unable to ensure the amount and distribution of old growth will provide sufficient habitat for the maintenance of a viable population of pine marten." Doc. 73 at 17. Thus, Plaintiffs properly raised and argued this issue consistently throughout the case.

The Findings and Recommendations also err by not defining what is a properly raised claim nor citing any authority for that proposition. While "it is well established in this circuit that [t]he general rule is that appellants cannot raise a new issue for the first time in their reply briefs[,]" as discussed extensively above, the issue of the Mud Creek Project violating the Species Viability Standard in the Forest Plan was repeatedly and properly raised beginning in the amended complaint. *Eberle v. City of Anaheim,* 901 F.2d 814, 818 (9th Cir.1990).

Even if this claim was first raised on reply, this Court has discretion to review claims raised on reply where it would not prejudice the Defendant. *Native Ecosystems Council v. Marten*, 612 F. Supp. 3d 1146, 1163 (D. Mont. 2020). In *Native Ecosystems Council v. Marten*, this Court found that where the Defendant had the opportunity to defend the newly raised claim in briefing and at oral

---

[1] Plaintiffs mistakenly refer to this Standard as (2)(e)(1). A close review of the Forest Plan indicates this Standard is (1)(e)(1). MC0000024.

argument, it was not prejudiced, and Plaintiff could raise an issue that "closely resembles its initial claim." *Id*. If the Court should agree with the Findings and Recommendations that this argument is a departure from Plaintiffs' original claim, the Court should still review this claim on the merits because Defendants had the opportunity to brief the merits of the species viability issue in their reply, and Defendants responded to the issue at oral argument in August 2025. "Defendants cannot claim prejudice when they responded to Plaintiffs current claim in their reply briefs [], and addressed it at oral argument." *Id*. Thus, even if the violation of the Species Viability Standard was not properly raised, it did not prejudice Defendants, and the Court should exercise its discretion to consider the merits of the claim.

### B. Objection 3: Plaintiffs should prevail on their NFMA species viability claim.

The Findings and Recommendations also erroneously adopt Defendants' argument that because the amount and distribution of old growth will remain the same, "the record indicates that vegetative treatments will not remove any stand from old growth status….it is unclear how the Project could violate F.1.e.1." Doc. 85 at 20. This is factually and legally incorrect and ignores Forest Plan requirements to ensure sufficient habitat for pine marten.

### 1. The Old Growth Amendment allows commercial logging to proceed in stands considered old growth under the original Forest Plan definition.

While the Mud Creek Project issued the Old Growth Amendment redefining the technical definition of old growth, the Forest Service never amended the other definition of old growth related to the Species Viability Standard, which requires "[t]he amount and distribution of old growth will be used to ensure sufficient habitat for the maintenance of viable populations…of pine marten." MC000024. The pine marten is a management indicator species, which is a species used to "monitor the effects of planned management activities on viable populations of wildlife and fish including those that are socially or economically important." MC0000157. A management indicator species "is used as a bellwether . . . for the other species that have the same special habitat needs or population characteristics." *Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 762 n. 11 (9th Cir. 1996). Pine marten were selected as an indicator species because they "depend on old-growth timber habitat types for nesting and feeding areas." MC0000871.

In addition to the Species Viability Standard, the 1987 Bitterroot National Forest Plan (Forest Plan) also defines old growth. This definition considers old growth status on the Forest as multistoried stands with 15 trees greater than 20 inches diameter or more per acre, a high percentage of canopy cover, and stands that are 40-acres or more, among other criteria. MC0014018. The Forest Service abandoned this old growth definition in favor of the Project-specific Old Growth

Amendment, which defines old growth as less than 40 acres and with attributes

defined in Green at al. (2011), including as few as eight large diameter trees per

acre and a canopy that is one uniform tree layer (e.g. not multi-layered).

MC0013799-98. The Old Growth Amendment lowers the standard for what

constitutes old growth and allows logging in these stands[2], including "[t]reatments

including commercial harvest utilizing improvement cuts, group tree and single-

tree selection cuts, or non-commercial stand improvement thinning[.]"

MC00138239.

     In response to Plaintiffs' argument that the Mud Creek Project and its Old

Growth Amendment violate the Species Viability Standard, the Findings and

Recommendations erroneously conclude that because no stands would be removed

from old growth status, the Forest Service could not "violate F.1.e.1." Doc. 85 at

20. The Magistrate's findings incorrectly determine "USFS need only show that

Project activities affecting the amount and distribution of old growth will not

detrimentally affect the maintenance of viable populations of pine marten." Doc.

85 at 20.

     Contrary to the Magistrate's findings, the Project activities authorized by the

Mud Creek Project – *e.g.* the Old Growth Amendment – will detrimentally affect

---

[2] The Forest Service admits the Old Growth Amendment allows the Forest "to treat
conditions related to the purpose and need of this project while retaining the old
growth status of stands[.]" MC0010825.

habitat to maintain viable populations of pine marten. The Findings and Recommendations never consider how the Forest Service will *ensure sufficient habitat to maintain viable populations* because the "amount and distribution of old growth" will stay the same. Doc. 85 at 20. While—technically—"[n]o treatments will remove any stand from old growth status….commercial and non-commercial treatments will be proposed within old growth stands[.]" MC0010531.

Even though the Forest Service still refers to the forest logged under the Old Growth Amendment as 'old growth'; for pine marten, the old growth management indicator species, the Mud Creek Project's logging "would essentially simplify the habitat for a species that selects for more complex habitat, by removing canopy cover, layers, some coarse wood, diseased and damaged trees and increasing habitat fragmentation." MC0015296. The Forest Service itself recognizes that "[t]he intent of the Forest Plan old growth direction is to *ensure sufficient habitat for wildlife*, including two indicator species, the pine marten and pileated woodpecker." MC00007644 (emphasis added). However, the Wildlife Report recognizes the Mud Creek Project "may convert currently identified marten habitat into unsuitable habitat. This is primarily due to reductions in canopy cover and coarse woody debris resulting from the various treatments and subsequent burning; larger openings (>40 acres) would exacerbate these effects." MC0015027. The logging in old growth "would reduce carrying capacity for marten to some

extent[,]" despite the Forest Plan and Ninth Circuit's precedent requiring the Forest

Service to ensure sufficient habitat for viable populations of pine marten.

### 2. The Forest Plan and Ninth Circuit precedent require population monitoring to comply with Standard (1)(e)(1).

As described in Plaintiffs' reply brief, the mechanism created by the Forest

Plan to ensure compliance with Standard (1)(e)(1) is population trend monitoring

of pine marten. MC0000128. Regarding pine marten, the Forest Plan mandates

annual monitoring of three transects and annual reporting of "Pine marten

population in relation to habitat changes," after a five-year average is established.

*Id*. The 2019 Biennial Monitoring Report discusses the connection between the

Forest Plan Standard and the monitoring requirement, stating "that the amount and

distribution of old growth will be used to ensure sufficient habitat for the

maintenance of two indicator species, the pine marten and pileated woodpecker (II-

19). The monitoring and evaluation requirements in the Plan proposed evaluating

pine marten population change in relation to habitat changes by running three snow

tracking routes annually on a number of established transects." MC0006704.

However, in the Findings and Recommendations, the Court never analyzes

whether the Forest Service complied with its own standards. *See Neighbors of*

*Cuddy Mountain v. Alexander,* 303 F. 3d 1059, 1070 (9th Cir. 2002) (holding

"NFMA's forest-wide species viability requirements is relevant to the lawfulness

of any individual timber sale"). In *Neighbors*, the Ninth Circuit explained that "the

18

approval of a sale may conflict with the Forest Service's mandate to insure species viability even though the logging would not violate Forest Plan standards for the areas directly affected by the sale" because it is possible that "old growth has been so devastated elsewhere in the forest as to doom old growth species with any further cuts." 303 F.3d at 1069–70.

The Forest Service has not been monitoring the population trends for pine marten within the Project area or throughout the entire Forest to determine whether it is maintaining viable populations of pine marten. For example, the 2019 Biennial Monitoring Report indicates that the Forest Service has not conducted transect monitoring for the marten at the intervals required by the Forest Plan. MC0006705 (describing for marten that "[t]he Forest rarely came close to completing the required number of transects due to these limitations. The data was not sufficient to ascertain population densities or trends[.]"). Nor does the Wildlife Report reflect that the Forest Service did transects *in the Project area* to determine population trends for pine marten. MC0015295 ("Forest does not have population estimates for marten within the analysis area[.]"). Nowhere in the record is there evidence that the Forest Service has been monitoring the pine marten population, including the "number of detections per mile of transect run" with the acceptable variability of 5% +/- the latest five-year average.

19

In sum, the Findings and Recommendations erroneously dismissed Plaintiffs' NFMA species viability claim by (1) finding it was improperly raised and (2) concluding the Forest Service complied with Standard (1)(e)(1) because the Project would not technically remove any forests from old growth status under the Old Growth Amendment's new definition.

## III.    ESA objections.

If FWS determines that the proposed action will neither harm the species nor adversely modify its habitat, it may authorize the taking of a species incidental to the proposed project. 16 U.S.C § 1536(b)(4). To determine whether the action will ultimately jeopardize a listed species or adversely modify its habitat, FWS may rely on mitigation measures. *Selkirk Conservation All. v. Forsgren,* 336 F.3d 944, 955 (9th Cir. 2003). In this case, FWS determined the Mud Creek Project "along with the accompanying Terms and Conditions supplied below, is not likely to jeopardize the continued existence of bull trout." FWS000050. FWS's reliance on vague and unenforceable mitigation measures to support its no jeopardy determination and incidental take statement for bull trout was arbitrary and capricious in violation of the ESA.

### A. Objection 4: The Findings and Recommendations erroneously distinguish *Center for Biological Diversity v. Bernhardt.*

Plaintiffs argue that the Mud Creek Project's Biological Opinion included and relied upon vague and unenforceable mitigation measures. Doc. 56 at 28; Doc.

73 at 23. The Findings and Recommendations erroneously distinguish *Bernhardt*, concluding that "the Term and Condition in question is part of an ITS. Therefore, the analogy to *Bernhardt* is inapt." 982 F.3d 723 (9th Cir. 2020); Doc. 85 at 29. According to the Magistrate's findings, "[t]he facts at hand are plainly distinguishable from those in *Bernhardt*. There, the court considered mitigation measures contained in the body of a Biological Opinion. Here, Plaintiffs challenge the Terms and Conditions of an RPM written into the Project ITS." This finding is factually wrong because the mitigation measures at issue in the Mud Creek Project are also in the body of the Biological Opinion. FWS0000044 ("[P]roposed design features and effective BMP management outlined within the BA (USFS 2021), along with the *Terms and Conditions* defined in section J-d of this biological opinion, will minimize the effects to bull trout[.]") (emphasis added).

Ultimately, the Findings and Recommendations conclude Plaintiffs' analogy is inappropriate because the Ninth Circuit "also held that mitigation measures 'can be made enforceable in a variety of ways, including by incorporation into the terms and conditions of an [ITS].'" Doc. 85 at 29 (citing *Bernhardt*, 982 F.3d. at 744). Doc. 85 at 28. This distinction is legally wrong.

The Findings and Recommendations err by misconstruing the Ninth Circuit's requirements regarding mitigation measures. *Bernhardt*, 982 F.3d. at 743-744.  Mitigation measures must constitute (1) a clear, definite commitment of

21

resources; *and* (2) be enforceable. "Mitigation measures must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise—enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987)). The Magistrate's findings err because while the Terms and Conditions incorporation into the Incidental Take Statement do indeed make mitigation measures enforceable, enforceability also depends on the specificity of the mitigation measure.

The Ninth Circuit has rejected reliance on uncertain and contingent mitigation measures, requiring instead that measures evaluated as part of the action have a "clear, definite commitment of resources for future improvements." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 935-36(9th Cir. 2008).

> An indefinite mitigation measure is less likely to trigger re-consultation because it will be difficult to know at which point or whether the action agency has failed to comply. For this reason, measures that are too vague, or do not commit resources, or are otherwise insufficiently integrated into the proposed action are *generally unenforceable* under the ESA, and thus cannot be properly relied upon.

*Bernhardt*, 982 F.3d*.* at 744 (emphasis added). In other words, a non-specific, indefinite mitigation measure undermines its enforceability, which is why the Ninth Circuit requires *both* specificity and enforceability.

While Terms and Conditions are made enforceable through reinitiation and liability for unauthorized takings under the ESA, if the Terms and Conditions are too indefinite or lack detail, as they were in the Mud Creek Project, agencies like the Forest Service can skirt enforcement actions. "The generality of the mitigation measures makes it difficult to determine the point at which the action agency may renege on its promise to implement these measures." *Bernhardt*, 982 F.3d. at 747.

Plaintiffs properly raise a the issue of vague and unenforceable mitigation measures in their amended complaint, opening brief, and reply brief, and the Court should reject the Magistrate's findings that *Bernhardt* is inapt and rule for Plaintiffs on this claim.

### 1. Term and Condition B is plainly vague and unenforceable.

As discussed above, the Findings and Recommendations dismiss Plaintiffs' arguments regarding Term and Condition B, but this Court should reach the same conclusion as the Ninth Circuit in *Bernhardt*: the mitigation measures in the Mud Creek Biological Opinion violate the ESA because they are so vague and indefinite. For example, Term and Condition B, incorporated in the body of the Biological Opinion as a mitigation measure, specifically states:

> The Forest will determine if road conditions are in danger of being degraded to the point where there is a high risk of sediment deposition to streams. The Forest will temporarily suspend haul or other use or until natural conditions are again conducive to use without creating sediment inputs to project area streams.

FWS0000054. Without more criteria or a description of conditional triggers, these are the types of "generalized contingencies" that make for unenforceable mitigation measures in the Ninth Circuit. *Bernhardt*, 982 F.3d at 743. As Plaintiffs' briefing extensively discusses, the Forest's determination that "road conditions are in danger of being degraded" muddies the line for when the Forest Service does not comply and reinitiation of consultation should occur. 50 CFR 402.16. In addition, 'until corrective actions can be implemented' amounts to a similar measure in *Bernhardt*, where the Ninth Circuit faulted FWS because "[t]he few concrete strategies provided are offered only as *examples* of possible strategies that could be taken, "in the event that encounters occur." It is unclear what will. . . .commit the action agency to carrying out any of the mitigation measures listed in the examples provided." *Bernhardt*, 982 F.3d at 747. Without definite criteria, the Forest Service and FWS cannot determine whether "the terms and conditions are not adhered to," or when "the level of incidental take anticipated in the biological opinion may be exceeded." FWS000055.

### 2.  Term and Condition C was properly raised and is also vague and unenforceable.

The Magistrate's findings also conclude that Plaintiffs' arguments regarding Term and Condition C and specifically the "analogy to *Bernhardt* is inapt, and Plaintiffs' argument is unpersuasive." Doc. 85 at 29. The Findings and Recommendations conclude "the scope of Plaintiffs' claims regarding Project

RPMs and other alleged 'mitigation measures' is significantly expanded in their reply brief. On reply, Plaintiffs develop their arguments on mitigation measures to include additional Terms and Conditions[.]" *Id*. But again, a close review of Plaintiffs' opening brief demonstrates that these claims were properly raised throughout the briefing. For example, Plaintiffs' argue that "[m]any of the design features are vague or difficult to enforce[,]" and go on to explain in the next paragraph that "term and condition C states 'The Forest will devise and implement a long-term solution to minimize the perpetual sediment delivery of the miles of FR 468 within the Nez Perce Fork RHCA prior to the initiation of the third implementation unit (Blue Joint).'" Doc. 56 at 28-29. And Plaintiffs' reply makes the same argument, raising that Term and Condition C's "promise to come up with a 'long-term solution' in the future is a 'noncommittal assurance[] that cannot shoulder the government's burden to identify a clear, definite commitment of resources.'" Doc. 73 at 26 (quoting *Bernhardt* at 746).

Thus, Plaintiffs analogy to *Bernhardt* is apt, and Plaintiffs' arguments properly raised Terms and Condition C in relation to *Bernhardt* in both their opening and reply briefs, and the Magistrate's findings are in error.

## CONCLUSION

Based on the foregoing objections, the Court should reject the Findings and Recommendations and grant summary judgment in favor of Plaintiffs on all claims.

Respectfully submitted this 14th day of October, 2025.

/s/ Oliver Wood
OLIVER WOOD LAW, PLLC

/s/ Alizabeth A. Bronsdon
BRONSDON LAW FIRM, PLLC

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 6,500 words in accordance with Local Rule 72.3(b). I relied on Microsoft Word to obtain the word count.

Respectfully submitted this 14th day of October, 2025.

/s/ Oliver Wood
OLIVER WOOD LAW, PLLC

/s/ Alizabeth A. Bronsdon
BRONSDON LAW FIRM, PLLC

*Attorneys for Plaintiffs*